ORIGINAL

E-filing

1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name  _Moyers_      _Raul_        _NONE_
          (Last)      (First)        (Initial)

3                              **FILED**

   Prisoner Number  _E-17403_

4  Institutional Address  _P.O. Box 689   F-252L_    MAR 28 2008

5  _Soledad, CA 93960-0689_   RICHARD W. WIEKING
                                CLERK, U.S. DISTRICT COURT
                        NORTHERN DISTRICT OF CALIFORNIA

6

7                **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**

8  _RAUL MOYERS_      CV
   (Enter the full name of plaintiff in this action.)

9                    08      1707

           vs.

10 _B. CURRY, Warden_      Case No. _____
                       (To be provided by the clerk of court)  **PJH**

11 _____   **PETITION FOR A WRIT**
                       **OF HABEAS CORPUS**

12 _____

13 _____   **(PR)**

14 (Enter the full name of respondent(s) or jailer in this action)

15

16               **Read Comments Carefully Before Filling In**

17 **When and Where to File**

18      You should file in the Northern District if you were convicted and sentenced in one of these

19 counties:  Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23      If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located.  If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined.  Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS      - 1 -

1 <u>Who to Name as Respondent</u>

2       You must name the person in whose actual custody you are. This usually means the Warden or

3 jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4 you are imprisoned or by whom you were convicted and sentenced. These are not proper

5 respondents.

6       If you are not presently in custody pursuant to the state judgment against which you seek relief

7 but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8 custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9 was entered.

10 <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11       1. What sentence are you challenging in this petition?

12             (a)    Name and location of court that imposed sentence (for example; Alameda

13                   County Superior Court, Oakland):

14       <u>Los Angeles County Superior</u>    <u>Los Angeles, CA</u>

15                   Court                          Location

16             (b)    Case number, if known  <u>A593540</u>

17             (c)    Date and terms of sentence <u>4/21/89, 25 years to life +2 years</u>

18             (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                   parole or probation, etc.)        Yes <u>X</u>    No ____

20                   Where?

21                   Name of Institution: <u>CTF Central</u>

22                   Address: <u>Soledad, CA  93960-0689</u>

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 challenging more than one sentence, you should file a different petition for each sentence.)

26 <u>Does not apply, Petitioner is challenging parole</u>

27 <u>suitability denial.</u>

28 _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

1    3. Did you have any of the following?  *Does not apply.*

2        Arraignment:                    Yes *N/A*    No *N/A*

3        Preliminary Hearing:          Yes *N/A*    No *N/A*

4        Motion to Suppress:          Yes *N/A*    No *N/A*

5    4. How did you plead?

6        Guilty _____    Not Guilty _X_   Nolo Contendere _____

7        Any other plea (specify) _*None*_____

8    5. If you went to trial, what kind of trial did you have?

9        Jury _X_    Judge alone_____   Judge alone on a transcript _____

10   6. Did you testify at your trial?            Yes *N/A*   No *N/A*

11   7. Did you have an attorney at the following proceedings:

12      (a)   Arraignment            Yes *N/A*   No *N/A*

13      (b)   Preliminary hearing     Yes *N/A*   No *N/A*

14      (c)   Time of plea           Yes *N/A*   No *N/A*

15      (d)   Trial                 Yes *N/A*   No *N/A*

16      (e)   Sentencing            Yes *N/A*   No *N/A*

17      (f)   Appeal               Yes *N/A*   No *N/A*

18      (g)   Other post-conviction proceeding   Yes *N/A*   No *N/A*

19   8. Did you appeal your conviction?        Yes *N/A*   No *N/A*

20      (a)   If you did, to what court(s) did you appeal?

21           Court of Appeal          Yes *N/A*   No *N/A*

22           Year: _N/A_    Result: _N/A_____

23           Supreme Court of California    Yes *N/A*   No *N/A*

24           Year: _N/A_    Result: _N/A_____

25           Any other court          Yes *N/A*   No *N/A*

26           Year: _N/A_    Result: _N/A_____

27

28      (b)   If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS    - 3 -

1    petition?    Yes _N/A_    No _N/A_

2    (c)    Was there an opinion?    Yes _____    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4    Yes _N/A_    No _N/A_

5    If you did, give the name of the court and the result:

6    _Does not apply to this petition._

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?    Yes _____    No _X_

10    [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition. You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17    questions for each proceeding. Attach extra paper if you need more space.

18    I.    Name of Court: _Does not apply._

19    Type of Proceeding: _____ " _____

20    Grounds raised (Be brief but specific):

21    a. _Does not apply_

22    b. _____ ' ' _____ ' ' _____

23    c. _____ ' ' _____ ' ' _____

24    d. _____ ' ' _____ ' ' _____

25    Result: _____ ' ' _____ ' ' _____ Date of Result: _" '_

26    II.    Name of Court: _Does not apply._

27    Type of Proceeding: _____ ' ' _____

28    Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS    - 4 -

1    a._____

2    b._____

3    c._____

4    d._____

5    Result: _____Date of Result:_____

6    III.    Name of Court: _Does not apply._____

7    Type of Proceeding: _____

8    Grounds raised (Be brief but specific):

9    a._____

10   b._____

11   c._____

12   d._____

13   Result: _____Date of Result:_____

14   IV.    Name of Court: _Does not apply._____

15   Type of Proceeding: _____

16   Grounds raised (Be brief but specific):

17   a._____

18   b._____

19   c._____

20   d._____

21   Result: _____Date of Result:_____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                 Yes _____    No _X_

24   Name and location of court: _None_____

25   **B. GROUNDS FOR RELIEF**

26   State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

1  need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5       Claim One: _See attached petition._

6       _____

7       Supporting Facts: _See attached petition._

8       _____

9       _____

10      _____

11      Claim Two: _See attached petition._

12      _____

13      Supporting Facts: _See attached petition,_

14      _____

15      _____

16      _____

17      Claim Three: _See attached petition._

18      _____

19      Supporting Facts: _See attached petition,_

20      _____

21      _____

22      _____

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25      _None_

26      _____

27      _____

28      _____

PET. FOR WRIT OF HAB. CORPUS          - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4    _____ *See attached petition.* _____

5    _____     ι ι          ι ι          _____

6    _____     ι ι          ι ι          _____

7    Do you have an attorney for this petition?                    Yes_____    No $\underline{X}$

8    If you do, give the name and address of your attorney:

9    _____ *Does not apply.* _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on _3/25/08_

14              Date                          Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 7 -

S154637

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re RAUL MOYERS on Habeas Corpus

The petition for writ of habeas corpus is denied.

George, C. J., was absent and did not participate.

**SUPREME COURT**
**FILED**

JAN **3 0** 2008

Frederick K. Ohlrich Clerk

_____
Deputy

**BAXTER**
_____
Acting Chief Justice

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

In re

RAUL MOYERS,

on

Habeas Corpus.

B199834

(Los Angeles County
Super. Ct. No. A593540)

ORDER

COURT OF APPEAL - SECOND DIST.
F I L E D

JUL  3 - 2007
JOSEPH A. LANE _____ Clerk
V. GRAY _____
Deputy Clerk

BY THE COURT:

The petition for writ of habeas corpus, filed June 18, 2007, has been read and
considered and is denied. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 653-654; *In re
Dannenberg* (2005) 34 Cal.4th 1061, 1070-1071, 1098.)

# *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| Date: | APRIL 16, 2007 | | | |
|---|---|---|---|---|
| Honorable: STEVEN R. VAN SICKLEN | | Judge | J. PULIDO | Deputy Clerk |
| NONE | | Bailiff | NONE | Reporter |

|  | (Parties and Counsel checked if present) |
|---|---|
| BH 004225 | |
| In re, | |
| RAUL MOYERS, | Counsel for Petitioner: |
| Petitioner, | |
| On Habeas Corpus | Counsel for Respondent: |

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on April 24, 2006 in San Luis Obispo County Superior Court and transferred to this Court on September 28, 2006. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on April 28, 1989 after a conviction for first degree murder. He was sentenced to 27 years to life. His minimum parole eligibility date was July 2, 2006. The record reflects that on June 25, 1988, petitioner and his wife separated. Petitioner was not happy about the separation. He met his wife on June 29 at a public park to talk. He then shot her several times. She was killed by a gunshot wound to the chest.

The Board found petitioner unsuitable for parole after a parole consideration hearing held April 12, 2006. Petitioner was denied parole for five years. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on his commitment offense.

The Court finds that there is some evidence to support the board's finding that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1).) Petitioner shot his wife in the early evening in a public park in the vicinity of many other people, any of whom could have been injured. The Board found that petitioner is lacking in insight into the crime (Reporter's Transcript, April 12, 2006).

The record reflects that the Board also based its decision to deny parole at this time on petitioner's unstable social history. (Cal. Code Regs., tit. 15, §2402, subd. (c)(3).) The Board found that petitioner had an unstable social history due to his "significant substance abuse problem that impacted his life in various ways, including that he had been drinking at the time of the commitment offense." (RT, p. 56). Additionally, he received an undesirable discharge from the army for going AWOL in order to drink with friends. Despite these problems with alcohol, petitioner denied being an alcoholic when questioned by the Board. His psychological

1

| Minutes Entered |
|---|
| 04-16-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | APRIL 16, 2007 | | | |
| Honorable: STEVEN R. VAN SICKLEN | | Judge | J. PULIDO | Deputy Clerk |
| NONE | | Bailiff | NONE | Reporter |

|  | (Parties and Counsel checked if present) |
|---|---|
| BH 004225<br>In re,<br>RAUL MOYERS,<br>Petitioner,<br>On Habeas Corpus | Counsel for Petitioner:<br><br>Counsel for Respondent: |

report indicated that alcohol use is a risk factor and precursor to violence. (Id at.57.) Therefore, there is some evidence to support the Board's conclusion that petitioner is unsuitable for parole based on his unstable social history.

The Court finds that there is some evidence to support the Board's decision to deny parole for five years. The Board found that petitioner was lacking in any insight into the commitment offense that would indicated that he "understands the nature and magnitude of the offense." (Cal. Code Regs., tit. 15, §2402, subd. (d)(3).) The Board found petitioner's version of the murder "flies in the face of common sense." (RT, 58). Where guilt is uncontested, petitioner's version of the events may be some evidence he lacks remorse and understanding of the nature and magnitude of the offense. (*In re McClendon* (23004) 113 Cal.App.4th 315, 322.) Additionally, the Board was concerned with his continued denial of his substance abuse problem. (Id at 59.) There is some evidence to support the Board's conclusion that petitioner requires more programming to gain insight and understanding into the magnitude of his offense.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to send notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Raul Moyers
E-17403
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689

Department of Justice
Office of the Attorney General of the State of California
Gregory J. Marcot, Deputy Attorney General
110 West A. Street, Suite 1100
San Diego, CA 92101

| Minutes Entered |
|---|
| 04-16-07 |
| County Clerk |

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES**<br>COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012<br>PLAINTIFF/PETITIONER:<br><br>RAUL MOYERS | Reserved for Clerk's File Stamp<br>**CONFORMED COPY**<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>**MAY 1 0 2007**<br><br>John A. Clarke, Executive Officer/Clerk<br>By _____, Deputy |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004225 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time            ☑ Order re: Writ of Habeas Corpus
☐ Order to Show Cause            ☐ Order Show Cause & Appointment of Counsel
☐ Order for Informal Response       ☐ Order re:
☐ Order for Supplemental Pleading   ☐ Copy of

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

May 10, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
         Joseph M. Pulido

Raul Moyers
E-17403
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689


Department of Justice
Office of the Attorney General of the State of
California
Gregory J. Marcot, Deputy Attorney General
110 West A. Street, Suite 1100
San Diego, CA 92101

Comes now, Raul Moyers, Petitioner in pro se, and hereby petitions this Honorable Court for a writ of habeas corpus on Petitioner's Parole Board Hearing, held on April 12, 2006.

I.
STATE AND FEDERAL CLAIM NUMBER ONE.
CALIFORNIA PENAL CODE SECTION §3041(a)(b) CREATES A PROTECTABLE LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A REASONABLE EXPECTATION OF A PAROLE RELEASE DATE. THE COMMANDING WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

II.
STATE AND FEDERAL CLAIM NUMBER TWO
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a), WHEN THEY DENIED PAROLE BY INCORRECTLY APPLYING "SOME EVIDENCE" TO BOOTSTRAP THEIR DENIAL OF SUITABILITY FOR RELEASE ON PAROLE.

III.
STATE AND FEDERAL CLAIM NUMBER THREE
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a), BY MIS-APPLYING SOME EVIDENCE AND APPLYING ARBITRARY AND CAPRICIOUS CONCLUSIONS TO DENY PAROLE.

IV.
STATE AND FEDERAL CLAIM NUMBER FOUR
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a), BY USING UNCHANGING FACTORS TO DENY PAROLE, AND BY NOT ACCURATELY APPLYING TITLE 15 C.C.R. §2402 "COLD BLOODED MURDER".

V.
STATE AND FEDERAL CLAIM NUMBER FIVE
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, 7(a), WHEN THEY FAILED TO CONSIDER A PAROLE RELEASE DATE UNDER P.C. Section §3041(a), (SEPARATE AND DISTINCT TREATMENT OF A "CLASS OF ONE").

VI.
STATE AND FEDERAL CLAIM NUMBER SIX
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a), BY PREJUDGING AND PREDETERMINING THE OUTCOME OF PETITIONER'S PAROLE SUITABILITY HEARING.

ii

STATE AND FEDERAL CLAIM NUMBER ONE (I)
CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PROTECTABLE LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A "REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

Under California law, a convicted person sentenced to a term of 15/25 years 'to life' shall be released on parole unless his release would pose an unreasonable risk to public safety or unreasonable risk to society if released from prison. Cal. P.C. §3041(a)(b); Cal. Code of Regs., Title 15, §§2400-2411.

### DUE PROCESS IN THE PAROLE CONTEXT

The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of life, liberty, or property without due process of law. United States Constitutional Amendments, V, XIV.

It is now settled that California parole scheme, codified in California Penal Code section §3041, vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007) (citing Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillon v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002)).

Under the "clearly established" framework of Greenholtz and Allen, we hold that California's parole scheme gives rise to a cognizable liberty interest on parole. The scheme "creates a presumption that parole release will be granted" unless the statutorily defined determinations are made." Allen, 482 at 378 (quoting Greenholtz, 442 U.S. at 12). In, In re Deluna, 126 Cal.App.4th 585, 24 Cal.Rptr.3d 643 (2005), held that under Rosenkrantz and McQuillon, parole applicants continue to have a "liberty interest" in parole release.

//

//

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II.

STATE AND FEDERAL CLAIM NUMBER TWO.
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL
PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S.
CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec.
7(a), WHEN THEY DENIED PAROLE BY INCORRECTLY APPLYING "SOME
EVIDENCE" TO BOOTSTRAP THEIR DENIAL OF SUITABILITY FOR RELEASE
ON PAROLE.

The Superior Court's denial, a denial on the merits, based on "some evidence"

is contrary to and an unreasonable application of U.S. Supreme Court law, and,

is contrary to California Evidence Code §115, as set forth within.

First, under the Merriam-Webster Dictionary, Eleventh Edition, "Modicum":

a small amount. "Some": a certain number or amount. However, "Preponderance"

is defined as: having greater weight, force, influence, or frequency.

Petitioner asserts that, the "some evidence" standard espoused in

Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455, 105 S.Ct. 2768,

86 L.Ed.2d 356 (1985), is not the authority under California law. Under the

holdings in Jurasek v. Utah State Hospital, 158 F.3d 506 (10th Cir. 1998) (Sister

Court), the state may confer more comprehensive due process protections upon

its citizens than does the federal government.

Petitioner relies on California Evidence Code Sec. §115, under "PREPONDERANCE

OF EVIDENCE" standard, (the 'mimimum' evidence standard in California), where,

the preponderance of evidence is to be applied to situations where there is no

evidence standard set. (Such as parole suitability hearings).

Therefore the State of California has conferred more, or a greater, evidence

standard upon the Board, by making the 'minimum' evidence standard "preponderance

of evidence", rather than that espoused in Hill, supra, i.e., "some evidence".

Hill, supra, derived the "some evidence" standard from Powell, relating

only to a disciplinary hearing. Hill, addresses, at page 2774; "requiring a

modicum of evidence to support a decision to revoke good time credits." (Emphasis

added).

2

1

2

At page 2774: [3]: "We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits." (Emphasis added).

3

4

"This standard is met if there was some evidence from which the conclusion of the administrative tribunal could be deduced..." United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S., at 106, 47 S.Ct., at 304.

5

6

7

8

9

Citing Hill, the U.S. Supreme Court recently explained in a plurality opinion that it had utilized the "some evidence" standard not as a standard of proof, but rather as a standard of review when examining an administrative record developed after an adversarial proceeding. Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 2651, 159 L.Ed.2d 578 (2004), n.8.

10

11

12

13

14

15

"We agree with the prevailing view and conclude that Hill addressed only the appropriateness of "some evidence" as a standard of appellate review, not a standard of proof. Therefore, we now seek to detemine through our own analysis the appropriate fact-finding standard to be used by the DOC. To determine whether a standard of proof in a particular type of proceeding satisfies due process, the Supreme Court has prescribed a three-factor test that examines: (1) the private interest affected, (2) the risk of erroneous deprivation of such interest, and (3) the government's interest. Matthews v. Eldridge, 424 U.S. 319, 335, 47 L.Ed.2d 18, 96 S.Ct. (1976).

16

17

In Carrillo, Supreme Court of Minnesota, 710 N.W.2d 763, 2005 Minn. LEXIS, 424, Filed July 28, 2006, that court relying on Eldridge and Hamdi, held that:

18

19

20

21

22

23

"Taking the Supreme Court's three factors into consideration we conclude that the "some evidence" standard is inappropriate for use by the DOC at the fact-finding level. We conclude that the "preponderance of evidence" standard better protects against an erroneuos deprivation of an Inmate's liberty interest in his supervised release date and does not impose an unacceptable burden on the DOC. Therefore, we conclude that a DOC hearing officer must find by a preponderance of the evidence that Carrillo has committed a disciplinary offense before the commissioner can extend the date of his supervised release. Accordingly, we hold that the district court and the court of appeals erred when they denied Carrillo's petition for writ of habeas corpus."

24

25

26

27

The State of California, by Legislative intent, has conferred more, or a greater, evidence standard upon the Board, by making the 'minimum' evidence standard 'preponderance of evidence', rather than that espoused in Hill, i.e., "some evidence".

28

Petitioner contends that a reasonable understanding of the holding in Hamdi,

3

1  supra, is that a court will apply the "some evidence" standard to review records
2  to see if there was proof under the preponderance of evidence standard, not that
3  the record of the executive decision maker's only required "some evidence" of
4  proof as claimed by the Superior Court, when they applied "some evidence" to
5  determine a standard of proof rather than a standard of review to determine if
6  there was a preponderance of evidence in the record to support the denial of
7  suitability. The Superior Court incorrectly applied "some evidence" as a standard
8  of proof to support denial of suitability for parole. Thus their decision was
9  contrary to and an unreasonable application of U.S. Supreme Court law.

10  Petitioner's due process and equal protection rights were violated when
11  the defunct minimally necessary evidence standard, under "some evidence", was
12  applied in place of preponderance of evidence as is mandated by California
13  Evidence Code §115: The second paragraph of §115 reads as follows: "Except as
14  otherwise provided by law, the burden of proof requires proof by a preponderance
15  of evidence.", see also, U.S. Supreme Court precedents.

16                                         III.
                           STATE AND FEDERAL CLAIM NUMBER THREE
17                 THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL
                   PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S.
18                 CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec.
                   7(a), BY MIS-APPLYING SOME EVIDENCE AND APPLYING ARBITRARY
19                 AND CAPRICIOUS CONCLUSIONS TO DENY PAROLE.

20  Petitioner will herein establish that the Board's conclusions were arbitrary
21  and capricious at the least, and do not meet the "some evidence" principle derived
22  from a "preponderance of evidence" in denying parole.

23  Petitioner's "psychological Evaluation and Life Prisoner Evaluation" will
24  more than establish how Petitioner has changed for the better and rehabilitated
25  himself in the past 18 years, and is suitable for parole.

26  Petitioner will herein list each of the arbitrary and capricious conclusions
27  by the Board and then list the substantiated suitability documentation prepared
28  by, (1) a California Clinical Board Certified Psychologist, and, (2) a qualified

                                          4

1 | (CDC) Correctional Counselor.

2 | The Board's Unsubstantiated Conclusions

3 | Parole Transcripts, Exhibit "A", at p.55: Inmate Moyers would pose an
4 | unreasonable risk to society or a threat to public safety. (Note; No where
5 | supported in the record).

6 | Parole Transcripts, Exhibit "A", at p.56: Instability in inmate Moyers social
7 | history. (Note: If this were true, it was 18 years in the past).

8 | Parole Transcripts, Exhibit "A", at p.57: Significant risk factors and
9 | precursors to violence. (Note: No where supported in the record).

10 | Parole Transcripts, Exhibit "A", at p.60: "You really haven't been doing
11 | any work in the area of self-help." (Note: Petitioner has over 30 self-help
12 | chronos ranging from 1994 to the present date).

13 | The following statements and conclusions from Petitioner's Psychological
14 | Evaluation and Life Prisoner Evaluation, will substantiate the facts of why
15 | Petitioner should be given a parole date.

16 | Psychological Evaluation, Exhibit "B", at pp.1-5:

17 | **SUMMARY**

18 | In considering Petitioner's potential for dangerous behavior in the
19 | institution, he remains entirely disciplinary - free. He has changed a great
20 | deal in the past 18 years. Petitioner has grown in self-awareness, maturity,
21 | positive direction in his life, and self-control. As a result, his potential
22 | for dangerous behavior is definitely below average in comparison to other inmates.
23 | (Emphasis added).

24 | In considering his potential for dangerous behavior if released to the
25 | community, the level of Service Inventory-Revised, was administered. This is
26 | an actual measure that assesses criminal background, substance abuse history,
27 | academic and vocational achievment, family relationships and other factors.
28 | Petitioner's score places him at the GAF-80 percentile in comparison to other

5

1   prison inmates. This means that if 100 inmates were released on parole, he would

2   do better than 80% of other parolees. In addition, his excellent institutional

3   adjustment, record of being an outstanding worker and his positive attitude,

4   would indicate that his potential for dangerous behavior in the community is

5   less compared to other inmates. In fact, based upon Petitioner's life changes,

6   his risk is below average in comparison to the other inmates.

7                  CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

8        There is no evidence of emotional problems in this case that would interfere

9   with granting parole. Petitioner does have a strong family support system in

10   the community. His thinking is markedly prosocial. There is no evidence of any

11   antisocial thinking or values. He also is a hard worker with an excellent work

12   ethic. He has viable skills that will enable him to support himself in the

13   community without any problems. He also has two (2) current job offers as well

14   as three (3) residences available to him.

15               Life Prisoner Evaluation, (Exhibit "C", at pp.1-5):

16        Petitioner, "has maintained relatively steady assignments and had programmed

17   overall in a positive manner."

18        "He has attended AA group sessions and Impact Self-Help programs."

19        "During his incarceration, he has only received "one" (1) CDC-128A, had

20   one CDC-128A for failure to report on 10/21/94. He has no CDC-115's". See also,

21   (Exhibit "A", at p.37).

22        "It is also reflected in the POR of the Central File, that his children

23   harbor no animosity towards inmate Moyers which would also help to make his

24   transition easier from prison."

25        Petitioner asserts that, he will have a very strong support structure to

26   help assure his successful reintegration into mainstreem society, as is

27   established in the Life Prisoner Evaluation Report sections "A" Residence and

28   "B" Employment. (Exhibit "C" at, p.3) and (Exhibit "D").

1      Petitioner has five (5) family members that will positively support him

2  in any area he needs to sustain parole and lead a law abiding life. Petitioner

3  also has confirmed employment to help him re-enter society.

4                        PETITIONER'S SELF-HELP

5      Parole Transcripts, (Exhibit "A", at p.48): The Board stated that inmate

6  Moyers has not participated in self-help.

7      Petitioner asserts that; As stated in his Pyschological Evaluation (Exhibit

8  "B", at p.2), he has been very active in Alcoholics Anonymous and has strong

9  Biblical values.

10     Parole Transcripts, (Exhibit "A", at P.55): The Board referring to

11  Petitioner's Psychological Evaluation stated that Petitioner was in "Institutional

12  Remission." (I.e., alcohol/drug abuse).

13     Petitioner asserts that; He has chosen not to drink alcohol or use illegal

14  narcotics. It is well establioshed in the CDC prison system that alcohol and

15  narcotics are readily, if not abundently, available, as Title 15 C.C.R.

16  regulations have a violation (§3016) on this matter.

17            PETITIONER'S VOCATIONS AND SELF-HELP

18     Exhibit "A", pp.32-36; at p.32: "Your vocational training includes Vocational

19  Computer Technology, as well as Computer Refurbishing all the way from, looks

20  like from 1995 to the present date."

21     Exhibit "A", pp.33-35: Establish that Petitioner has numerous certificates

22  in Computer Technology, Computer Refurbishing (Repair), Book-keeping, Accounting,

23  Workshop for Literacy Tutoring, Teachers Aid and many more. To quote Commissioner

24  Perez: "This is your work history, and these are all above-average and

25  satisfactory scores."

26     Petitioner has attended and participated in AA/NA from 1994 to this present

27  date, and has numerous certificates and commendments for his participation in

28  his self-help group.

1   Petitioner has made excellent strides while he has been incarcerated and
2   will continue to do so when released from prison.

3   Petitioner has a sincere remorse for the life he took and will forever hold
4   himself accountable for the adverse effects the crime had on the victim's family
5   and on his own. Petitioner's intention was not to take a life that tragic day,
6   but to reconcile his marriage. He accepts responsibility and is focused on
7   reunification with his family and other successful people.

8   Petitioner contends that, the BPH panel (Commissioner Fisher) made several
9   comments throughout the parole suitability hearing as to Petitioner's involvement
10  in Alcoholics Anonymous (AA). In particular, (Exhibit "A", at p.39): "Do you
11  know the 12 steps?" "How many of them do you know?"

12  The BPH panel based part of its unsuitability for the parole decision, (See,
13  Exhibit "A", at p.59), on Petitioner's involvement in Alcoholics Anonymous (AA).
14  This is a violation of Petitioner's United States Constitutional Right of due
15  process and equal protection under the Fourteenth Amendment as it pertains to
16  the First Amendment. (See, Exhibit "E").

17  In the case of Turner v. Hickman, 342 F.Supp.2d 887 (E.D. Cal. 2004), the
18  Court ruled that requiring a California life prisoner to attend Narcotics
19  Anonymous (NA), or, Alcoholics Anonymous (AA) as a predicate for parole
20  constitutes a state establishment of religion prohibited by the First Amendment.
21  Furthermore, the court enjoined the Board of Prison Terms (BPT) from ever imposing
22  such a requirement in the future and orders all records of past references to
23  the prisoner's failure to attend NA be expunged from his prison records. See
24  also, Lee v. Weisman, 505 U.S. 577 (1992); Kerr v. Farrey, 95 F.3d 472 (7th Cir.
25  1996); Warner v. Orange County Dept. of Probation, 115 F.3d 1068 (1997).

26  Petitioner contends that, there is nothing in the record to support the
27  Board's conclusion that Petitioner poses a risk or danger to society if released
28  on parole, but, to the contrary, a professional Psychologist/Psychiatrist came

8

1  to the conclusion that Petitioner would not pose a danger to society if released
2  on parole.

3      Petitioner's due process and equal protection rights under the U.S.
4  Constitution's Fourteenth Amendment were violated as the Board did not give
5  Petitioner a fair and impartial hearing, and, they did not take all the evidence
6  supporting suitability before them into consideration. (I.e., Psychological
7  Evaluation and Life Prisoner Evaluation.) (I.e, "individualized consideration").

8                    IV.
           STATE AND FEDERAL CLAIM NUMBER FOUR
9  THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL
   PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S.
10 CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec.
   7(a), BY USING UNCHANGING FACTORS TO DENY PAROLE, AND BY
11 NOT ACCURATELY APPLYING TITLE 15 C.C.R. §2402 "COLD BLOODED
   MURDER".
12

13     Petitioner will herein establish that his U.S. Constitutional rights of
14 due process and equal protection are continuing to be violated, by denying parole
15 to Petitioner on his commitment offense, prior conduct to the instant offense
16 and other unchanging factors. See Parole Board transcripts. (Exhibit "A", at
17 pp.26-28 & pp.55-59.)

18     Petitioner contends that, the California Court of Appeals for the Fourth
19 District has held that the Board of Parole Hearings boilerplate findings
20 characterizing the crime as "exceptionally callous disregard for human suffering",
21 committed in a "dispassionate and calculated manner" were unsupported by any
22 evidence. In In re Richard Shaputis, 37 Cal.Rptr.3d, (See, herein Exhibit "F"),
23 (attached to MOTION FOR JUDICIAL NOTICE), California Court of Appeals, Fourth
24 District, First Division, December 28, 2005. The court relied to a large extent
25 on the reasoning of In re Smith, 14 Cal.App.4th 343 (2003), and In re Scott,
26 (2004) 119 Cal.App.4th 871, 884 (Scott) stating:

27         [T]here is no evidence Shaputis "tormented, terrorized, or injured
           [his victim] before deciding to shoot [her]; or that he gratuitously
           increased or unnecessarily prolonged her pain and suffering...Was the
28         crime callous? Yes. However, are the facts of the crime some evidence

1

> that [Shaputis] acted with exceptionally callous disregard for [the
> victim's] suffering; or do the facts distinguish this crime from other
> second degree murders as exceptionally callous? No. "[Citation.]" (Id.
> at p.367).

Regarding the findings that Shaputis crime was "dispassionate or calculated",

the court found:

> The BPT's findings that Shaputis acted in a dispassionate and calculated
> manner, in addition to being inconsistent with the jury's verdict
> acquitting him of first degree murder (cf. Scott, supra, 119 Cal.App.4th
> at pp.889-890), is unsupported by (and indeed may be irrreconcilable
> with) the evidence on which BPT purported to rely. Accordingly, the
> BPT's reliance on this factor was arbitrary and capricious. (Scott,
> at pp.891-892).)

Additionally, the court found that the Board's reliance on the unsuitability

factor, "unstable or tumultous relationships" (Calif. Code of Regs., Title 15,

Division II, Art. II, Section §2402(c)(3)) to deny parole cannot justify a finding

of unsuitability unless the inmate CURRENTLY poses an unreasonable threat to

others based on some evidence of a current inability to maintain sobriety. The

court stated:

> "WE are similarly convinced the BPT's reliance on Shaputis former
> alcoholism - related violence toward his marital partner, the sole
> evidence conceivably supporting the findings he had "unstable or
> tumultous relationships" with other persons, cannot justify a finding
> that Shaputis CURRENTLY poses an unreasonable threat to others if
> released on parole, absent some evidence there is a CURRENT likelihood
> Shaputis will be unable to maintain his sobriety on the parole. In
> re Smith, supra, 114 Cal.App.4th at p.372; Cf. Biggs v. Terhune, (9th
> Cir. 2003) 334 F.3d 910, 916 [although reliance on conduct prior to
> imprisonment to justify denial of parole can be initially justified
> as fulfilling the requirements set forth by state law, where inmate
> over time continues to demonstrate exemplary behavior and evidence
> of rehabilitation, denying him a parole date simply because of the
> nature of prior conduct would raise serious questions involving his
> liberty interest in parole]; accord, Irons v. Warden of California
> State Prison - Solano (E.D. Cal. 2005) 358 F.Supp.2d 936, 947 and fn.2.

Under the holdings of Smith (Second District), Scott I & II (First District),

and Shaputis (Fourth District), the Board's boilerplate findings that every crime,

regardless of the facts, shows an "exceptionally callous disregard for human

suffering" and/or committed in a "dispassionate and/or calculated" manner cannot

be sustained.

10

These labels, placed on virtually every crime (through the use of form/rote language) by the Board, cannot be rubber stamped simply because any life crime is an offensive, antisocial act. The facts must be analyzed carefully before the above aggravated findings can be made.

Utilizing both Smith and Shaputis, the Board's reliance on an individual's former lifestyle, including drug and alcohol addiction, certainly may be argued to be arbitrary in cases where no evidence suggests a **CURRENT** inability to maintain sobriety. As the Shaputis court observed:

> [T]he Bpt's conclusion Shaputis remained a danger to society, to the extent it was premised on a former lifestyle that all of the evidence showed was a historical relic, is so lacking in any medical, psychological or behavorial evidentiary support that it is arbitrary and capricious, within the differential standards articulated by Rosenkrantz, 29 Cal.4th 616.

A prisoner's use of drugs is not appropriate consideration in determining parole suitability. See, In re Smith, 109 Cal.App.4th 489, 505.

The First, Second and Fourth District Courts of Appeal have now published cases chipping away at the foundation of the Board's policy of denying parole on the rote/form generalizations and boilerplate findings. Ironically, in spite of these courts decisions the Board seems just as resolute as ever to deny parole based on the crime, criminal priors, any type of ancient social history involving drugs or alcohol. The Board still refuses to recognize the Biggs principles (familiar to readers as a due process denial when the crime and other unchanging factors are repeatedly used as a basis to deny parole in light of strong evidence of rehabilitation).

In the case of Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1065, 1070. The court reasoned in pertinent part: "While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances — after nearly two decades of incarceration and a half dozen parole suitability

1 | hearings – violates due process because petitioner's commitment offense has become
2 | such an unreliable predictor of his present and future dangerousness that it
3 | does not satisfy the 'some evidence' standard. After nearly twenty years of
4 | rehabilitation, the ability to predict a prisoner's future dangerousness based
5 | simply on the circumstances of his or her crime is nil." (Id. at p.1084). See
6 | also, Martin v. Marshall (2006) 431 F.Supp.2d at pp.1040-1042, of which, this
7 | case involved multiple victims; Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003).

8 | Furthermore, Petitioner's offense is no more callous, heinous, atrocious
9 | or cruel than the following recent cases from the appellate courts of California.

10 | In the decision by the Second Appellate Court of California, Division Eight,
11 | in the case of Wen Lee, (2006) 49 Cal.Rptr.3d 931. Lee went armed with a gun
12 | and a box of ammunition. He had decided that if Soong refused to pay, he would
13 | kill Soong and then himself. Lee drove 15 minutes to the restaurant and asked
14 | Soong for his money. Soong shook his head and said he did not have time to talk.
15 | Lee pulled out his gun and fired five times before the gun jammed. He hit Soong
16 | twice, who survived the shooting, but one of the bullets hit Soong's wife in
17 | the head, killing her. (Note: Two (2) victims and five (5) shots fired). Lee
18 | was sentenced to Second degree murder.

19 | At pp.937-938, the court stated that: "...they were not "atrocious", or
20 | at least were no more atrocious than whenever one human being kills another –
21 | and were not committed "in an especially heinous, atrocious or cruel manner."
22 | The measure of atrociousness is not general notions of common decency or social
23 | norms, for by that yardstick all murders are atrocious. (See, In re Scott, supra,
24 | 119 Cal.App.4th at p.891, "All second degree murders by definition involve some
25 | callousness – i.e., lack of emotion or sympathy, emotional insensitivity,
26 | indifference to the feelings, and suffering of others"). Rather, the inquiry
27 | is whether among murders, the one committed by Lee was particularly heinous,
28 | atrocious or cruel. (In re Ramirez (2001), 94 Cal.App.4th 549, 570, disapproved

on another point by In re Dannenberg (2005), 34 Cal.4th 1061, 1082-1083, 1100). By that measure, Lee's crimes were more commonplace than egregious."

"Comparing Lee to defendants for whom the Board or Governor properly denied parole because the defendants crimes were atrocious is illuminating". Rosenkrants, 29 Cal.4th at p.678; In re Dannenberg, supra, 34 Cal.4th at p.1095; In re McClendon, (2003) 113 Cal.App.4th 315 at pp.321-322; In re Burns, (2006) 136 Cal.App.4th 1318 at pp.1327-1328; In re Van Houten, (2004) 116 Cal.App.4th 339, at pp.346, 351, 366; In re Deluna, (2005) 126 Cal.App.4th 585 at p.593; In re Lowe, 130 Cal.App.4th 1405 at p.1414; In re Morrall, (2002) 102 Cal.App.4th 280.

Petitioner contends that, in the above case of Wen Lee and the following case of Weider, the State of California has established what offenses and their circumstances constitutes the terminology of "especially or exceptionally callous, particularly egregious, heinous, atrocious or cruel." Wen Lee or Weider did not fall under these categories and neither does Petitioner's commitment offense.

In a most recent decision, December 6, 2006, by the Sixth Appellate District Court of California, 2006 DJDAR 15795, In re Bernard John Weider. This appellate court's decision is based on the same subject matter as Petitioner's, in that Weider was denied parole based on the Board's determination that the commitment offense was carried out in an especially cruel or callous manner.

In summary of the commitment offense, Weider and his wife Susan separated and she moved in with a man named George Laird. Two years after the separation Weider stopped at a restaurant to get something to eat. Weider's wife Susan and Laird were there and an argument ensued. Weider went to his car and retrieved a .380 caliber handgun and returned to the restaurant, where Weider fired the gun twice at Laird and missed. Laird ran behind the bar and Susan wrestled with Weider. Laird came back to the front of the restaurant, grabbed a bottle from the bar, and hit Weider over the head. "laird grabbed for the gun and he and Weider struggled over it. Patrons of the bar started to help Laird, and as Weider

13

1  and Laird struggled on the floor, several shots were fired. Laird received two
2  shots, one a contact wound, at close range and died, two other patrons were shot,
3  one twice."

4      Weider was convicted of Second degree murder and two counts of assault with
5  a firearm. He was sentenced to an indeterminate term of 15 years to life.

6      At p.15800: "The only remaining factual basis for the Board's 2005 decision
7  is it's conclusion that the commitment offense was carried out in an especially
8  cruel and callous manner in that there were multiple victims, the crime was
9  carried out in a "dispassionate and calculated manner", and "showed a callous
10 disregard, if nothing else, for your community." (§2402, Subd. (c)(1)(A)(B)(D).)

11     At p.15801: "We first note that appellant rightly does not attempt to justify
12 the Board's finding that the crime was committed in a manner that showed a callous
13 disregard or lack of respect for the "community". The standard is whether the
14 crime was committed in a manner that showed, exceptionally callous disregard
15 for human suffering. (§2402, Subd. (c)(1)(D).) There is no evidence of that here."

16     "The Board's finding that the crime was "dispassionate" and "calculated"
17 does not conform to the appropriate standard either. The finding was based upon
18 evidence that Weider "took a weapon into a bar, into a public place". But in
19 deciding whether the crime was particularly heinous, atrocious, or cruel, the
20 Board is to consider whether "[t]he offense was carried out in a dispassionate
21 and calculated manner, such as an execution murder". (§2402, Subd. (c)(1)(B).)
22 The murder the Board describes is not at all like an execution-style murder.
23 The fatal wound was delivered during the struggle over the gun. And there was
24 no evidence that Weider conducted himself dispassionately. To the contrary, the
25 evidence shows that he was angry and distraught."

26     Petitioner contends that, the above entitled cases of <u>Wen Lee</u>, <u>Weider</u> and
27 <u>Rosenkrantz</u> <u>ALL</u> had the element of pre-meditation which constitutes First (1st)
28 degree murder, yet all of these persons who committed these offenses were released

1    after serving 20 years or less.

2        In the case of In re Jeffrey David Elkins, Case No. A111925, 2006 DJDAR

3    14489, California Court of Appeals, First Appellate District, Division Two. Elkins

4    beat his victim to death with a baseball bat then robbed him. At p.14492, "And

5    Mr. Elkins actions after the murder demonstrated those of a cold-blooded,

6    dispassionate killer". As described in a 1980 letter from the Alameda County

7    District Attorney's office to the probation office after the murder, Mr. Elkins

8    placed Mr. Ecklund's body in the trunk of his car, went back into his friend's

9    house, took a shower, and went many miles into the mountains, located a desolated

10    area, and dumped Mr. Ecklund's body down a steep grade.

11        At p.14497, "Rather, the decision concludes that Elkins actions after the

12    murder demonstrated those of a cold-blooded, dispassionate killer". It cites

13    Elkins going ahead to take Ecklund's wallet, money, and drugs, driving the body

14    to Donner Pass the next morning and dumping it down a steep grade, stealing from

15    Ecklund's storage unit and his girlfriend's residence over the next several days,

16    and then fleeing the state.

17        At the same page, 14497, the court concluded, "Given the lapse of 26 years

18    and the exemplary rehabilitative gains made by Elkins over that time, continued

19    reliance on these aggravating factors of the crime no longer amount to "some

20    evidence" supporting denial of parole." (Emphasis added).

21        Petitioner contends that, although his offense, tragic as it was, is not

22    of the same severity as that of Elkins, but the Board used the aggarviting factors

23    of Petitioner's crime, after 18 years of positive rehabilitation gains to deny

24    him parole.

25        Petitioner agrees that every murder is tragic and a shooting that arises

26    out of passion and stress would not normally fit the "cold blooded murder"

27    category, especially when the jury did not find this to be true in their verdict.

28        Petitioner's offense involved one victim, shot with a handgun. The murder

15

occurred as a result of an escalation in an argument. These facts do not tend to distinguish Petitioner's offense as egregious. The motive for the murder, while trivial, is a 'conventional' first degree murder.

However, "particularly egregious" means nothing more than finding elements in excess of those "minimally necessary to convict." In re Dannenberg, 34 Cal.4th 1061, 1095, 23 Cal.Rptr.3d 417, 440 (2005).

The Board never took into consideration the significant stress that Petitioner was under at the time of the offense.

Petitioner's daughter stated, at (Exbibit "A", p.57), that Petitioner had been going down hill the past few years before this crime occurred. Petitioner was also trying to reconcile his marriage.

Petitioner's commitment offense, considering the circumstances of how the crime occurred and what motivated the offense, should not be considered the same in severity as the above cases of Rosenkrantz, Wen Lee, Weider or Elkins. Therefore, the language of Title 15 C.C.R. §2402 should not and must not be applied to Petitioner.

Furthermore, the First, Second, Fourth and Sixth Appellate Courts of California have established by case law, herein, that Title 15 C.C.R. §2402 of "exceptionally callous, particularly egregious or heinous, atrocious or cruel" do not apply to offenses such as Petitioner's.

This Honorable Court must at some point in time determine when the U.S. Constitutions Fifth and Fourteenth Amendments due process violations start. One would reason that after the inmate's initial (1st) parole hearing, the crime and other unchangeable factors could not constitutionally be applied as an unsuitability factor for parole. The court would have to reason that the due process violation has become a violation of cruel and unusual punishment under the U.S. Constitutions Eighth Amendment.

As several courts have held, that continued use of unchanging factors 'could'

16

1  result in a due process violation. Petitioner submits that if there is a 'cut
2  off point' where the due process violation would 'finally' occur it would be
3  then reasonable to assume that the due process violation does occur after the
4  first (1st) usage of the unchanging factors, or automatic denials based on
5  unchangeable circumstances would become commonplace.

6      Petitioner contends that, he has been incarcerated for 18 years, he has
7  a very good record while in prison, and Petitioner has applied his rehabilitation
8  goals in a very positive manner. To continuously deny Petitioner parole because
9  of his conduct prior to imprisonment and commitment offense equates to a due
10 process violation under the U.S. Constitution's Fifth and Fourteenth Amendments
11 because Petitioner can never change the 'unchangeable' circumstances used for
12 parole suitability denials.

13     Additionally, the Board continues to deny those who fail to express adequate
14 "insight" into the causative factors of the crime or who fail to express adequate
15 remorse. This presents another legal issue for the courts to resolve: Under penal
16 Code Sec. §5011(a)(b), the Board shall not require an admission of guilt to any
17 crime as a condition of setting a parole date. Additionally, under Title 15 Sec.
18 §2236, the Board shall not require an admission of guilt, and the prisoner may
19 refuse to DISCUSS the facts of the crime. But until the Board hears adequate
20 (their level) insight and remorse articulated by the prisoner, parole will
21 continue to be denied. The Legislature created a 'right' under §5011 and the
22 Board refuses to acknowledge that right (to not discuss the case, crime or guilt).

23     Petitioner asserts that: the Board gave no reference to Petitioner's remorse,
24 or to the fact that Petitioner has taken full responsibility for what happened
25 that tragic evening.

26     To the contrary, the Board stated that Petitioner needs to come to terms
27 with what happened that evening. The fact is, there is nothing to support the
28 Board's conclusion on this matter.

17

1  Petitioner has expressed, to the Board, Clinical Psychologist and (CDC)

2  Correctional Counselor, his sorrow and deep regret for his actions that caused

3  so much pain and anguish on all persons involved in this tragedy.

4                                    V.
                     STATE AND FEDERAL CLAIM NUMBER FIVE
5        THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL
         PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S.
6        CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec.
         7(a), WHEN THEY FAILED TO CONSIDER A PAROLE RELEASE DATE
7        UNDER P.C. Section §3041(a), (SEPARATE AND DISTINCT TREATMENT
         OF A "CLASS OF ONE").

8

9      For an equal protection claim to proceed Petitioner must allege specific

10 facts in support of his claim. A habeas petitioner has the burden of alleging

11 specific facts that show a federal claim is presented, or the petition is subject

12 to dismissal. Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995). Conclusory

13 allegations do not warrant habeas relief. Id. at 204.

14     Petitioner's allegations are not conclusory, they state a prima facie equal

15 protection claim under both the California and U.S. Constitution.

16     The U.S. Constitutions Fourteenth Amendment Equal Protection Clause provides

17 that no State shall deny to any person "the equal protection of the laws." See

18 also, California Constitution Article I, Sec. 7(a). The Equal Protection Clause

19 ensures that "all persons similarly situated should be treated alike." City of

20 Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). To prevail on an

21 equal protection claim, Petitioner must initially show that he was treated

22 differently from other similarly situated persons. City of Cleburne, supra, 473

23 U.S. at 439; Fraley v. U.S. Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993).

24     The mere fact that some inmates convicted of second degree murder may have

25 been paroled sooner than Petitioner does not establish the basis for a federal

26 equal protection claim. See, Sturm v. California Adult Authority, 395 F.2d 446,

27 448-49 (9th Cir. 1967) (holding that, "the fact that other prisoners have had

28 their sentence reduced, or been granted parole, affords no ground for complaint

                                    18

1   by petitioner.")

2       However, Petitioner's equal protection claim lies elsewhere, other than

3   a mere comparison between an inmate released earlier or paroled sooner than

4   himself, as set forth herein.

5                     **EQUAL PROTECTION UNDER "CLASS OF ONE"**

6       In the case of In re MIKAEL SCHIOLD, Court of Appeals, First Appellate

7   District, Division Five, Case No. A103107, attached hereto with MOTION FOR

8   JUDICIAL NOTICE, as Exhibit "G". (With reference to numbered paragraphs).

9       Schiold was transferred to the country of Sweden, under the "SETTLEMENT

10   AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS", on habeas corpus. Schiold

11   and Respondents entered into a "SETTLEMENT AGREEMENT" transferring Schiold to

12   Sweden. (Paragraph #4 of Exhibit "G").

13       Case No. A103107 was agreed to as "stayed" pending Schiold's transfer.

14   (Paragraphs #5,6,7, of Exhibit "G").

15       Explicitly at paragraph #8 (of Exhibit "G"): "Releasor (Schiold) agrees

16   that he will be held in custody by the government of Sweden until January 1,

17   2007."

18       Page 5, paragraph #16 (of Exhibit "G"), establishes that: The agreement

19   and settlement, in order to stay the case, was signed by the Supervising Deputy

20   Attorney General, Anya Binsacca, dated 10/22/2003.

21       Petitioner asserts that the State of California in collusion with the

22   Attorney General's Office and the Board did in fact violate the equal protection

23   clause of the Fourteenth Amendment of the U.S. Constitution, and, California

24   Constitution Article I, Sec. 7(a), by "setting an immutable release date" for

25   Schiold, when his term was set without being found suitable under §3041(b) and

26   going directly to §3041(a).

27       The language in paragraph #8 of page 3 (of Exhibit "G"), of the "SETTLEMENT

28   AGREEMENT" expressly states that "he will be held in custody of the government

1  of Sweden **UNTIL** January 1, 2007." Petitioner asserts that this date, January

2  1, 2007, established a 'term setting' under §3041(a). (Emphasis added).

3      A foreign national (Schiold) is being treated distinctly different than

4  'all' U.S. Citizens in California serving a sentence of life with the possibility

5  of parole. Petitioner is being treated distinctly different than Schiold because

6  he cannot be transferred to another country, and all similarly situated prisoners,

7  thus creating separate and distinct "classes" of inmates for release criteria.

8      The fact that Schiold was found suitable by the Board is irrelevant to the

9  claim herein, as the Governor over-ruled the Board's determination and found

10  Schiold to be unsuitable, which nullified the Board's finding of suitability.

11  See, paragraphs #2,3,6 (of Exhibit "G"). Schiold's term was set at January 1,

12  2007, AND, Schiold does not have to serve any parole time after being released.

13  See, "SETTLEMENT AGREEMENT".

14      The most basic requirement for a claim of violation of equal protection

15  under the Fourteenth Amendment of the U.S. Constitution lies on the issue of

16  non-equal treatment of a "**CLASS**", or, a showing of separate and/or distinct

17  difference in treatment, both criminally and civilly, among groups or "**CLASSES**"

18  of persons.

19      The U.S. Supreme Court has established a "class of one" in the case of

20  Village of Willowbrook v. Olech, 528 U.S. 562, 145 L.Ed.2d 1060, 120 S.Ct. 1073

21  (2000) at pp.1074-75: "We granted certiorari to determine whether the Equal

22  Protection Clause gives rise to a cause of action on behalf of a "class of one"

23  where the plaintiff did not allege membership in a class or group." (527 U.S.

24  1067, 120 S.Ct. 10, 144 L.Ed.2d 841 (1999).):

25          "Whether the complaint alleges a class of one or a class of five is
           of no consequence because we concluded that the number of individuals
26          in a class is immaterial for equal protection analysis."

27      Our cases have recognized successful equal protection claims brought by

28  a "class of one", where the plaintiff alleges that he/she has been intentionally

treated differently from others similarly situated and that there is no rational basis for the difference in treatment. Sioux City Bridge Co., v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); Allegheny Pittsburg Coal Co. v. Commission of Webster City, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). "In so doing, we have explained that 'the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its proper execution through duly constituted agents." Sioux City Bridge Co., supra, at p.445, 43 S.Ct. 190 (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38 S.Ct. 495 (1918).)

"It is clearly established that a state violates the equal protection clauses when it treats one set of persons differently from others who are similarly situated." Wheeler v. Miller, 168 F.3d 241, 252 (5th Cir. 1999).

Petitioner has established separate treatment, discrimination, and the Board's failure to follow U.S. Supreme Court precedents, thus their failure to set Petitioner's term, as was done to Schiold, violates both the California and U.S. Constitutions Equal Protection Clauses.

<u>FAILURE TO CONSIDER TERM SETTING</u>

At no time during the hearing(s), nor at any time during Petitioner's incarceration has the Board considered the determinate term that Petitioner would serve, as calculated by Title 15 C.C.R. §2404 (Exhibit "I"), Matrix or the time he has actually served as factors in the suitability equation. The Court of Appeals in, In re Ramirez, (2001) 94 Cal.App.4th 549, at 569 held:

> "The Board cannot ignore the determinate term prescribed for a commitment offense when it considers the gravity of the crime as a factor weighing against a finding of suitability for parole. The Board must make its determination 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public.' (P.C. §3041(a).) Determining what would be a 'uniform' term for an inmate serving a determinate term for offenses that include concurrent determinate terms is not an exact science. However, the Board should strive to achieve at least a rough balance

21

between the gravity of the offense, the time the inmate has served, and the sentences prescribed by law for the commitment offense."

At page 570, the court said:

"The Board must also consider the length of time the inmate has served in relation to the terms prescribed by the Legislature for the offenses under consideration, in order to arrive at a "uniform" term as contemplated by P.C. §3041(a)."

The gravity of Petitioner's offense must be measured not in terms of the life maximum potential, but in relation to the determinate terms prescribed for such offenses in 15 C.C.R. §2403(c). The Board must consider the appropriate determinate term that would be set and the time he has already served. The Board has failed to follow the criteria of §2403(c). (Note: The Board is still in violation by rules and regulations that they are applying.)

## FAILURE TO FIX PRIMARY TERM

At no time during Petitioner's incarceration has the Board ever held a hearing to fix Petitioner's 'primary term' on his indeterminate sentence. A 'primary term' is not set in conjunction with or dependent upon a parole hearing. In re Rodriguez, (1975) 14 Cal.3d 639; People v. Scott, (1984) 150 Cal.App.3d 910, 918-19. Petitioner has a right to have his term fixed proportionately to his offense and his culpability.

The Los Angeles County Superior Court, on June 26, 2006, In re Robert Rosenkrantz, Case No. BH003529, attached as (Exhibit "H") to MOTION FOR JUDICIAL NOTICE, specifically at page 3, lines 14-15 establish that the Board set Rosenkrantz term: "On September 9, 1999, petitioner was found unsuitable for parole but the panel set his prison term." A June 30, 2001 date was set for release. (Emphasis added).

Evaluating proportionality does not hinge on the life maximum, but is measuring the time actually served with the sentence deemed appropriate by the Board's sentencing regulations. The Board cannot abdicate this responsibility either by saying it has no authority to fix terms (See, Schiold and Rosenkrants,

supra), or by sub-summing term-fixing under the parole function. Petitioner is entitled to the fixing of his primary term as an ultimate, immutable release date, under the Equal Protection (CLASS OF ONE) of the Fourteenth Amendment. See also, In re Rodriguez, supra; People v. Duran, (1983) 140 Cal.App.3d at 502-503; People v. Rodriguez, (1977) 19 Cal.3d 221, 230; Rosenkrants, supra.

In McGinnis v. Royster, 93 S.Ct. (1973) the court held, at page 1057 that:

> "Each inmate has both a 'minimum' parole date, which is the earliest date on which he 'may' be paroled at the discretion of the Parole Board, and a 'statutory release' date which is the earliest date he 'must' be paroled by the Parole Board. (Fn.3), "He also has a maximum expiration date which is the date of the maximum sentence to which an inmate can be held if he receives no good time credits at all."

The case refers to an 'indeterminate sentence' and establishes that there are actually three (3) dates to such a sentence; (1) the minimum parole date, (2) the statutory release date, (3) the maximum expiration date (i.e., death).

While P.C. §1170 et seq., apply to determinate sentences, the current provisions of P.C. §3041 governing parole for inmates serving indeterminate terms were added as part of the bill enacting the Determinate Sentencing Law, and were intended to serve the same purpose as the determinate sentencing provisions. (Stats., 1976 Ch. 1139, Sec. 281, p.5151; In re Stanworth, (1982) 33 Cal.3d 176, 182). Our Supreme Court has made it clear that the 'uniform terms' called for by section §3041(a) are analytically equivalent to determinate sentences imposed under §1170 et seq. (People v. Jefferson, 21 Cal.4th 86, 96).

Apparently, the State of California only follows the law and sets a life prisoner's term when it is convenient, to avoid or terminate legal actions (by entering into "SETTLEMENT AGREEMENTS"), or in an arbitrary manner, with no regard to violating due process and equal protection rights under both California and U.S. Constitutional mandated guidelines.

//

//

23

## VI.
### STATE AND FEDERAL CLAIM NUMBER SIX
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a), BY PREJUDGING AND PREDETERMINING THE OUTCOME OF PETITIONER'S PAROLE SUITABILITY HEARING.

Petitioner contends that, (Exhibit "A", at pp.27-28, 58), establishes that Commissioner Fisher, in her statement and details of Petitioner's commitment offense, "this was a cold-blooded murder", and the forceful use of the word "brutal", had prejudged and predetermined the denial of Petitioner's parole before the suitability hearing even started. See, Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994), a decision-making "body that has prejudged the outcome cannot render a decision that comports with due process."

Petitioner contends that, the suitability hearing was contrary to the holdings in Greenholtz and Allen's language of due process rights to a _fair_, _impartial_ and _meaningful_ hearing.

Petitioner contends that, the BPH panel violated Petitioner's U.S. Constitutional rights of due process and equal protection under the Fourteenth Amendment, by not following P.C. §3041.5(b) and administering upon Petitioner a multiple five (5) years denial, when in fact, there is _nothing_ in the record to support such a decision.

Petitioner has _never_ had a CDC-115 disciplinary action. He has programmed exceptionally well and made very good use of his time while incarcerated.

When the BPH gave Petitioner the "5 year" denial, it recited virtually the same reasons/excuses it gave for the parole denial. This was a clear violation of In re Jackson, (1985) 39 Cal.3d 464, which expressly held that the statement of reasons for a multi-year denial, as required by P.C. §3041.5(b), must be a separate and distinct statement that is not a mere recital of the same reasons used to deny parole, even if worded slightly different the excuses were the same.

Petitioner also brings to this Court's attention, the case of In re Ruthford,

1    (Case No. SC135399A), April 8, 2005, Superior Court for Marin County, California.

2       The court stated that the BPT cannot give multi-year denials or other

3    practices in order to try to "catch up" on their back log of parole suitability

4    hearings.

5       Petitioner contends that, it is reasonable to believe and assume that the

6    BPH gave him a multi-year (5) denial to aid in catching up on their back log

7    of hearings. This assertion is based on the fact that there is nothing in the

8    record to support the multi-year (5) denial, but to the contrary, Petitioner

9    was entitled to a release date under P.C. §3041(a)(b) criteria.

10      Petitioner further contends that, his due process rights under the U.S.

11   Constitutions Fourteenth Amendment were violated by the BPH panel (Commissioner

12   Fisher). Said Commissioner made allegations about Petitioner's offense, (cold-

13   blooded murder, etc.), of which were biased. This same Commissioner

14   unconstitutionally used Petitioner's self-help of Alcoholics Anonymous for part

15   of her denial, and lastly, Commissioner Fisher gave Petitioner a multi-year (5)

16   denial, when Petitioner has been a model prisoner with no misconduct of any kind.

17   In fact, the multi-year (5) denial should be construed as a violation of

18   Petitioner's rights under the Fourteenth Amendment of the U.S. Constitution,

19   of due process and unusual punishment. There must be some basis for a five (5)

20   year denial, such as, mis-conduct while in prison.

21      Petitioner asserts that, the BPH was biased toward him. See, Martin v.

22   Marshall, supra, 2006 WL 1344584 (N.D. Cal.): "Under due process clause, inmate

23   has been afforded an adequate parole process if the parole procedure itself

24   provides inmate with sufficient safeguards, including an opportunity to be heard

25   before an unbiased decision maker, and in the case of denial of parole, given

26   the reasons underlying the decision, and if "some evidence" supports the decision

27   to grant or deny parole. U.S.C.A. Amendment XIV.

28      The decision by decision-maker, Commissioner Fisher, was made totally

25

contrary to the U.S. Constitutions Fourteenth Amendment of due process and equal protection:

First: The decision was made solely on the offense and prior conduct to the commitment offense, in violation of the Fourteenth Amendment.

Second: Petitioner's rights of due process and equal protection under the Fourteenth Amendment were violated by the BPH panel, by applying the self-help of Alcoholics Anonymous in support of its reasoning for a multi-year (5) denial.

Third: The biased language and statements by Commissioner Fisher establishes that Petitioner's parole suitability hearing was not in a manner prescribed by an unbiased decision-maker, and, points to an unsuitability decision that was pre-determined. The trial record establishes that the jury made no finding what-so-ever in its verdict that the crime was a "cold-blooded murder".

Fourth: The multi-year (5) denial of parole, with no evidence in the record to support such a denial establishes the biased conduct of Commissioner Fisher.

Fifth: The courts have established that the BPH cannot apply multi-year denials in order to "catch up" on their back log of parole suitability hearings.

Petitioner has sufficiently established that he should receive a new parole suitability hearing that is fair and unbiased.

## CONCLUSION

There is no articulable evidence to support the Board's conclusion that Petitioner still poses an unreasonable (current) risk to society if paroled. The Board appears to have recited rote/form language without regard to the facts and evidence before it and with disregard for Petitioner's right to individualized and unbiased consideration and due process.

The federal courts have determined that denial of parole solely on the commitment offense and the inmates conduct prior to the commitment offense is considered a U.S. Constitution Fourteenth Amendment violation.

The Board's findings that Petitioner demonstrated a callous disregard for

26

1  human suffering was "blind to the record", (In re Scott, supra, 119 Cal.App.4th
2  at p.892), which shows no evidence of suffering above that inherent in any death.
3  The Board's assertion that the motive was "trivial" is directly refuted by the
4  Board's Matrix which identifies the circumstances of this crime as being
5  unexceptional and commonplace. The Board's findings regarding "threat to society"
6  is completely unsupported given Petitioner's (18) years of performance as a model
7  prisoner.

8      Petitioner has been diligently devoted to self-help improvement while
9  incarcerated, has marketable skills and has realistic parole plans. The record
10  provides no reasonable grounds to reject, or even challenge, the findings and
11  conclusions of the Psychologist and Counselor concerning Petitioner's
12  dangerousness. (In re Smith, supra, 144 Cal.App.4th at pp.343, 369).

13      There is nothing in the record that the Board made any effort to compare
14  Petitioner's crime to others. Since parole is the rule and not the exception,
15  (Smith, supra, 114 Cal.App.4th at p.351), the Board is constitutionally required
16  to "weigh the inmate's criminal conduct not against ordinary social norms, but
17  against other instances of the same crime or crimes." (In re Ramirez, supra,
18  94 Cal.App.4th at p.570). The Board's "predetermined conclusions in search of
19  justification", (In re Caswell, (2001), 92 Cal.App.4th 1017, 1030), is amply
20  demonstrated by its findings that the crime was trivial. "It could not be both."
21  (Scott, supra, 119 Cal.App.4th at p.892). This appears, by the Board, to be no
22  more than a reading of form/rote language without reference to Petitioner's case,
23  apparently to provide "a post hoc rationalization for a decision already made".
24  (In re Rosenkrantz, (2000), 80 Cal.App.4th at p.427). In fact, the totality of
25  the record, not just Petitioner's years of positive incarceration and model
26  behavior, demonstrates that Petitioner has done nearly everything possible under
27  the circumstances, and everything society can expect, to justify a chance on
28  parole and to demonstrate his rehabilitation.

1　　　The Board has continued to violate Petitioner's due process and equal
2　protections rights by incorrectly/unconstitutionally applying P.C. §3041(b) to
3　Petitioner.

4　　　The unsuitability factors do not out weigh the suitability factors. In fact,
5　the record establishes that there are NO unsuitability factors supported by the
6　record.

7　　　　　　　　　　　Respectfully submitted,

8

9

10　　　　　　　　　　　Raul Moyers

11

12　　　　　　　　　　　DECLARATION

13　　　I, Raul Moyers, declare under penalty of perjury that the foregoing is true
14　and correct, executed this _25_ day of _March_, 2007, at Soledad, California, County
15　of Monterey.

16

17

18　　　　　　　　　　　Raul Moyers

19

20

21

22

23

24

25

26

27

28

## PRAYER

Wherefore, Petitioner respectfully requests that this Honorable Court declare/order that;

1). Penal Code §3041(a)(b) does create a protectable liberty interest at a parole suitability hearing for an expectant release date:

2). Respondents show cause why Petitioner is not entitled to the relief requested:

3). The BPH set a release date consistent with Petitioner's MEPD as is established in P.C. §3041(a):

4). The language in P.C. §3041(a) is the only true and constitutionally legal requirement for a parole release date consideration:

5). Petitioner be given a new parole suitability hearing that is fair, unbiased and meaningful under due process of law:

6). Petitioner's conviction must be proven to be "particularly egregious", or, "cold-blooded and brutal" under the standard of "special circumstances" before the BPH can apply subdivision (b) of P.C. §3041:

7). The BPH's conclusions are arbitrary and capricious against Petitioner:

8). That the Board set Petitioner's prison sentence (term), by the Matrix, as was done for Schiold, in Petitioner's Claim Number Six:

9). That Petitioner be given an evidentiary hearing to establish how many other cases where the State set the term for other life prisoners and thus further violated the Fourteenth Amendment of the U.S. Constitution:

10). If the BPH does not set a parole release date for Petitioner, that this Honorable Court, under the U.S. Supreme Court's Constitutional grant of power, issue an order for Petitioner's release on parole forthwith:

11). Grant Petitioner such other relief as this Court deems just and proper in the interest of justice as Petitioner is a layman at law.

t                                        //

1   Raul Moyers E-17403
    Box 689   F-252L
2   California State Prison
    Soledad, CA 93960-0689

3        Petitioner, in pro per

4

5                    CALIFORNIA COURT OF APPEALS
                     SECOND APPELLATE DISTRICT
6

7

8   RAUL MOYERS,                 )    Case No. _____
                                 )
9        Petitioner,             )
                                 )
10  v.                           )    MOTION/REQUEST FOR JUDICIAL NOTICE
                                 )
11  CURRY, Warden,               )
                                 )
12       Respondent.             )
                                 )
13

14  TO: THE HONORABLE JUSTICES OF THE CALIFORNIA COURT OF APPEALS:

15       Pursuant to Evidence Code Section 451 Subd. (a), (c) and (d), and 459 Subd.

16  (a), Commode Home Systems, Inc., v. Superior Court, (1982) 32 Cal.3d 211, 218219,

17  and, Adamson v. Zipp, (1984) 163 Cal.App.3d Supp. 1, n.17, Petitioner hereby

18  requests this Court to take "Judicial Notice" of the hereto attached court orders

19  in the case(s) of, In re Richard Shaputis, 37 Cal.Rptr.3d 324 (Exhibit "F"); In

20  re MIKAEL SCHIOLD, Court of Appeal, First Appellate District, Division Five, Case

21  No. A103107 (Exhibit "G"); and, in re Robert Rosenkrantz, Los Angeles County

22  Superior Court, June 26, 2006, Case No. BH003529 (Exhibit "H").

23       This Court must take Judicial Notice of the factual findings of other courts,

24  even though the Court need not accept the truth of those findings. (Mack v. State

25  Bar of California, (2001) 92 Cal.App.4th 957, 961, rehearing denied, review denied;

26  Duggal v. G.E. Capitol Communications, Inc., (2000) 81 Cal.App.4th 81; People

27  v. Moore, (1997) 59 Cal.App.4th 168, 178.)

28       The aforementioned cases arose out of habeas proceedings filed in the

                                    1

aforementioned courts. Review of the attached cases (Exhibits "F", "G" and "H") will assist this Court in evaluating the arguments presented in Petitioner's habeas petition, attached to this MOTION/REQUEST FOR JUDICIAL NOTICE.

Respectfully submitted,

Raul Moyers

Dated: 6/13/07

# EXHIBIT    "A"

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: ) CDC Number E-17403
)
RAUL MOYERS )
)
_____)

INMATE
COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

APRIL 12, 2006

PANEL PRESENT:

Ms. Susan Fisher, Presiding Commissioner
Mr. Fernando Perez, Deputy Commissioner

OTHERS PRESENT:

Mr. Raul Moyers, Inmate
Ms. Katera E. Rutledge, Attorney for Inmate
Mr. Paul Turley, Deputy District Attorney
Mr. Rich (last name and title indiscernible)
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No      See Review of Hearing
_____ Yes     Transcript Memorandum

C. M. LOPEZ, Peters Shorthand Reporting

Exhibit "A"

ii

## INDEX

PAGE

Proceedings............................................. 1

Case Factors........................................... 11

Pre-Commitment Factors................................. 17

Post-Commitment Factors................................ 31

Parole Plans........................................... 22

Closing Statements..................................... 47

Recess................................................. 54

Decision............................................... 55

Adjournment............................................ 61

Transcriber Certification.............................. 62

--oOo--

```
 1              P R O C E E D I N G S
 2         DEPUTY COMMISSIONER PEREZ:  We're on
 3   record.
 4         PRESIDING COMMISSIONER FISHER:  How's
 5   that?
 6         INMATE MOYERS:  Sounds good.
 7         PRESIDING COMMISSIONER FISHER:  Okay,
 8   good.  Have you used one of those before?
 9         INMATE MOYERS:  Pardon me?
10         PRESIDING COMMISSIONER FISHER:  Have you
11   used one of those --
12         INMATE MOYERS:  No --
13         PRESIDING COMMISSIONER FISHER:  --
14   hearing devices before?
15         INMATE MOYERS:  -- she just showed me how
16   to do it.
17         PRESIDING COMMISSIONER FISHER:  Okay.
18   All rightie.  Well, let me know if you have any
19   problem, okay?
20         INMATE MOYERS:  Okay.
21         PRESIDING COMMISSIONER FISHER:  Because
22   for one thing, my voice tends to get kind of
23   quiet after awhile.  After I stop paying
24   attention.
25         INMATE MOYERS:  After awhile, yeah.
26         PRESIDING COMMISSIONER FISHER:  Yeah, so
27   let me know if you can't hear anything, okay?
```

1      **INMATE MOYERS:** Okay, fine.

2      **PRESIDING COMMISSIONER FISHER:** All

3   right. This is going to be a -- I'm sorry -- an

4   initial parole consideration hearing for Raul

5   Moyers. How do you pronounce it?

6      **INMATE MOYERS:** Raul Moyers.

7      **PRESIDING COMMISSIONER FISHER:**

8   M-o-y-e-r-s, CDC Number E-17403. Today's date is

9   4/12/06, and we're located at the Correctional

10  Training Facility at Soledad. The inmate was

11  received on 4/28/89 from Los Angeles County. The

12  life term began on 1 -- I'm sorry -- 11/1/89, and

13  the minimum eligible parole date is 7/2/06. The

14  controlling offense for which the inmate has been

15  committed is first degree murder, Case Number A-

16  5938540, count one, Penal Code Section 187.

17  There was also a finding of use of a firearm.

18  That's Penal Code Section 12022.5(a). Inmate

19  received a term of 27 years to life. Once again,

20  the minimum eligible parole date is 7/2/06. And,

21  Mr. Moyers, we're going to tape record today; so

22  for the transcriber who's going to be typing this

23  up, we're each going to say our first and last

24  name and spell our last name. When I get to you,

25  give us your CDC number as well. All right? I'm

26  going to start with myself and go to my left.

27  Susan Fisher, F-i-s-h-e-r, Commissioner.

1          **DEPUTY COMMISSIONER PEREZ:** My name is

2    Fernando Perez, P-e-r-e-z, Deputy Commissioner,

3    Board of Parole Hearings.

4          **DEPUTY DISTRICT ATTORNEY TURLEY:** Paul

5    Turley, T-u-r-l-e-y, Deputy District Attorney,

6    Los Angeles County.

7          **(UNIDENTIFIED):** Rich (indiscernible).

8          **ATTORNEY RUTLEDGE:** Katera E. Rutledge,

9    R-u-t-l-e-d-g-e, attorney for Mr. Moyers.

10         **INMATE MOYERS:** My name is Raul Moyers,

11   M-o-y-e-r-s.

12         **PRESIDING COMMISSIONER FISHER:** CDC

13   number?

14         **INMATE MOYERS:** My CDC number is E-17403.

15         **PRESIDING COMMISSIONER FISHER:** Thank

16   you. I want to note for the record that we have

17   two correctional officers present who are here

18   for security purposes and will not be

19   participating in the hearing. And, let's see,

20   here. What did I do with that? Mr. Moyers,

21   before we get started, I'm going to read the

22   Americans with Disabilities Act to you, all

23   right? And I just have a few questions for you.

24   The Americans with Disabilities Act is a law to

25   help people with disabilities. Disabilities are

26   problems that make it harder for some people to

27   see, hear, breathe, talk, walk, learn, think,

1    work, or take care of themselves than it is for

2    others.  Nobody can be kept out of public places

3    or activities because of a disability.  If you

4    have a disability, you have the right to ask for

5    help to get ready for your hearing, get to the

6    hearing, talk, read forms and papers, and

7    understand the hearing process.  The Board will

8    look at what you ask for to make sure that you

9    have a disability that is covered by the ADA and

10   that you have asked for the right kind of help.

11   If you do not get help, or if you don't think

12   you got the kind of help you need, ask for a

13   1074 Grievance Form.  You can also get help to

14   fill it out.  Do you understand that?

15        **INMATE MOYERS:**  Yes.

16        **PRESIDING COMMISSIONER FISHER:**  And you

17   signed the 1073 Form in March of '05.  And,

18   actually, I didn't see any disabilities checked;

19   but we have -- we did find out today that you

20   have some difficulty with hearing; is that

21   correct?

22        **INMATE MOYERS:**  Yes, ma'am.

23        **PRESIDING COMMISSIONER FISHER:**  All

24   right.  Do you have a hearing aid or --

25        **INMATE MOYERS:**  No.  No, I don't.

26        **PRESIDING COMMISSIONER FISHER:**  Have you

27   -- has the doctor talked to you at all about.

1    your hearing loss?

2          INMATE MOYERS:  I've applied for it.

3          PRESIDING COMMISSIONER FISHER:  You've

4    applied for it, but you haven't been seen yet?

5          INMATE MOYERS:  (indiscernible).

6          PRESIDING COMMISSIONER FISHER:  Okay.

7    How long ago did this start?

8          INMATE MOYERS:  It's been awhile, seven

9    years, eight years.

10          PRESIDING COMMISSIONER FISHER:  Okay, and

11    how long ago was it when you asked to see the

12    doctor?

13          INMATE MOYERS:  Seven years ago.

14          PRESIDING COMMISSIONER FISHER:  Maybe we

15    can make that part of our decision then.  Do you

16    normally wear glasses to read?

17          INMATE MOYERS:  Normally, yes.

18          PRESIDING COMMISSIONER FISHER:  Okay.  Do

19    you have the glasses with you?

20          INMATE MOYERS:  No.

21          PRESIDING COMMISSIONER FISHER:  Okay.

22    Did you do an Olsen Review on your file?

23          INMATE MOYERS:  Yes, I did.

24.          PRESIDING COMMISSIONER FISHER:  Okay, and

25    did you have your glasses available for your

26    review?

27          INMATE MOYERS:  No.  No, I can read.

1        **PRESIDING COMMISSIONER FISHER:** You can
2    read --

3        **INMATE MOYERS:** I can read without them.
4        **PRESIDING COMMISSIONER FISHER:** --
5    without them? Okay. All right. Just wanted to
6    make sure. Have you ever been included in the
7    mental health programs in the prison?

8        **INMATE MOYERS:** No.

9        **PRESIDING COMMISSIONER FISHER:** Okay.
10   And is there any physical disabilities that you
11   have that might make it difficult for you to
12   participate in today's hearing?

13       **INMATE MOYERS:** No.

14       **PRESIDING COMMISSIONER FISHER:** Okay.
15   We're going to go ahead. This hearing is being
16   conducted pursuant to Penal Code Sections 3041
17   and 3042 and the Rules and Regulations of the
18   Board of Parole Hearings that govern parole
19   consideration hearings for life inmates. The
20   purpose of the hearing today is to consider your
21   commitment offense, your prior criminal and
22   social history, and your behavior and
23   programming since you've been in prison for this
24   offense. We have had the opportunity to review
25   your file. I'm going to give you opportunity to
26   make any corrections that you need to today.
27   All right? We are going to reach a decision.

1   today as to whether or not we find you suitable

2   for parole; and if we do find you suitable

3   today, I'll explain to you how much longer

4   you'll be in prison.  Before we recess today to

5   deliberate, I'm going to give you and Ms.

6   Rutledge, as well as Mr. Turley, the opportunity

7   to make a final statement about your

8   suitability.  I want to remind you that you are

9   not required today to admit or discuss the

10  offense, but the panel accepts the findings of

11  the court to be true.  Do you understand that?

12          **INMATE MOYERS:**  (indiscernible).

13          **PRESIDING COMMISSIONER FISHER:**  The

14  California Code of Regulations states that

15  regardless of time served, a life inmate shall

16  be found unsuitable for and denied parole if in

17  the judgment of the panel he would pose an

18  unreasonable risk of danger to society or a

19  threat to public safety if released from prison.

20  You rights that are related to this hearing; and

21  they include the right to a timely notice of the

22  hearing, the right to review your Central File,

23  and the right to present relevant documents.

24  Counsel, have those rights been met?

25          **ATTORNEY RUTLEDGE:**  Yes.

26          **PRESIDING COMMISSIONER FISHER:**  Okay.

27  You also have the right, Mr. Moyers, to an

8

1    impartial panel.  Having seen your two panel

2    members today, do you have any objections to

3    your panel?

4        **INMATE MOYERS:**  No.

5        **PRESIDING COMMISSIONER FISHER:**  Okay.

6    Counsel?

7        **ATTORNEY RUTLEDGE:**  No.

8        **PRESIDING COMMISSIONER FISHER:**  I'm going

9    to give you a copy of our Decision today.  It's

10   going to be tentative, and it will be in effect

11   within 120 days, and then a copy of the Decision

12   and a copy of the transcript of today's hearing

13   is going to be sent to you.  All right?  Now I

14   don't know if you're familiar with the process

15   or not, but in recent history they changed the

16   way that you appeal Board decisions just in the

17   last couple of years, so now all appeals go

18   directly to the court.  If you need additional

19   information about that, your correctional

20   counselor should have it; and it will also be in

21   the prison library.  All right?  Is there any

22   confidential to be used today?

23       **DEPUTY COMMISSIONER PEREZ:**  Yes, there is

24   confidential material in the record; however,

25   for the purposes of this hearing, it will not be

26   used today in consideration.

27       **PRESIDING COMMISSIONER FISHER:**  Thank

1    you.   Ms. Rutledge, did you have everything on
2    the checklist?

3        **ATTORNEY RUTLEDGE:**  Yes.

4        **PRESIDING COMMISSIONER FISHER:**  Mr.
5    Turley?

6        **DEPUTY DISTRICT ATTORNEY TURLEY:**  Yes, I
7    have all that.

8        **PRESIDING COMMISSIONER FISHER:**  Okay,
9    thank you.  Is there anything that you need to
10   submit?

11       **ATTORNEY RUTLEDGE:**  We don't -- we will
12   at the -- when we get to parole plans, we've got
13   that information, and then we'll do that then.

14       **PRESIDING COMMISSIONER FISHER:**  Okay,
15   then just so you know, I've got a couple of
16   letters here today, one from (indiscernible)
17   Mier, M-i-e-r, and from Richard Villareal.

18       **ATTORNEY RUTLEDGE:**  We'll be objecting to
19   those letters; they were untimely.  We just got
20   them today.

21       **PRESIDING COMMISSIONER FISHER:**  Okay.
22   All right.  Are you objecting now, or do you
23   want to --

24       **ATTORNEY RUTLEDGE:**  I'll object now.

25       **PRESIDING COMMISSIONER FISHER:**  Okay.
26   Let me take a look at them.  I am not going to
27   allow the letter from (indiscernible ) because

10

1  it's not next of kin; but I am going to allow

2  Mr. Villareal's letter because he is a relative,

3  in fact, the brother of the victim; and so as

4  such it is a victim's impact statement. Victims

5  are (indiscernible), so we'll go ahead and

6  consider that. Aside from that, any other

7  objections?

8        **ATTORNEY RUTLEDGE:** No.

9        **PRESIDING COMMISSIONER FISHER:** Thank

10 you. And is Mr. Moyers going to be speaking

11 with us?

12       **ATTORNEY RUTLEDGE:** Mr. Moyers will speak

13 on all issues except the commitment offense.

14       **PRESIDING COMMISSIONER FISHER:** Okay.

15 Mr. Moyers, if you'll raise your right hand, I

16 need to swear you in. Do you solemnly swear or

17 affirm that the testimony that you give at this

18 hearing will be the truth and nothing but the

19 truth?

20       **INMATE MOYERS:** I do.

21       **PRESIDING COMMISSIONER FISHER:** All

22 right, thank you. All right. Since this is Mr.

23 Moyers' initial hearing and we're not going to

24 be talking to him about the crime, what I'm

25 going to do is read from the appellate facts;

26 and I will read that into the record. That

27 includes both the summary of the crime and Mr.

1    Moyers' comments (indiscernible).

2          **ATTORNEY RUTLEDGE:** No objections.

3          **PRESIDING COMMISSIONER FISHER:** Okay.

4    And for the transcriber, this starts on page 2.

5    It's dated January 29, 1991, about halfway down

6    under Factual and Procedural Statement. It says

7    on June 25, 1988, Linda threw defendant out of

8    the house following an argument. On that day,

9    Veronica Moyers -- that's V-e-r-o-n-i-c-a --

10   their daughter, asked Linda to hide the gun

11   which Linda kept inside a purse in the bedroom

12   closet. Veronica never saw any bullets for the

13   gun and never asked -- never saw -- Linda ever

14   handle the gun. Another family member had asked

15   Linda and defendant to hold on to the gun.

16   Jeannette Moyers, another daughter -- that's

17   J-e-a-n-n-e-t-t-e -- told Linda they should hide

18   the gun. Linda put the gun, which was wrapped

19   in a white towel, under the bed. On Wednesday,

20   June 29, about 2:00 p.m., defendant told a

21   neighbor, Debra Saenz, I believe it is --

22   S-a-e-n-z -- that he was not happy about his

23   separation from Linda, that he was going to try

24   one more time; and, quote, "if it didn't work,

25   he was just going to snap. He couldn't take it

26   anymore," end quote. Defendant also told her

27   that he would just, quote, "kill her or

1    something," end quote, adding, quote, "but it

2    wouldn't be around here; it wouldn't be here,"

3    end quote. On that same day, defendant returned

4    to the house when he asked his son, Raul,

5    Junior, when Linda would be home. He was told

6    around 6:00 p.m. Defendant then entered the

7    master bedroom and remained there for about 15

8    minutes with the door locked. He left with a

9    white towel, which resembled the one wrapped

10   around the gun, under his arm. After Linda

11   arrived home from work that day, she left again

12   around 6:00 to 6:30 p.m. in the direction of the

13   park across from the house to meet the

14   defendant. She was not carrying anything. On

15   June 29, 1988, around 6:30 p.m., Jillian --

16   that's J-i-l-l-i-a-n -- Burchfield,

17   B-u-r-c-h-f-i-e-l-d, saw a man and woman sitting

18   at a picnic table. She heard something that

19   sounded like a cap gun and a second shot around

20   25 or 30 seconds later. She saw the man

21   pointing the gun on the other side of the table

22   and stand. Although a tree obstructed her view

23   of the woman, she heard the woman yell no. The

24   man shot the woman again, sat down, and then

25   shot again. She did not see the woman try to

26   hit the man, and the man was not limping when he

27   walked away. Burchfield did not identify the

13

1   defendant as the man at trial.  Karla Rocha --
2   and that's Karla with a 'K' and Rocha, R-o-c-h-a
3   -- and Fernando Lamp, L-a-m-p, were in their car
4   when Rocha heard a shot.  Looking in the
5   direction of the sound, she saw a man walking
6   around a picnic table and a woman lying on the
7   bench.  The man fired at the body on the bench
8   and then ran towards a truck.  Lamp heard two or
9   three shots and then noticed a man going under
10  the table and then shooting again.  He did not
11  see the woman struggle with the man.  Lamp
12  identified defendant at trial as the man who he
13  saw at the park.  While driving toward the park,
14  Roberta Machado, M-a-c-h-a-d-o, saw a man at a
15  table -- at a picnic table -- stand up and point
16  a gun at a woman sitting opposite.  The man
17  fired at least twice before coming around the
18  table and firing at least two more shots.  She
19  did not see the woman try to harm the man and
20  did not see the woman with a gun.  When Sergeant
21  Madrid arrived around 6:30 p.m. at the park, he
22  found Linda slumped over a park bench, dead with
23  an injury to the chest area.  Michael Gough,
24  G-o-u-g-h, a Burbank police officer, was
25  confronted with the same scenario when he
26  arrived to investigate.  He then went to an
27  apartment on Verdugo -- and that's V-e-r-d-u-g-o

14

1   -- where defendant worked as a maintenance
2   person. After he was handcuffed, defendant
3   stated spontaneously, quote, "I know I killed
4   her. You got here just in time," end quote.
5   After advisement of his rights at the police
6   station, defendant stated, quote, "You know I
7   killed her. What else do you want?" end quote.
8   A .22 caliber revolver was found on the floor of
9   the apartment at Verdugo. A box of .22 bullets
10  was found in defendant's truck. A .22 caliber
11  bullet was removed from near Linda's spine.
12  According to Dr. Choi, C-h-o-i, the cause of
13  death was a gunshot wound to the chest. Gough
14  noticed a wound to the defendant's leg and a
15  hole in his pants in the same spot as the wound.
16  Robert Cistaro, C-i-s-t-a-r-o, a Burbank Field
17  Evidence Technician, photographed the leg injury
18  and the pants. The photograph of the leg was
19  marked as People's Exhibit 28. In his defense,
20  defendant testified that he did not intend to
21  harm Linda. He claimed that although he had had
22  verbal arguments about his drinking with Linda
23  before, you never struck him. At the park,
24  defendant and Linda had an argument over his
25  drinking. He promised to stop, to attend AA
26  meetings, whatever it would take to get them
27  back together. Linda, however, called him a

15

1    liar about his promise to stop drinking because

2    she smelled alcohol on him. Defendant had had a

3    few drinks before meeting her at the park. He

4    also testified that I was Linda, not he, who had

5    taken the gun to the park and that she had

6    learned to shoot a gun when Richard Ramirez was

7    committing crimes. He started that -- I'm sorry

8    -- he stated that during the argument, he heard

9    two clicks and was shot in the leg, ran around

10   the table and struggled with Linda for the gun.

11   The gun went off once and a second time when he

12   grabbed it. The gun had a hair trigger. His

13   hand was not on the trigger, and he never pulled

14   back the hammer. All right. Let's see. I

15   think I'm going to stop there unless you have

16   anything further that you really want me to

17   cover here. The rest of it goes into testimony

18   by other people.

19        **ATTORNEY RUTLEDGE:** A couple things we'd

20   like to note for the record. One is we don't

21   have the actual transcripts. We have testimony

22   that doesn't include cross-examination.

23        **PRESIDING COMMISSIONER FISHER:** Um-hum,

24   exactly.

25        **ATTORNEY RUTLEDGE:** And there is one

26   point in the -- later there is -- in some of the

27   other documents -- it notes that there was a.

16

1 missing photograph. It's an issue that was

2 raised; it's never resolved regarding the

3 gunshot wound to the leg. But Mr. Moyers will

4 speak to his responsibility for this offense.

5 However, he will not discuss the facts of the

6 incident.

7 **PRESIDING COMMISSIONER FISHER:** Right,

8 okay. There are a few things I'd like to put in

9 the record also from the Board report here;

10 because when he did talk to the correctional

11 counselor, there was some other information that

12 he included. He says that -- it -- in fact,

13 this says -- and this is the 2005 calendar Board

14 report in June. It says inmate and his wife

15 were having problems a few days before the

16 crime, and he had left the family home. He was

17 attempting to get her back. On the day of the

18 crime, she called him to discuss their

19 situation. When he arrived at home, she came

20 out and said they could talk at the park. They

21 were at the park for a little while, and the

22 conversation turned into an argument. Moyers

23 said she brought the gun and in the heat of the

24 moment shot him in the leg. He reacted and went

25 for the gun. As they struggled it went off. He

26 took the gun and pointed it at her to keep her

27 back and says as he was holding it

17

1    (indiscernible).  He saw her fall to the table

2    and got frightened.  He then went to one of the

3    jobsites he worked at and while drinking

4    composed the (indiscernible).  He did not think

5    he would kill (indiscernible) stated that he had

6    no intention of taking the victim's life and is

7    extremely remorseful.  And it does note -- the

8    notes -- there is a sentence at the end of the

9    summary of the crime in the Board report that

10   says he was (indiscernible) some notes in his

11   possession mentioning threats of violence

12   (indiscernible) the victim.  So I think that

13   covers everything for the record for this

14   initial hearing, unless you have anything else,

15   Counsel?

16            **ATTORNEY RUTLEDGE:**  No, not at this time.

17   Thank you.

18            **PRESIDING COMMISSIONER FISHER:**  Okay.

19   All right.  Mr. Moyers, what I'm going to do is

20   go into a little bit of information about your

21   history before you came to prison for this

22   offense, all right?  And looking at -- just at

23   the Board report now under Prior Criminal

24   History, it says that you had no juvenile

25   record; and it says that you were arrested in

26   1977 for drunk driving.  It doesn't show a

27   disposition though.  Do you remember that?

18

1        **INMATE MOYERS:** I was arrested for drunk
2   driving before.

3        **PRESIDING COMMISSIONER FISHER:** What
4   happened? Did they keep you for awhile and send
5   you home? Did they (indiscernible)?

6        **INMATE MOYERS:** Yeah, for awhile then
7   sent me home.

8        **PRESIDING COMMISSIONER FISHER:** Okay.
9   All right. And then again, let's see, you were
10  arrested again in November of 1982 for battery?
11  Do you remember that?

12       **INMATE MOYERS:** For battery?

13       **PRESIDING COMMISSIONER FISHER:** Um-hum.

14       **INMATE MOYERS:** Okay, yeah. Yes, I do.

15       **PRESIDING COMMISSIONER FISHER:** It
16  doesn't show a disposition. What happened? Did
17  you get -- were you charged with anything or --

18       **INMATE MOYERS:** We -- I went to court
19  like I was supposed to, and the other gentleman
20  never showed up.

21       **PRESIDING COMMISSIONER FISHER:** Okay. So
22  then at that point, was everything dropped?

23       **INMATE MOYERS:** Yes.

24       **PRESIDING COMMISSIONER FISHER:** Okay.
25  And then the last thing I show was in 1988, this
26  offense so -- does that sound correct? Is there
27  anything else that we're missing?

19

1       INMATE MOYERS:  No.

2       PRESIDING COMMISSIONER FISHER:  No?

3       INMATE MOYERS:  Not that I know of.

4       PRESIDING COMMISSIONER FISHER:  Okay.

5  All right.  Then let's just move on.  Once

6  again, since this is your initial hearing, I'm

7  going to try to put some things into the record

8  for future reference, all right?  It says here

9  that you were born in Mexico and you're the

10 youngest of seven children.  Is that right?

11      INMATE MOYERS:  That's correct.

12      PRESIDING COMMISSIONER FISHER:  Okay.

13 You came to California when you were about 13?

14      INMATE MOYERS:  Right.

15      PRESIDING COMMISSIONER FISHER:  Okay.

16 And your parents are both deceased; is that

17 right?

18      INMATE MOYERS:  Yes, ma'am.

19      PRESIDING COMMISSIONER FISHER:  All

20 right.  It says here that you were in the Armed

21 Forces for two years and you received an

22 Honorable Discharge.  This was the Army; is that

23 right?

24      INMATE MOYERS:  Yes, ma'am.

25      PRESIDING COMMISSIONER FISHER:  Okay.

26 Married in 1968.  Says that you have three

27 children and that you're still in contact with

1    your children.  Is that correct?

2        **INMATE MOYERS:**  That's correct.

3        **PRESIDING COMMISSIONER FISHER:**  Okay.  It

4    does say that you had an extensive history of

5    alcohol dependence, that -- as we noted before --

6    that you had a DUI before you came to prison for

7    this crime and doesn't make any mention of any

8    other kinds of substances.  Did you ever use any

9    drugs or anything?

10        **INMATE MOYERS:**  No, ma'am.

11        **PRESIDING COMMISSIONER FISHER:**  Okay.

12    The way they described your drinking habits, is

13    that correct?

14        **INMATE MOYERS:**  Yes, ma'am.

15        **PRESIDING COMMISSIONER FISHER:**  Okay.

16    Did you drink every day?

17        **INMATE MOYERS:**  No, ma'am.  See, I was a

18    salesman first; and every time I had a meeting

19    with one of the customers, I would take them out

20    and show them, you know -- so they would buy the

21    product -- and we'd drink.

22        **PRESIDING COMMISSIONER FISHER:**  Are you

23    an alcoholic?

24        **INMATE MOYERS:**  Well, they told me not to

25    deny it.  If you drink one beer, you're an

26    alcoholic.

27        **PRESIDING COMMISSIONER FISHER:**  Well,

1    that's not really correct.  And I think you're

2    kind of skating around the issue here.  Are you

3    an alcoholic?

4         **INMATE MOYERS:**  No.

5         **PRESIDING COMMISSIONER FISHER:**  I had a

6    feeling you'd say that.  All right.  Anything

7    else about your social history that I haven't

8    mentioned that you think -- well, actually,

9    there is more.  I should ask you did you

10   graduate from high school?

11        **INMATE MOYERS:**  No.

12        **PRESIDING COMMISSIONER FISHER:**  Okay.

13   Have you gotten your GED since you've been in

14   prison?

15        **INMATE MOYERS:**  Not in prison.  I got it

16   when I was in the Army.

17        **PRESIDING COMMISSIONER FISHER:**  And that

18   was in the Service.  Okay.  I should have

19   thought of that, because they won't let you in

20   without one, will they?

21        **INMATE MOYERS:**  Right.

22        **PRESIDING COMMISSIONER FISHER:**  Okay.  I

23   can't think of any other questions for you about

24   your social history.  Is there anything that

25   I've overlooked that you think would be

26   important for us to know?

27        **INMATE MOYERS:**  No.

22

1          **PRESIDING COMMISSIONER FISHER:**  Okay.
2   All right.  Let's move on.  Tell me what you
3   would do if you were to receive a parole date.
4          **INMATE MOYERS:**  Well, first of all, I'd
5   go to my brother's or my nephew.  They offered
6   me a job -- to start working and try to help my
7   kids.
8          **PRESIDING COMMISSIONER FISHER:**  What kind
9   of job is it?
10         **INMATE MOYERS:**  My brother has a laundry.
11  I can work there.  And my nephew, he's got a
12  construction company.  That's what I can do.
13         **PRESIDING COMMISSIONER FISHER:**  Okay, and
14  where would you live?
15         **INMATE MOYERS:**  I would live with one of
16  my sisters.  I can live with either one --
17         **PRESIDING COMMISSIONER FISHER:**  Um-hum.
18  All right.
19         **INMATE MOYERS:**  -- of my sisters.
.20        **PRESIDING COMMISSIONER FISHER:**  Okay.
21  Let me see if I have anything in here before we
22  go on to your -- (indiscernible) do you know if
23  everything that's in the Board packet is in
24  here?
25         **ATTORNEY RUTLEDGE:**  No, it's not.
26         **PRESIDING COMMISSIONER FISHER:**  Okay.
27         **ATTORNEY RUTLEDGE:**  There are some

1    letters you have there that are not in the --

2         INMATE MOYERS:  Right.

3         ATTORNEY RUTLEDGE:  -- are not in the

4    Board packet.

5         PRESIDING COMMISSIONER FISHER:  Okay, but

6    you don't know if everything is -- the opposite.

7    Is everything that's in the Board packet in his

8    packet?

9         ATTORNEY RUTLEDGE:  Yes, letters of

10   support, yes.

11        PRESIDING COMMISSIONER FISHER:  All

12   right, let's use this then.  I think it's more

13   complete.

14        ATTORNEY RUTLEDGE:  And his certificates

15   too.  And he's got the record.

16        PRESIDING COMMISSIONER FISHER:  Okay.

17   I'm not so worried at this point about the

18   certificates and that Mr. Perez (indiscernible).

19   All right.  Now you have a list of people who

20   said they will provide support for you here

21   right up in the front.  Do you also have letters

22   from those people?

23        INMATE MOYERS:  They're in there.

24        PRESIDING COMMISSIONER FISHER:  Okay,

25   good.  All right.  I have a letter here from

26   B. C. Cumping.

27        INMATE MOYERS:  That's my nephew.

1          **PRESIDING COMMISSIONER FISHER:**  He says
2     he's the owner of B.C. Cumping Concrete.  It
3     lists the address.  It says. "I'm offering a job
4     opportunity to Mr. Raul Moyers as a construction
5     worker"; and he tells us what your rate of pay
6     would be.  T and C Cleaners, he says, "I, Manuel
7     Moyers, am the owner of T and C Cleaners and am
8     offering Mr. Raul Moyers an opportunity at my
9     business mentioned above."  A letter here from
10    your sister, Virginia?

11          **INMATE MOYERS:**  Yes, ma'am.

12          **PRESIDING COMMISSIONER FISHER:**  She talks
13    about the fact that she has known you since you
14    were a child and that she thinks that your
15    attitude has changed and your behavior has
16    changed and that despite your mistakes that she
17    thinks you're a good person.  I have one here
18    from your brother, Manual.  It says, "I have
19    full confidence, I believe that my brother is a
20    useful and law-abiding citizen.  He's made
21    mistakes; but after all that, I believe he's a
22    very good person."  And he says, "I will open my
23    home doors to my brother and invite him to live
24    in my home anytime he desires.  I will pay for
25    all of his personal expenses."  And it says that
26    he's also planning to help you find a job and
27    provide transportation (indiscernible).  This is

```
 1   from your sister -- is it Eldamira?
 2        INMATE MOYERS:  Eldamira.
 3.       PRESIDING COMMISSIONER FISHER:  Okay.
 4   I'll never be able to say that right.  I have a
 5   problem pronouncing names correctly.  I don't
 6   know what it is, but I just can't --
 7        INMATE MOYERS:  Roll your 'R's.
 8        PRESIDING COMMISSIONER FISHER:  What?
 9        INMATE MOYERS:  Roll your 'R's.
10        PRESIDING COMMISSIONER FISHER:  I can't
11   roll those 'R's.  And she says, "I'd like to let
12   you know that I will open my home doors to my
13   brother and invite him to live in my home
14   anytime he desires.  I will pay for all his
15   personal expenses."  This is the same --
16   essentially the same -- letter as the one from
17   your brother.  And here's another one from Maria
18   Castillo.  It's the same letter basically saying
19   that she plans on supporting you.  And from
20   Rafina Cordenas?
21        INMATE MOYERS:  Cardenas (indiscernible).
22        PRESIDING COMMISSIONER FISHER:  And these
23   are your sisters, right, these last two?
24        INMATE MOYERS:  Right.
25        PRESIDING COMMISSIONER FISHER:  And they
26   both say that they will support you if you're
27   paroled.  (indiscernible) got some
```

 1  (indiscernible) stuff in there.

 2        **ATTORNEY RUTLEDGE:**  You know what?  I

 3  think I've got that -- a different one.

 4        **INMATE MOYERS:**  Do you have this one?

 5        **PRESIDING COMMISSIONER FISHER:**  Oh, yeah.

 6  Okay.

 7        **ATTORNEY RUTLEDGE:**  That's right.

 8        **PRESIDING COMMISSIONER FISHER:**  Now in

 9  response to 3042 Notices, we did get a letter

10  today from City of Burbank Police Department.

11  Before I read it into the record, do you have

12  any objections on this one?  Did you receive a

13  copy?

14        **ATTORNEY RUTLEDGE:**  It's dated March

15  20th?

16        **PRESIDING COMMISSIONER FISHER:**  March

17  13th.

18        **ATTORNEY RUTLEDGE:**  March 13th?  No,

19  there are no objections to that.

20        **PRESIDING COMMISSIONER FISHER:**  All

21  right.  It says the purpose of this letter is to

22  express opposition by the Burbank Police

23  Department to the granting of parole to Raul

24  Moyers.  Mr. Moyers was convicted in 1988 for

25  the first degree murder of his wife, Linda

26  Valerio Moyers.  During the investigation,

27  several facts were discovered that clearly

1    showed that this brutal murder was willful,

2    deliberate, and premeditated there as follows.

3    Mr. Moyers shot his unarmed wife several times

4    at close range with a .22 caliber single-action

5    revolver. A single-action revolved must be

6    intentionally cocked by hand each time before

7    each shot can be fired. The murder occurred in

8    the picnic area of McCambridge -- that's

9    M-c-capital C-a-m-b-r-i-d-g-e -- a very popular

10   and widely used public park within the City of

11   Burbank. The murder occurred at 6:49 p.m. on a

12   Wednesday evening while there were many other

13   persons, including children, in the park. Mr.

14   Moyers fled the scene immediately after shooting

15   his wife, making no attempt whatsoever to offer

16   her emergency first aid. Additionally, at no

17   time did Mr. Moyers attempt to summon any type

18   of medical aid for his mortally wounded wife.

19   He instead left her to die. Mr. Moyers took the

20   revolver with him when he fled, thus placing

21   other members of the community in danger. Mr.

22   Moyers had the revolver within arm's reach when

23   he was arrested by detectives approximately two

24   hours after the murder. At the time of his

25   arrest and subsequent interview, he showed no

26   remorse whatsoever for murdering his wife. I

27   believe that if Mr. Moyers is granted parole and

1    released from prison, he would be an extreme and
2    continuous danger to the community and to
3    surviving family members and friends of Linda
4    Valerio Moyers.  Further it is the belief and
5    desire of the Burbank Police Department that Mr.
6    Moyers should serve the remainder of his life
7    sentence in prison for the reasons· mentioned
8    above and for the brutal nature in which this
9    crime was carried out against Linda Valerio
10   Moyers.  And then he gives his contact
11   information.  As I mentioned, I also have a
12   couple of letters related to the friends and
13   family of the victim; and I am going to read the
14   letter from her brother.  And it says, "My name
15   is Richard A. Villareal.  I am the brother of
16   Linda Villareal Moyers.  My niece, Jeannette
17   Moyers -- and I'm going to spell this --
18   D-e-s-c-i-s-c-i-o-l-o -- contacted me about the
19   parole hearing of Raul Moyers, her father, and
20   asked if I would send a letter to the parole
21   board explaining my views or make whatever input
22   I could to influence your decision of the
23   possible parole of Raul Moyers.  This is
24   obviously very difficult, as it means once again
25   to relive the pain and hurt of what happened to
26   my sister so many years ago.  I don't know if he
27   ever accepted his guilt for what he did.  I know

 1  he pled not guilty. I don't know what's been
 2  going through his mind all these years; but I am
 3  a law enforcement officer and I have over the
 4  years worked in correctional institutes, so I
 5  know some of the con games played out prior to
 6  parole hearings. I don't know what's going on
 7  through his mind. I could try and explain all
 8  the difficult times his actions have caused
 9  members of my family, especially the children of
10  Raul and Linda. I don't know if any of that
11  would justify continuing incarceration. Only
12  God knows for sure what has been going on
13  through his -- what's been going through his
14  mind -- these past many years. Only God knows
15  if he's accepted his actions and guilt or if he
16  just wants to get out of prison and cause more
17  harm. I suppose an indication would be just
18  what has Raul been doing in prison all these
19  years. Has he repented? Has he caused problems
20  for the prison staff? Has he caused harm to
21  anyone else while in prison? I don't know. I
22  will ask this of you: Please answer these
23  questions before making a decision. I know
24  before he murdered my sister and he does play
25  mind games, which are really just another form
26  of crime games. So please consider your actions
27  when deciding. No one in my family really wants

1  to go through the pain again." All right. Is

2  there anything else, Mr. Moyers, about your

3  parole plans that I haven't asked you about?

4        **INMATE MOYERS:**  No, ma'am.

5        **PRESIDING COMMISSIONER FISHER:**  Okay.

6  When you're paroled, do you plan on

7  participating in substance abuse programming?

8        **INMATE MOYERS:**  Yes, ma'am.

9        **PRESIDING COMMISSIONER FISHER:**  And have

10  you looked into that?

11        **INMATE MOYERS:**  I've tried. I contacted

12  my brother and asked him to see if he could get

13  me some sponsors from AA, and they don't do

14  nothing about it.

15        **PRESIDING COMMISSIONER FISHER:**  Okay. Do

16  you know -- in relation to where you would be

17  living -- do you know where the AA meetings are

18  held?

19        **INMATE MOYERS:**  I know that there is

20  (indiscernible) where my sister (indiscernible);

21  there's some in Glendale, because I used to live

22  in Glendale.

23        **PRESIDING COMMISSIONER FISHER:**  Okay.

24  All right. Is there anything else about any of

25  the areas that I've covered that we're missing

26  anything, or do you feel like we've covered it

27  adequately?

```
 1          INMATE MOYERS:  I think we covered it.
 2          PRESIDING COMMISSIONER FISHER:  Okay.
 3    I'm going to ask you to turn your attention to
 4    Commissioner Perez, and he's going to go through
 5    your institutional program with you.
 6          DEPUTY COMMISSIONER PEREZ:  Good
 7    afternoon, Mr. Moyers.
 8          INMATE MOYERS:  How are you doing?
 9          DEPUTY COMMISSIONER PEREZ:  And Counsel.
10    The documents that will be considered during this
11    process -- and I have been able to include your
12    Central File and information that was pulled from
13    your Central File, as well as the Life Prisoner
14    Evaluation report prepared for the June 2005
15    calendar by Correctional Counselor S. Martinez.
16    Also, the post-conviction progress report
17    covering the period of November 7th, 2002, to the
18    present; and this report was also -- well, it was
19    actually prepared by Correctional Counselor
20    Jucina.  The psychological evaluation was
21    prepared for the April 2006 calendar by Dr.
22    Petrosec, Ph.D.  Also, any information that you
23    brought forth yourself or by your attorney will
24    be certainly considered during these proceedings.
25    Recommendations that were made at the
26    documentation hearing -- this documentation
27    hearing was held in November 2002 -- indicated
```

1   that you continue self-help programs, that you

2   remain discipline free, that you continued work

3   programs, and that you obtain multiple vocational

4   trades as available.  And our records show that

5   it looks like you have been involved in --

6   certainly been in compliance with those

7   recommendations.  You're to be commended for that

8   too.

9        **INMATE MOYERS:**  Thank you.

10       **DEPUTY COMMISSIONER PEREZ:**  Housing -- Mr.

11   Moyers, you were initially received by CDC at CSP

12   in Folsom, their Reception Center on 6/5/1999.

13   After the processing, you were approved for

14   placement at the Old Folsom facility; and you are

15   currently housed here at CTF; and you've been

16   here since June 11, 1998.  You've also been

17   housed at CCI, CSP in Corcoran, as well as again

18   here at CTF.  Your Classification Score upon

19   reception was 49, and your current Classification

20   Score is 19.  Custody upon reception was CLOB,

21   and your current custody is a Medium A.  We have

22   a lot of entries, so you've got to bear with me

23   here.  But this is an initial hearing, and that's

24   part of this whole process.  But your vocational

25   training includes Vocational Computer Technology,

26   as well as Computer Refurbishing all the way

27   from, looks like from 1995 to the present date.

```
 1   And you've got one, two, three, four, five, six,
 2   seven, eight, nine, ten, eleven, twelve,
 3   thirteen, fourteen, fifteen, sixteen, seventeen,
 4   eighteen, nineteen, twenty -- there are at least
 5   20 entries of Vocational Computer Tech entries
 6   and vocational activities:  You were a Teacher's
 7   Aide -- actually, this is -- excuse me.  This is
 8   your work history, and these are all above-
 9   average and satisfactory scores.  You were a
10   Teacher's Aide in 1999, on 9/3/1999, 6/8/1999,
11   3/24/1999, 7/28/1999.  You were a Line Server on
12   7/15/1998, and you received exceptional and
13   above-average scores on those.  Let's backtrack
14   for vocational -- actually, that was -- included
15   work and vocational -- but also your chronos and
16   laudatories include on 6/15/1994, a diploma from
17   International Correspondence Schools for
18   Bookkeeping and Accounting; six -- excuse me --
19   2/23/1993, Certificate of Completion for 12 hours
20   of Workshop for Literacy Tutoring; 6/28 -- excuse
21   me -- 5/7/1996, you received a certificate for
22   Computer Vocational participation; 4/22/1997 for
23   that same entry of Computer Vocational
24   participation; on 8/15/2000, the Right to Know --
25   these were hazardous materials -- 2/23/2000, you
26   were involved -- you were commended -- as well as
27   on December 15th, 2000, for your AA/DNA
```

34

1    participation and cooperation.  On 4/13/2001, you
2    were commended and given a certificate for
3    completion of a course on Hepatitis; 4/6/2001,
4    Sexually Transmitted Diseases; 11/22/2002,
5    completion of HIV/AIDS Course; 12/30/1998,
6    Teacher's Aide, a commendation for your
7    assistance on assisting others on computer use.
8    Also you were given one, two, three certificates
9    for Computer Repair Technician Program, your
10   participation on that -- in that -- program on
11   11/1/1999; 4/10/1997 and 11/1/2000, you received
12   a commendation for your attitude during the
13   Central Facility -- as a Central Facility --
14   Watch Officer; giving you a commendation on
15   6/28/2005, you were given a Certificate of
16   Completion for 12-hour workshops, Literacy to
17   Tutoring.  And I think I read that into the
18   record already.  Also, on 6/20/2004, in
19   continuation of a laudatory, includes Certificate
20   of Completion for Vocational Computer
21   Refurbishing; 11/11/2000, Certificate of
22   Appreciation for Computer Refurbishing; and
23   participation on 12/23/2000 for Bookkeeping and
24   Accounting completion, 6/15/1997; 8/29/1995 for
25   DOS and Certificate of Vocational Achievement;
26   9/28, Microsoft Access 2.0; 11/21/19 95, Microsoft
27   Word 600, Excel 5.0, 11/21/1995; Lotus,

1    3/18/1996, 1, 2, 3 software (indiscernible), 5.0;

2    2/23/1993, Certificate of Completion for a 12-

3    hour Literacy Workshop; 1/9/1998, Certificate of

4    Appreciation for Design for the Monthly Report

5    Programming; on 9/18/1996, you were given a

6    Letter of Appreciation for your Microsoft Access

7    2.0 for your vocational achievement and also on

8    3/18/1996 for Lotus 1, 2, 3; 5.0.

9    Congratulations.  That's quite a list.  I've

10   never seen a list quite like this.

11         **INMATE MOYERS:**  Thank you.

12         **DEPUTY COMMISSIONER PEREZ:**  Your self-help

13   involvement includes from your -- looks like from

14   your entry into this facility, we have one, two,

15   three, four, five, six, seven, eight, nine, ten,

16   eleven, twelve, thirteen, fourteen, fifteen,

17   eighteen, nineteen, twenty, twenty-one, twenty-

18   two, twenty-three, twenty-four, twenty-five,

19   twenty-six, twenty-seven, twenty-eight, twenty-

20   nine, thirty, thirty-one, thirty-two, thirty-

21   three, thirty-four entries of continuous AA and

22   NA involvement at this facility.  It looks like

23   beginning on 12/27/1994; that's our earliest

24   entry.  Your work -- looks like you've been

25   involved here working -- your first entry is in

26   1991 of Tutoring, Grading, and ESL Programs.

27   That was 7/1/1993; 12/24/1999, you were in the

1    Yard Crew after that.  You worked on the floors.

2    You were a Painter, a Machine Operator.  Looks

3    like you were a Tailor; you didn't like that.  So

4    we're (indiscernible) to go through your

5    (indiscernible) scores here -- (indiscernible) as

6    well as janitorial work.  Did I miss anything

7    here?

8            **INMATE MOYERS:**  No, sir.

9            **DEPUTY COMMISSIONER PEREZ:**  It looks like

10   you're pretty much all over the globe here with

11   different work activities; and, certainly,

12   congratulations in that regard.  Looks like that

13   kept you out of trouble.  Mr. Moyers, the

14   assessment made by CCI Martinez indicates that

15   providing letters of support arrive -- if they

16   arrive, Moyers should have a strong support

17   structure to ensure successful reintegration into

18   the mainstream society.  It looks like you did

19   secure that, and it's noted for the record that

20   your children harbor no animosity towards you

21   which would also help your transition easier from

22   prison release.  Recommendations made by CCI

23   Martinez indicate that you'd benefit by

24   continuous self-help and remaining disciplinary

25   free.  The psychologist indicates an Axis I, a

26   current diagnostic impression of alcohol

27   dependence in institutional remission.  Axis II,

1     it says no diagnosis, and you have a current GAF

2     Score of 80.  The psychologist's assessment of

3     dangerousness indicates that within a controlled

4     setting your risk is minimal.  During your years

5     of incarceration, you've not received any 115s;

6     and that's certainly to be -- that's a commended

7     -- something to be commended for.  And it says

8     you have a slightly less average level of

9     dangerousness compared to other inmates and

10    you've obtained numerous vocational skills while

11    in prison and you've dealt with your substance

12    abuse issues and you've taken responsibility for

13    your crime.  It says significant risk factors and

14    precursors to violence are certainly your

15    substance abuse, and a relapse would increase his

16    risk for violence (indiscernible) the gains that

17    you've made.  Recommendations made by

18    Psychologist Laura Petrosec on January 11th,

19    2006, indicates that you've taken responsibility

20    for your crime and you continued to remain a

21    stable individual committed to your work,

22    studies, and family.  Mr. Moyers' history within

23    CDC facilities related to his disciplinary

24    record, behavior, and work record all attest to

25    your stability and sound decision-making skills.

26    It's her professional opinion that his release to

27    the community on parole which should be based on

38

1  custody and not psychological factors.  Did I
2  miss anything here?
3          INMATE MOYERS:  (indiscernible).
4          DEPUTY COMMISSIONER PEREZ:  Is this
5  correct?  Anything you want to add for the
6  record?
7          INMATE MOYERS:  No.  That's good.
8          DEPUTY COMMISSIONER PEREZ:  Counsel?
9          ATTORNEY RUTLEDGE:  No.
10          DEPUTY COMMISSIONER PEREZ:  All right.
11  Back to you, Commissioner.
12          PRESIDING COMMISSIONER FISHER:  All right.
13  I just need to clarify some other things.  What
14  happened -- you ended up in an Undesirable
15  Discharge, is that right, from the Army?
16          INMATE MOYERS:  Yes.
17          PRESIDING COMMISSIONER FISHER:  What
18  happened?
19          INMATE MOYERS:  We were over here at Fort
20  Ord waiting for the discharge, and we all decided
21  to go partying.  We went AWOL.
22          PRESIDING COMMISSIONER FISHER:  You went
23  AWOL?
24          INMATE MOYERS:  Yeah.  And then when they
25  brought us back, they -- that's what they gave
26  me, an Undesirable Discharge.
27          PRESIDING COMMISSIONER FISHER:  Okay, you

39

 1   went AWOL because you'd been drinking, right?

 2          INMATE MOYERS:  Well, we went out to

 3   party; yes, ma'am.

 4          PRESIDING COMMISSIONER FISHER:  Okay.

 5   Okay.  Do you know the 12 Steps?

 6          INMATE MOYERS:  If -- yeah, I know some of

 7   them.

 8          PRESIDING COMMISSIONER FISHER:  Okay.

 9          INMATE MOYERS:  If you asked me what it is

10   right now, I won't be able to answer, because I'm

11   so nervous right now, it's pathetic, you know.

12          PRESIDING COMMISSIONER FISHER:  Okay.  How

13   many of them do you know?

14          INMATE MOYERS:  Pardon me?

15          PRESIDING COMMISSIONER FISHER:  How many

16   of them do you know?

17          INMATE MOYERS:  I tried to learn most of

18   them.

19          PRESIDING COMMISSIONER FISHER:  Okay.

20   When did you start going to Alcoholics Anonymous?

21          INMATE MOYERS:  Since the early 90s.

22          PRESIDING COMMISSIONER FISHER:  Early 90s?

23   Do you remember any of them right now?

24          INMATE MOYERS:  No, ma'am.

25          PRESIDING COMMISSIONER FISHER:  How come?

26          INMATE MOYERS:  It's like I -- I'm

27   nervous.  I don't know.  And I've been studying

40

1   them all this month, I've been going through

2   them.

3       PRESIDING COMMISSIONER FISHER:   But you

4   told me earlier you don't -- you don't believe

5   you're an alcoholic, right?

6       INMATE MOYERS:   I'm not an alcoholic,

7   ma'am.   I don't know what -- like you just said,

8   those people aren't saying the right thing.   I

9   just tried to mention that -- take one day at a

10  time, you know.   They say that if you have one

11  drink, you're an alcoholic.   That's what

12  (indiscernible) try to state, you know.

13      PRESIDING COMMISSIONER FISHER:   Well,

14  yeah, but you had a lot more than one drink on

15  more than one occasion.   You got thrown out of

16  the Army --

17      INMATE MOYERS:   That's true.

18      PRESIDING COMMISSIONER FISHER:   -- because

19  of your drinking.

20      INMATE MOYERS:   But in the Army, that's

21  what they do.   That's --

22      PRESIDING COMMISSIONER FISHER:   I'm not

23  talking about what they do.   I'm talking about

24  what you do.

25      INMATE MOYERS:   Okay, that's what I do.

26      PRESIDING COMMISSIONER FISHER:   Do you

27  have any questions?

```
 1        DEPUTY COMMISSIONER PEREZ:  No.

 2        PRESIDING COMMISSIONER FISHER:  Do you

 3   have any questions?

 4        DEPUTY DISTRICT ATTORNEY TURLEY:  Based

 5   on the inmate's response, I'd like for the Board

 6   to inquire as to whether he believes that if he

 7   were to be paroled that he could occasionally

 8   have a drink.

 9        INMATE MOYERS:  No.

10        PRESIDING COMMISSIONER FISHER:  Anything

11   else?

12        DEPUTY DISTRICT ATTORNEY TURLEY:  His

13   answer was no?

14        PRESIDING COMMISSIONER FISHER:  His

15   answer was no.

16        DEPUTY DISTRICT ATTORNEY TURLEY:  Not at

17   all?

18        PRESIDING COMMISSIONER FISHER:  Yeah.

19   You don't believe that you can --

20        INMATE MOYERS:  No.  I could never go

21   back to that, no.

22        PRESIDING COMMISSIONER FISHER:  -- ever

23   have another drink?  Okay.

24        DEPUTY DISTRICT ATTORNEY TURLEY:  Did he

25   say he could not or he did not think he would?

26        INMATE MOYERS:  I won't go back to that.

27        DEPUTY DISTRICT ATTORNEY TURLEY:  Thank
```

1    you.  That's all.

2         **PRESIDING COMMISSIONER FISHER:**  Okay.

3    Counselor, do you have any questions?

4         **ATTORNEY RUTLEDGE:**  Yeah.  Do you go to

5    AA because you've got a drinking problem?

6         **INMATE MOYERS:**  It's one of the

7    accommendations [sic] they gave me, they told me

8    to do, to go to AA and try to learn everything

9    they do in there.

10        **ATTORNEY RUTLEDGE:**  Do you think alcohol

11   related at all to your commitment offense?

12        **INMATE MOYERS:**  Yes, it was.

13        **ATTORNEY RUTLEDGE:**  All right.  And what

14   are you going to do to prevent yourself from

15   drinking when you parole?

16        **INMATE MOYERS:**  I'm going to enlist to an

17   AA program outside.

18        **ATTORNEY RUTLEDGE:**  What about -- would

19   you be interested in maybe doing like a halfway

20   house too or substance abuse --

21        **INMATE MOYERS:**  That would be fine.

‪ 22   Sure.

23        **ATTORNEY RUTLEDGE:**  And do you have any

24   objection to weekly testing from parole to --

25        **INMATE MOYERS:**  Oh, they can test me

26   every day, you know.

27        **ATTORNEY RUTLEDGE:**  All right.  And have

43

1   you been offered Pruno in the prison?

2         INMATE MOYERS:  Everybody has been

3   offered Pruno in --

4         ATTORNEY RUTLEDGE:  Have you

5   (indiscernible)?

6         INMATE MOYERS:  I haven't tried it.

7         ATTORNEY RUTLEDGE:  You haven't tried it?

8         INMATE MOYERS:  No.

9         ATTORNEY RUTLEDGE:  Why not?

10        INMATE MOYERS:  Huh?

11        ATTORNEY RUTLEDGE:  Why not?

12        INMATE MOYERS:  Why not?  Because I don't

13  think it's any good.

14        ATTORNEY RUTLEDGE:  Nope.

15        DEPUTY COMMISSIONER PEREZ:  Hold on a

16  second.  Pruno's not good, or --

17        INMATE MOYERS:  No.

18        DEPUTY COMMISSIONER PEREZ:  --  or it's

19  not good to drink?

20        INMATE MOYERS:  No, it's not good -- I

21  mean, period, you know.  I'm in here  for that

22  offense with drinking, so I don't think I'm

23  going to drink in here, or drink on the outside.

24  So that's --

25        DEPUTY COMMISSIONER PEREZ:  Just curious.

26        INMATE MOYERS:  That's, you know --

27        ATTORNEY RUTLEDGE:  Have you benefited

44

1  from being involved with Alcoholics Anonymous?

2      **INMATE MOYERS:**  Have I benefit -- well, I

3  learned quite a few things, yes.

4      **ATTORNEY RUTLEDGE:**  Like what have you

5  learned?

6      **INMATE MOYERS:**  That if you have one

7  drink, you want another one.  And after another

8  one, you just don't know what the hell you're

9  doing.  And that's true.  It happened to me, you

10  know.  The only thing that you have to do is

11  just stay away from that.

12      **ATTORNEY RUTLEDGE:**  Oh, and did you

13  support your family before the commitment

14  offense?

15      **INMATE MOYERS:**  (indiscernible).

16      **ATTORNEY RUTLEDGE:**  Pardon?

17      **INMATE MOYERS:**  Yes, ma'am.

18      **ATTORNEY RUTLEDGE:**  So the whole time you

19  were married to --

20      **INMATE MOYERS:**  Linda Moyers.

21      **ATTORNEY RUTLEDGE:**  -- Linda -- how --

22  you supported the family, she and the kids?

23      **INMATE MOYERS:**  Yes, ma'am.

24      **ATTORNEY RUTLEDGE:**  No further questions.

25      **PRESIDING COMMISSIONER FISHER:**  I have

26  one more question; and, Counsel, if you need to,

27  you can (indiscernible).  The file indicates

45

1    that your children don't hold any animosity

2    towards you.  Is that the truth?

3         INMATE MOYERS:  I talk to them as far as

4    that goes.

5         PRESIDING COMMISSIONER FISHER:  Okay.

6         INMATE MOYERS:  We talk, we send letters,

7    we communicate.  I send them money whenever I --

8         PRESIDING COMMISSIONER FISHER:  Okay,

9    that's not what I asked you.  They aren't angry

10   at you because of this?

11        INMATE MOYERS:  We don't discuss that.

12   We -- like I said, we don't have any discussion

13   on that.  We both just, you know -- every time I

14   call, they answer the phone.

15        PRESIDING COMMISSIONER FISHER:  Okay.

16        DEPUTY COMMISSIONER PEREZ:  Hold on one

17   second.

18        PRESIDING COMMISSIONER FISHER:  All

19   right.

20        DEPUTY COMMISSIONER PEREZ:  Okay, we're

21   back on record.

22        PRESIDING COMMISSIONER FISHER:  Okay.  So

23   if you were to receive a parole date and you got

24   involved with another woman, whether you got

25   married or not, how would you handle it if she

26   decided she didn't want to continue her

27   relationship with you?

46

1      **INMATE MOYERS:**  First of all, I don't
2   know if I would get involved with another woman;
3   but if I did, I would tell her exactly what
4   happened.

5      **PRESIDING COMMISSIONER FISHER:**  No,
6   that's not what I asked you.

7      **INMATE MOYERS:**  And then --

8      **PRESIDING COMMISSIONER FISHER:**  If you
9   got involved with another woman and she decided
10  that she didn't want to see you anymore and she
11  was done with the relationship but you weren't
12  done with the relationship, how would you handle
13  it?

14     **INMATE MOYERS:**  I'd walk away.

15     **PRESIDING COMMISSIONER FISHER:**  Okay.
16  All right.  Counsel, do you have anything else?

17     **ATTORNEY RUTLEDGE:**  Did Linda deserve to
18  be shot?

19     **INMATE MOYERS:**  No.  (indiscernible).

20     **ATTORNEY RUTLEDGE:**  No further questions.

21     **PRESIDING COMMISSIONER FISHER:**  Let me
22  clarify.  Did you say, "I don't think so"?

23     **INMATE MOYERS:**  (indiscernible) what I
24  said at the last hearing, I said no; and then I
25  said I don't think (indiscernible).  I don't
26  know how the way you guys want me to answer
27  this.

1          **PRESIDING COMMISSIONER FISHER:**  Just

2    clarification.  All right.  Would you like to

3    close?

4          **DEPUTY DISTRICT ATTORNEY TURLEY:**  Yes,

5    thank you.  The inmate -- his counsel suggested

6    that he accepts that he accepts responsibility

7    for what happened here.  Based upon the facts

8    that we have available to us, what he's

9    accepting responsibility for is Linda bringing a

10   gun to the park; Linda pulling the gun on him;

11   he's struggling with her; him getting shot in

12   the leg; and then through nervousness, the gun

13   went off a couple of times.  There's a big

14   difference between accepting responsibility for

15   that false scenario and accepting responsibility

16   for the truth.  And accepting responsibility for

17   a false scenario is not accepting

18   responsibility.  And the facts of the case as

19   they're presented in the statement that was read

20   is that the inmate apparently removed the gun

21   from the house.  He left with the white towel

22   similar to the one the gun had been wrapped in.

23   The testimony was that when Linda left the

24   house, she was carrying nothing.  Post-criminal

25   event, reality was bullets that would fit the

26   weapon were found in the defendant's -- in the

27   inmate's -- possession.  There was no suggestion

1    of any bullets being found by his wife -- his

2    former wife.  His statements that he made were

3    that his wife had taken lessons in handling

4    firearms, and their children indicated that

5    she'd never done anything like that.  And the

6    expert testified that the wound that he had in

7    his leg was inconsistent with the facts that he

8    had used to describe how he received that wound.

9    So there's a very different scenario that the

10   inmate needs to take responsibility for before

11   he's taken responsibility for this crime.  He

12   has to take responsibility for removing the

13   firearm, for pointing it at his wife.  Here's a

14   man who's 41 years old, been married to the same

15   woman for more than 20 years, meets her in a

16   park, shoots her twice, walks away, leaving her

17   there to die without calling for any help, and

18   suggesting that the reason that they had this

19   altercation because he loves her and he wants to

20   live with her.  Strange reward for 20 years of

21   marriage.  A man who says he's not an alcoholic

22   but was given an Undesirable Discharge from the

23   Army related to, in his word, partying; was

24   kicked out of the house by his wife of more than

25   20 years, whom he says he loves, because of

26   drinking.  He has attended AA for virtually non-

27   stop for the last 12 years or so.  He's unable

1    to recite the steps and says he's still not an
2    alcoholic. As the -- as I've said earlier, it's
3    important in the process of dealing with the
4    threat that a person represents to public safety
5    for that person to have realized the
6    truthfulness of the events in which he was
7    involved in committing a crime. This inmate has
8    -- despite the fact that he's been in prison for
9    a very long time -- there isn't any indication
10   in the file that he has taken responsibility and
11   dealt with the reality of what he did that
12   caused the death of this woman that he says that
13   he loved. And I think that is a critical step
14   for rehabilitation. All these AA meetings that
15   he's gone to, they've got to tell him over and
16   over and over realizing you have a problem is
17   the beginning of that rehabilitation. Dealing
18   with the truth for criminal behavior is the
19   beginning of rehabilitation. And until the
20   inmate learns to deal with the truthfulness and
21   to accept the truthfulness of what happened here
22   as opposed to the false scenarios that are all
23   that's indicated, included, in the file that we
24   now have, then I believe he continues to
25   represent a threat to public safety. I believe
26   he continues -- in my view -- he continues to
27   represent a threat to public safety until he can

1   say with a straight face and a stand-up
2   attitude, "Yes, I'm an alcoholic," that his
3   history -- an alcoholic is a person whose life
4   is destroyed by alcohol, and he certainly has
5   all of the indicia for that, and he needs to
6   deal with that and accept that. And that based
7   on all of the above, we recommend that defendant
8   be given a denial and be given a multi-year
9   denial at this time. Thank you very much.
10          **PRESIDING COMMISSIONER FISHER:** Thank
11   you. Counsel?
12          **ATTORNEY RUTLEDGE:** Going to the factors
13   of suitability -- well, first let me clarify --
14   I asked Mr. Moyers if he had a drinking problem,
15   and he answered in the affirmative. I'm not
16   sure if he misunderstands that the term
17   alcoholic; but I think if he's been going to AA
18   meetings for that long, he thinks he belongs
19   there whether or not he wants to verbalize today
20   that he's an alcoholic. Obviously he knows
21   something is not right, you know. We have
22   people in here that kill people when they were
23   drunk and have never gone to AA, so I think that
24   he has virtually answered that question, does --
25   is in touch with his -- he said how alcohol, you
26   know, got him here; and I don't think anybody
27   would disagree with that. Going through his

1    factors in favor of suitability, he has no

2    juvenile record, no adult convictions, his

3    stable social history.  He was married to Mrs.

4    Moyers for 20 years, they raised three children,

5    and he supported that family, stayed with them,

6    supported them that entire time.  He had a very

7    good work record according to the file.  He has

8    indicated signs for remorse throughout the file.

9    He says he's extremely remorseful for his action

10   and how it has affected so many people.

11   Motivation for the crime -- it appears that

12   there was some testimony or information from a

13   doctor during the adjudication of his matter

14   that he had been under stress; and, you know,

15   his wife had just told him to get out.  I would

16   call that a significant stress in his life.

17   Again, he has no lack of -- any kind of criminal

18   history.  He's not 58?

19          **INMATE MOYERS:**  (indiscernible).

20          **ATTORNEY RUTLEDGE:**  He's 58 years old,

21   which indicates a very low rate of recidivism.

22   Understanding the plans for the future, he has

23   submitted very concise information to the Board

24   about what he's going to do when he gets out on

25   parole.  He's even gone as far as to try find a

26   sponsor in AA, he's got lots of family support,

27   lots of letters to support that, and everything

1    laid out -- contact information -- should the --
2    when the Governor needs to review and confirm
3    parole plans, it will be very easy with the
4    information that he's provided. He has
5    marketable skills, you know. The neat thing is
6    he's taken up computers, which I know a lot of
7    people don't, you know, like to try at his age;
8    but he's learned that, so he's kind of expanded
9    himself vocationally also by completing other
10   vocations, by taking lots of business classes.
11   He got a diploma for Bookkeeping and Accounting.
12   He's managed to keep himself employed with all
13   types of different jobs: Teacher's Aide, Line
14   Server, Janitor, Tailor. Also furniture. He's
15   done vocational work in furniture finishing. He
16   pretty much non-stop since he's been in custody
17   has been working, trying to upgrade himself
18   vocationally, and also getting some self-help.
19   He has numerous laudatory chronos of lots of
20   different self-help programs regarding hazardous
21   materials, other health courses, AA and NA.
22   He's been in custody now for 18 years. And I
23   would note too that his children talk to him.
24   And I wanted to address the letter from the
25   victim's -- brother?
26           INMATE MOYERS:  Brother.
27           ATTORNEY RUTLEDGE:  Richard Villareal.  I

53

```
 1  think he asks fair questions, and I wanted to
 2  address -- I think that -- Mr. Moyers has had no
 3  rules violations.  I don't think he's caused any
 4  problems to anybody in prison.  In fact, he's
 5  tried to be useful since he's been here.  Has he
 6  played any mind games?  I think he's been very
 7  straightforward with the Board.  He's very
 8  nervous.  He's usually quite a jovial person,
 9  but I noticed today he was very uptight, and I
10  think he is genuinely very nervous.  And he has,
11  you know -- has he accepted his actions or
12  guilt, or does he just want to get out of prison
13  and cause more harm?  I, you know, we want to
14  say, oh -- the People said -- well, he poses an
15  unreasonable risk.  I can't see how this man,
16  having not committed any -- not being -- having
17  any prior convictions, no rules write-ups in the
18  last 18 years, presents an unreasonable risk in
19  light of the fact that he, during a stressful
20  situation with his wife, shot her, takes
21  responsibility for that, has new skills since
22  he's been in here, has full family support,
23  parole plans, understands the impact of alcohol
24  in his life, which is really key.  That is the
25  key of his commitment offense, and he's
26  recognized that.  And he is prepared to do all
27  those things that will keep him out of trouble.
```

54

1    So I don't think there's any support to him

2    being an unreasonable risk. I think he -- I

3    think anytime someone is let out of prison,

4    there is some risk there; and not letting him

5    out would be an unreasonable -- I don't think he

6    poses an unreasonable risk. I think he meets

7    all the factors for suitability, especially the

8    institutional behavior and understanding of

9    plans for the future. I would note too that he

10   has participated in Impact, still remains in

11   contact with his kids, is sending them money;

12   and his family is very supportive of him,

13   showing that he's maintained social -- or stable

14   -- social stability since he's been in custody.

15   So all those -- in light of all those factors, I

16   would ask that the Board give him a parole date

17   today. Thank you.

18        **PRESIDING COMMISSIONER FISHER:** Thank

19   you. Mr. Moyers, is there anything that you'd

20   like to add?

21        **INMATE MOYERS:** No.

22        **PRESIDING COMMISSIONER FISHER:** Okay.

23   We'll go ahead and recess. We'll have you come

24   back (indiscernible).

25                    R E C E S S

26                    --o0o--

27

55

```
 1              CALIFORNIA BOARD OF PAROLE HEARINGS
 2                        D E C I S I O N
 3              DEPUTY COMMISSIONER PEREZ:  Okay, we're
 4    on record, Commissioner.
 5              PRESIDING COMMISSIONER FISHER:  Can you
 6    hear me?
 7              INMATE MOYERS:  Yes, ma'am.
 8              PRESIDING COMMISSIONER FISHER:  Okay,
 9    good.  All right.  I want to note for the record
10    that everyone who was previously in the room and
11    identified themselves have returned to the room.
12    And, Mr. Moyers, the panel reviewed all the
13    information received from the public and relied
14    on the following circumstances in concluding
15    that you are not yet suitable for parole and
16    would pose an unreasonable risk of danger to
17    society or a threat to public safety if released
18    from prison.  Certainly, the first thing that we
19    considered was your commitment offense.  For the
20    record, again this is the murder of Linda
21    Villareal Moyers.  This was the wife of Mr.
22    Moyers.  She had apparently left him.  They had
23    been separated for a period of time, and he was
24    attempting to resurrect the relationship.  Based
25    on the information in the statement of facts and
26    the appellate report -- appellate decision --
27    RAUL MOYERS  E-17403  DECISION PAGE 1  4/12/06
```

56

```
 1   Mrs. Moyers apparently was in possession of a
 2   gun that had been given to she and Mr. Moyers by
 3   another family member who had asked them to hold
 4   on to the gun.  There was a statement made by
 5   her daughter that she had asked Mrs. Moyers to
 6   hide the gun; and she stated later, in the
 7   transcripts from the trial, that that was
 8   because she thought it would be better for them
 9   if the gun was hidden.  The bottom line is this,
10   Mr. Moyers had Mrs. Moyers meet him at the park
11   near their home; and witnesses saw him shoot at
12   her more than once.  None of the witnesses saw
13   her do anything aggressive toward him.  No one
14   ever saw her with the gun.  People who saw him
15   leaving the scene of the shooting said that he
16   was not limping.  And police officers who
17   arrived on the scene found her dead.  We also
18   considered Mr. Moyers' unstable social history,
19   which included his significant substance abuse
20   problem that impacted his life in various ways,
21   including the fact that he'd been drinking at
22   the time of the commitment offense, as well as
23   the fact that he went AWOL when he was at Fort
24   Ord and as the psych evaluation puts -- and I
25   believe it's the psych evaluation
26   (indiscernible) the Board report psych
27   RAUL MOYERS  E-17403  DECISION PAGE 2  4/12/06
```

57

1    evaluation -- says he went AWOL while stationed

2    at Fort Ord during the last six months of his

3    tour.  He stated that he simply, quote, "took

4    off," end quote, after drinking alcohol with his

5    peers.  Due to this he was given an Undesirable

6    Discharge (indiscernible) was reduced in rank to

7    an E-2.  The Axis I in the most recent psych

8    evaluation is alcohol dependence in

9    institutional remission.  Under Assessment of

10   Dangerousness, Dr. Petrochec says Mr. Moyers has

11   a slightly less than average level of

12   dangerousness compared to other inmates.  He is

13   dealing with the substance abuse issue.

14   Significant risk factors and precursors to

15   violence are his past substance abuse and a

16   relapse would increase his risk for violence and

17   undo the gains that he has made.  In Mr. Moyers'

18   appeal, he's contending that he was so drunk as

19   to be unable to perform malice.  His daughter

20   says defendant also (indiscernible) on the

21   testimony of Jeannette at the sentencing hearing

22   the defendant had been going downhill in the

23   last few years, that he had a drug habit and

24   would come home drunk, wasted, and high.  He

25   also stated that he had been drinking daily for

26   several months prior to the shooting and had

27   RAUL MOYERS   E-17403   DECISION PAGE 3   4/12/06

58

1   spent about one hour drinking until about
2   1:00 p.m. on the day of the shooting. So the
3   bottom line, Mr. Moyers, is you can't have it
4   both ways. Either you have a drinking problem
5   or you don't but, you know -- and you can't
6   change your opinion of that based on where you
7   happened to be at the time and what you need to
8   convince people of. In a separate decision, the
9   hearing panel finds that the prisoner has been
10  convicted of murder and it's not reasonable to
11  expect that parole would be granted at a hearing
12  during the following five years. Specific
13  reasons for this are as follows. First of all,
14  once again, the commitment offense. This was a
15  cold-blooded murder of a woman with whom you had
16  an intimate relationship over a period of years
17  who shouldn't have had to be afraid of you and
18  who shouldn't have had to go out into public to
19  have a discussion with you in order to keep
20  herself safe. As it turns out, that didn't
21  really help then. In the area of insight, Mr.
22  Moyers, I've got to say I don't think you have
23  any. The story that you have been telling about
24  what happened in this event flies in the face of
25  common sense. You certainly are not required to
26  talk about the offense. When you don't talk
27  RAUL MOYERS   E-17403   DECISION PAGE 4   4/12/06

59

1    about the offense, what we have to do is we have

2    to look at what you said in the past; and what

3    you said in the past is just absolutely not

4    believable.  In the area of substance abuse,

5    once again, you can't have it both ways.  And

6    according to all of the information that I've

7    seen, you do have a substance abuse problem,

8    certainly with alcohol.  You've indicated that

9    you've been involved in substance abuse

10   programming since the early 90s today.  It looks

11   like it started in about 1994.  When I asked you

12   if you were an alcoholic on a couple of

13   occasions, you said no.  You don't know the·

14   steps, so what you've been doing since 1994 I'm

15   not entirely sure.  And when asked about why you

16   were going to AA by your attorney, you said

17   because they told you to, that it was one of the

18   things that you were told to do.  So, frankly, I

19   don't know where anybody gets the idea that you

20   are accepting responsibility for anything,

21   because from my perspective you're being

22   untruthful about what happened during the

23   commitment offense and you're not investing any

24   kind of serious focus on dealing with your

25   substance abuse problems.  I do want to say that

26   you've done a good job of programming in the

27   RAUL MOYERS  E-17403  DECISION PAGE 5  4/12/06

60

```
 1   area of vocation and in the area of education;
 2   but apart from your substance abuse programming,
 3   you really haven't been doing any work in the
 4   area of self-help.  We're going to recommend
 5   that you remain disciplinary free, that you
 6   continue your participation in substance abuse
 7   programming; in fact, I would tell you that you
 8   should never stop that.  You should be staying
 9   in a substance abuse program from this point
10   forward; and, frankly, I'm quite sure that when
11   you do receive a parole date, it will be part of
12   your parole as well.  But you need to get
13   involved in some self-help that will give you
14   the ability to look at yourself and look at your
15   crime and look at the way you treated your wife
16   and take some responsibility for your own
17   behavior.  I would like to see you do some
18   reading or some work in therapy or self-help in
19   the area of spousal abuse.  I would like to see
20   you do some work in the area of victim impact.
21   I would like for you to learn about how your
22   behavior impacts other people in general.  And I
23   would like for you to go through your file and
24   read the facts of this offense and really think
25   about what you did and be prepared at some point
26   in the future to talk to somebody about it in a
27   RAUL MOYERS  E-17403  DECISION PAGE 6  4/12/06
```

61

1   way that can make some sense so that the

2   Commissioners at some point can start to see

3   that you're developing insight over time.   And

4   that completes the decision (indiscernible).

5        **DEPUTY COMMISSIONER PEREZ:**   Good luck to

6   you.   I'll turn it off.   Thank you.

7                           --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED FIVE YEARS.

24   THIS DECISION WILL BE FINAL ON:_____AUG 1 0 2006_____.

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   RAUL MOYERS   E-17403   DECISION PAGE 7   4/12/06

62

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, C.M. LOPEZ, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1-61, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

INITIAL PAROLE CONSIDERATION HEARING OF RAUL MOYERS,

CDC NO. E-17403, ON APRIL 12, 2006, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated May 1, 2006, at Sacramento, California.

C.M. LOPEZ
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT "B"

## Life-Term Inmate Evaluation for the Board of Prison Terms
### MENTAL HEALTH EVALUATION

### PSYCHOSOCIAL ASSESSMENT

### 1. IDENTIFYING INFORMATION

| | |
|---|---|
| NAME: | Moyers, Raul |
| CDC# | E-17403 |
| AGE: | 58 years old |
| DOB: | 11-21-1947 |
| MARITAL STATUS: | Divorced |
| RACE: | Hispanic |
| RELIGION: | Catholic |
| DATE OF REPORT: | 01/11/06 |

This report is based on review of the inmate's medical file, review of his C-file, prior Board of Prison Terms reports. Prior psychological evaluations, current classification information and probation officer's report were used in preparation for this report. The current interview with the inmate and the report are limited by the amount of information given to this examiner by the inmate at the time of the interview. The following information is accurate to the extent that the records and the inmate's self-report are accurate As a result, the absolute accuracy cannot be assured. The primary purpose of this report is to provide the Board of Prison Terms psychological data, psychiatric diagnostic information and an assessment of dangerousness in regard to his possible release to the community. This evaluator is not responsible for any inaccurate statements or changed opinions expressed by the inmate at a later date. The inmate was interviewed for approximately 1 hour and 10 minutes and the inmate's file was reviewed for approximately 4 to 6 hours.

The inmate was informed that the interview was not confidential and a report with the results of the evaluation would be submitted to the Board of Prison terms to assist in determining his eligibility for parole. The inmate was informed that any disagreement with the substantive conclusion could be most appropriately address at the inmate's Board hearing. The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of the inmate's ability. For reasons not limited to the possibility that an individual may have a mental disability or condition which may qualify, under the American's with Disabilities Act, the evaluation was conducted by a licensed clinical psychologist.

Exhibit "B"

## Identifying Information:

Mr. Moyers is a 58-year-old, divorced, Hispanic male, received in CDC on 04/28/1989 who is serving a sentence of 27 years to life for murder in the first degree and use of firearm. Mr. Moyers is of medium stature and appears his stated age. There were no unusual physical characteristics readily apparent to the evaluator. Mr. Meyers does not have any known nicknames or aliases. This is the Initial evaluation for the Board of Prison Terms.

## Developmental history:

Mr. Moyers was born in Mexico and is the youngest of seven children, having three brothers and three sisters. Moyers was born on 11/21/47 to Francisco and Maria Moyers, in Chihuahua, Mexico. He had six siblings and when he was about thirteen years old, his family relocated to Los Angeles, California. He grew up in the Los Angeles area and graduated from Belmont High School in 1965. His father passed away in the early 1970's and his mother passed away in the mid 1980's. After graduation, he worked in a hardware store and married his wife, Linda. They had three children, Raul, Jeanette and Veronica. he maintains positive contact with them. Moyers served with the armed forces for two years and following an honorable discharge, he worked in the hardware business and in 1985 started his own company. It was a construction and maintenance remodeling entity and he did this until his arrest for the instant offense. All in all, there does not appear to be any pattern or indication that would have lead his path to a crime of this magnitude. The primary language spoken at home was Spanish but since then he has learned English. Mr. Moyers denied any birth defects and stated that he did not experience any significant childhood illnesses. He denied being the victim or perpetrator of physical or sexual abuse. He denied any history of arson or physical cruelly to animals.

## Education:

Mr. Moyers attended school until the 8th grade in Mexico. He is taking classes in English, and is trying to obtain his GED.

## Family History:

Mr. Moyers was born in Mexico. He denied a family history of mental illness and substance abuse. He denied any other family involvement with the legal system. His siblings write to him on a regular basis.

## Psychosexual Development and Sexual Orientation:

Mr. Moyers self-identified as heterosexual. He noted pubescent changes at about the age of twelve and had his first sexual encounter shortly thereafter. He reported that he had one significant relationship and a few casual relationships. He denied any high-risk sexual behavior or sexually aggressive behaviors or fantasies thereof.

## Military History:

He entered the US Army and served from 1968 through 1971. His overseas assignment was in Germany. His job was as a mechanic. When he rotated back to the United States, he went AWOL while stationed at Fort Ord during the last six months of his tour. He stated that he simply "took off" after drinking alcohol with his peers. Due to this, he was given an undesirable discharge, forfeited pay, and was reduced in rank to E-2.

## Marital History:

Mr. Moyers was married in 1968 and they had three children, Raul, 37, Veronica, 34, and Jeannette, 32. Mr. Moyers wife was the victim of his instant offense. He keeps in regular contact with his children.

## Employment/Income History:

Mr. Moyers has one year of trade technical education in the education field. He has predominantly worked as hardware salesmen and between 1968 he was self-employed in the construction business. He has finished a course in computer repair since being incarcerated. He has worked in the academic department as a teachers aide and is currently a clerk in the first watch office.

## Substance Abuse History:

Mr. Moyers has an extensive history of alcohol dependence before his incarceration. He received one DUI before his incarceration and was under the influence of alcohol when he committed the instant offense. He has been attending AA during his incarceration.

## Psychiatric and Medical History:

Mr. Moyers denied a history of psychiatric problems. There does not appear to be a family history of mental illness.

## Plans If Granted Release:

He has indicated that he will reside with his sister, Eldemira Cruz at 1642 Glendale Blvd., Los Angeles, CA 90026 phone # (213) 413-3432. He can also reside with his sisters Rufina Cardenas or Mary Castillo in Huntington Park, CA. He also has options with his brothers; Manual Moyers in Pico Rivera, CA. or Frank Moyers in Huntington Park, CA. He has stated that he can work for his nephew, Victor Cruz, who owns a construction business a Los Angeles; CA. Moyers has extensive experience in this field. Moyers has a very strong support structure to help ensure his successful reintegration into mainstream society. His children harbor no animosity towards inmate Moyers which would also help to make his transition easier from prison.

also help to make his transition easier from prison

## CLINICAL ASSESSMENT

### Current Mental Status/Treatment Needs:

Mr. Moyers is a 58 year-old Mexican born male. He was cooperative and forthcoming with relevant psychosocial information and case factors. Mr. Moyers was alert and oriented to all spheres. Speech was clear and coherent, his thought process was linear and goal directed. His memory, attention, and concentration appeared well within normal limits. He demonstrated fair insight and judgment and his cognitive abilities appeared to be grossly intact. He was cooperative and friendly in his attitude. At the time of the evaluation, Mr. Moyers did not appear to suffer from a major psychiatric illness. There was no evidence of a formal thought disorder, any depressive or manic symptoms.

### Therapy of Self-Help Activities

He has participated in AA off and on since being incarcerated and has completed the Impact program. His BPT documentation hearing acknowledged his positive behavior and self-help attendance.

### Current Diagnostic Impressions DSM IV

| Axis 1 | Alcohol Dependence, In Institutional Remission |
| Axis 2 | V71.09 No Diagnosis |
| Axis 3 | None. |
| Axis 4 | Incarceration |
| Axis 5 | GAF 80 |

### Review of Life Crime:

#### 1. Summary of Crime:

Moyers was arrested on 6/29/88 for the killing of his wife, Linda Villareal Moyers. Although there are no reports available at the time of the incident due to pre plea arrangement, the following information is taken from pages 3 5-36 of the sentencing transcript dated 4/21/89. Apparently Moyers and his wife were having marital problems shortly before the crime. Witnesses indicate that they had recently separated and Moyers was having trouble accepting it and was trying to reunite with his wife. At the park across the street from their house Moyers and the victim met to discuss the situation. Other witnesses said that they saw Moyers shoot the victim several times after they had been sitting at a picnic table for about fifteen minutes. Moyers was found with some notes in his possession, mentioning threats of violence towards the victim. He was taken into custody on the evening of the day of the crime.

2. Prisoner's Version: Moyers stated he agreed with the above version. He expressed remorse and was sincere. He stated he had no intention of taking his wife's life and was extremely remorseful for his actions and how it affected so many people.

## Assessment of Dangerousness:

A. Within a controlled setting, the risk is minimal. During his years of incarceration, the inmate has not received any CDC 115's.

B. If released into the community, Mr. Moyers has a slightly less than average level of dangerousness compared to other inmates. He has obtained vocational skills while in prison. He is dealing with his substance abuse issues. He also takes responsibility for his crime.

C. Significant risk factors and precursors to violence are his past substance abuse, and a relapse would increase his risk for violence and undo the gains he has made.

## Comments and Recommendations:

1. If paroled, he should be mandated to attend both AA and NA meetings and have frequent periodic drug testing for alcohol and illegal substances.

2. Mr. Moyers has taken responsibility for his crime. He continues to remain a stable individual committed to his work, studies, and family. Mr. Moyer's history within CDC's facilities related to his disciplinary record, behavior and work record all attest to his stability and sound decision making skills. It is my professional opinion that his release into the community and parole should be based upon custody and not psychological factors.

Laura Petracek, Ph.D.
Contract Psychologist, CA License PSY 20033
Correctional Training Facility, Soledad

1-11-2006
Date

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

1/11/2006
Date

# EXHIBIT "C"

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
JUNE 2005 CALENDAR

MOYERS, RAUL                                                    E-17403

## I.   COMMITMENT FACTORS:

A.   **Life Crime:** PC 187, Murder First, one count, with PC 12022.5(A) Use of a
     Firearm. Los Angeles County Case #A593540. Victim: Linda Villareal Moyers,
     age: unknown. Received into CDC on 4/28/89, sentence: twenty five years to
     Life plus two years. MEPD: 7/2/06.

   1.   **Summary of Crime:** Moyers was arrested on 6/29/88 for the killing of
        his wife, Linda Villareal Moyers. Although there are no reports available
        at the time of the incident due to pre plea arrangement, the following
        information is taken from pages 35-36 of the sentencing transcript dated
        4/21/89. Apparently Moyers and his wife were having marital problems
        shortly before the crime. Witnesses indicate that they had recently
        separated and Moyers was having trouble accepting it and was trying to
        reunite with his wife. At the park across the street from their house
        Moyers and the victim met to discuss the situation. Other witnesses said
        that they saw Moyers shoot the victim several times after they had been
        sitting at a picnic table for about fifteen minutes. Moyers was found with
        some notes in his possession, mentioning threats of violence towards the
        victim. He was taken into custody on the evening of the day of the crime.

   2.   **Prisoner's Version:** Moyers did not make a statement when he was
        arrested as to the nature of the crime. He did verbalize the following
        during the interview for this report. He and his wife, the victim, were
        having problems a few days before the crime and he had left the family
        home. He was attempting to get her back when, on the day of the crime,
        she had called him to discuss their situation. When he arrived at the home,
        she came out and said they could talk at the park and not in the home.
        They were at the park for a little while when the conversation turned into
        an argument. Moyers said she had brought the gun and in the heat of the
        moment, shot him in the leg. Moyers reacted and went for the gun. As
        they struggled, it went off. He took the gun and pointed it at her to keep
        her back and said as he was holding it. Nervousness caused the gun to go
        off again. He saw her fall to the table and got frightened. He then went to
        one of the job sites he worked at and while drinking, he composed the

MOYERS, RAUL          E-17403                    CTF-SOLEDAD          JUN/2005

SENT TO I/M ON _____

Exhibit "C"

2

threat notes. He did not think he had killed her. He stated that he had no intention of taking the victim's life and he is extremely remorseful for his actions and how it affected so many people.

3. **Aggravating/Mitigating Circumstances:**

    a.    **Aggravating Factors:**

        1. The prisoner had opportunity to cease but instead continued with the crime.
        2. Use of weapon.

    b.    **Mitigating Factors:**

        1. The prisoner has minimal history of criminal behavior.

B.    **Multiple Crime(s):** None.

    1.    **Summary of Crime:** None.

    2.    **Prisoner's Version:** None.

## II.    PRECONVICTION FACTORS:

A.    **Juvenile Record:** None noted.

B.    **Adult Convictions and Arrests:** Arrested 4/20/77 for drunk driving, disposition: unknown, arrested 11/2/82 for battery on person, disposition: unknown, arrested 6/29/88 for instant offense, disposition: convicted.

C.    **Personal Factors:** Moyers was born on 11/21/47 to Francisco and Maria Moyers, in Chihuahua, Mexico. He had six siblings and when he was about thirteen years old, his family relocated to Los Angeles, California. He grew up in the Los Angeles area and graduated from Belmont High School in 1965. His father passed away in the early 1970's and his mother passed away in the mid 1980's. After graduation, he worked in a hardware store and married his wife, Linda. They had three children, Raul Jeanette and Veronica. he maintains positive contact with them. Moyers served with the armed forces for two years and following an honorable discharge, he worked in the hardware business and in 1985 started his own company. It was a construction and maintenance remodeling entity and he did this until his arrest for the instant offense. All in all, there does not appear to be any pattern or indication that would have lead his path to a crime of this magnitude.

## III.    POSTCONVICTION FACTORS:

A.    **Special Programming/Accommodations:** None.

B.    **Custody History:** He has remained at CTF since his arrival on 10/19/94. His behavioral classification score is "0" points and he has maintained medium A custody. In addition, he has maintained relatively steady assignments and has programmed over all in a positive manner.

C.    **Therapy and Self-Help Activities:** He has attended AA group sessions and Impact self help program.

D.    **Disciplinary History:** During his incarceration, he has only had one CDC 128A for failure to report on 10/21/94. He has had no CDC 115's.

E.    **Other:** His last BPT hearing was a Documentation hearing on 11/7/02, wherein the Board acknowledged his positive behavior, self help attendance and to advise to obtain a second trade.

## IV.    FUTURE PLANS:

A.    **Residence:** He has indicated that he will reside with his sister, Eldemira Cruz at 1642 Glendale Blvd., Los Angeles, CA 90026 phone #(213) 413-3432. He can also reside with his sisters Rufina Cardenas or Mary Castillo in Huntington Park, CA. He also has options with his brothers, Manual Moyers in Pico Rivera, CA., or Frank Moyers in Huntington Park, CA. Updated letters are forthcoming.

B.    **Employment:** He has stated that he can work for his nephew, Victor Cruz, who owns a construction business a Los Angeles, CA. Moyers has extensive experience in this field. He can also utilize his accounting degree and his trade completion of vocational computer repair for employment avenues. Letter from his nephew is anticipated.

C.    **Assessment:** Providing letters of support arrive, Moyers should have a very strong support structure to help ensure his successful reintegration into mainstream society. It also is reflected in the POR of the Central File that his children harbor no animosity towards inmate Moyers which would also help to make his transition easier from prison release.

## V.    USINS STATUS: N/A.

LIFE PRISONER EVALUAT‌. REPORT
PAROLE CONSIDERATION HEARING
JUNE 2005 CALENDAR

## VI.    SUMMARY:

A.    Prior to release the prisoner could benefit from: continuing self help and remaining disciplinary free.

B.    This report is based upon a one hour interview and a three hour complete review of the Central File.

C.    Moyers was afforded an opportunity to examine his Central File on 3/22/05 per CDC 128B dated 3/22/05, reflecting that he declined the review.

D.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
JUNE 2005 CALENDAR

_____   9·14·05
S. Martinez                    Date
Correctional Counselor I

_____   4/15/05
J. Soares                      Date
Correctional Counselor II

_____ FC C=?   4/15/05
I. Guerra                      Date
Facility Captain

_____ CDR   4/19/05
D. S. Levorse                  Date
Classification and Parole Representative

# EXHIBIT "D"

Thursday, April 28, 2005

STATE OF CALIFORNIA
BOARD OF PRISON TERMS (CHAIRMAN)
428 J. STREET   6TH FLOOR
SACRAMENTO, CA. 95814

RE: MR. RAUL MOYERS

FROM:MANUEL MOYERS
9132 WEST AVENUE
PICO RIVERA, CA. 90660
(562) 695-5056

DEAR BOARD BOARD OF PRISON TERMS     CHAIRMAN

I, MANUEL MOYERS, BROTHER OF RAUL MOYERS AND HAVE KNOWN HIM FOR MORE
THAN 55 YEARS, I HAVE FULL CONFIDENCE AND BELIEVE THAT MY BROTHER RAUL IS A
USEFUL AND LAW ABIDING CITIZEN IN OUR COMMUNITY.
I KNOW HE HAS MADE MISTAKES LIKE MOST OF US, BUT AFTER ALL THAT I BELIEVE HE
IS A VERY GOOD PERSON.
I WILL LIKE TO TO LET YOU KNOW THAT I WILL OPEN MY HOME DOORS TO MY
BROTHER AND INVITE HIM TO LIVE IN MY HOME ANYTIME HE DESIRES, I WILL PAY FOR
ALL HIS PERSONAL EXPENSES.

I AM ALSO PLANNING ON FIND HIM A  DECENT JOB BASED ON ALL THE TRADES THAT
HE HAS LEARNED.
I WILL PROVIDE AT MY EXPENSE ALL MELAS TRANSPORATION AND CLOTHING IF
NECESSARY,AND ALL PERSONAL NEEDS. AND I WILL DO MY BEST TO GUIDE HIM IN
BEING A GOOD CITIZEN.AND WILL BE THERE FOR ALL HIS NEEDS

RESPECTFULLY:

MANUEL MOYERS

JUAN M. ARENAS NOTARY PUBLIC
STATE OF CALIFORNIA
LOS ANGELES COUNTY

SEAL:

JUAN M. ARENAS
COMM. #1349065
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Apr. 27, 2006

Exhibit "E"

Thursday, April 28, 2005

STATE OF CALIFORNIA
BOARD OF PRISON TERMS (CHAIRMAN)
428 J. STREET  6TH FLOOR
SACRAMENTO, CA. 95814

RE: MR. RAUL MOYERS

FROM: EDELMIRA CRUZ
1642 GLENDALE BLVD
LOS ANGELES, CA. 90026
(213) 413-7956

DEAR BOARD BOARD OF PRISON TERMS    CHAIRMAN

I, EDELMIRA CRUZ SISTER OF RAUL MOYERS AND HAVE KNOWN HIM FOR MORE THAN
50 YEARS; I HAVE FULL CONFIDENCE AND BELIEVE TAHT MY BROTHER RAUL IS A
USEFUL AND LAW ABIDING CITIZEN IN OUR COMMUNITY.
I KNOW HE HAS MADE MISTAKES LIKE MOST OF US, BUT AFTER ALL THAT I BELIEVE HE
IS A VERY GOOD PERSON.
I WILL LIKE TO TO LET YOU KNOW THAT I WILL OPEN MY HOME DOORS TO MY
BROTHER AND INVITE HIM TO LIVE IN MY HOME ANYTIME HE DESIRES, I WILL PAY FOR
ALL HIS PERSONAL EXPENSES.

I AM ALSO PLANNING ON FIND HIM A  DECENT JOB BASED ON ALL THE TRADES THAT
HE HAS LEARNED.
I WILL PROVIDE AT MY EXPENSE ALL MELAS TRANSPORATION AND CLOTHING IF
NECESSARY,AND ALL PERSONAL NEEDS.

RESPECTFULLY:

EDELMIRA CRUZ

JUAN M. ARENAS NOTARY PUBLIC
STATE OF CALIFORNIA
LOS ANGELES COUNTY

SEAL:



JUAN M. ARENAS
COMM. #1349065
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Apr. 27, 2006

Thursday, April 28, 2005

STATE OF CALIFORNIA
BOARD OF PRISON TERMS (CHAIRMAN)
428 J. STREET   6TH FLOOR
SACRAMENTO, CA. 95814

RE: MR. RAUL MOYERS

FROM: RUFINA CARDENAS
6762 CEDAR STREET
HUNTINGTON PARK, CA. 90255
(323) 581-2709

DEAR BOARD BOARD OF PRISON TERMS      CHAIRMAN

I, RUFINA CARDENAS, SISTER OF RAUL MOYERS AND HAVE KNOWN HIM FOR MORE
THAN 55 YEARS, I HAVE FULL CONFIDENCE AND BELIEVE TAHT MY BROTHER RAUL IS A
USEFUL AND LAW ABIDING CITIZEN IN OUR COMMUNITY.
I KNOW HE HAS MADE MISTAKES LIKE MOST OF US, BUT AFTER ALL THAT I BELIEVE HE
IS A VERY GOOD PERSON.
I WILL LIKE TO TO LET YOU KNOW THAT I WILL OPEN MY HOME DOORS TO MY
BROTHER AND INVITE HIM TO LIVE IN MY HOME ANYTIME HE DESIRES, I WILL PAY FOR
ALL HIS PERSONAL EXPENSES.

I AM ALSO PLANNING ON FIND HIM A DECENT JOB BASED ON ALL THE TRADES THAT
HE HAS LEARNED.
I WILL PROVIDE AT MY EXPENSE ALL MELAS TRANSPORATION AND CLOTHING IF
NECESSARY, AND ALL PERSONAL NEEDS. AND I WILL DO ALL MY BEST TO GUIDE HIM IN
THE RIGHT DIRECTION.

RESPECTFULLY:

*Rufina Cardenas*
RUFINA CARDENAS

*Juan M. Arenas*
JUAN M. ARENAS NOTARY PUBLIC
STATE OF CALIFORNIA
LOS ANGELES COUNTY

SEAL:



JUAN M. ARENAS
COMM. #1349065
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Apr. 27, 2006

Thursday, April 28, 2005


STATE OF CALIFORNIA
BOARD OF PRISON TERMS (CHAIRMAN)
428 J. STREET  6TH FLOOR
SACRAMENTO, CA. 95814


RE: MR. RAUL MOYERS


FROM:MARIA CASTILLO
7118 ARBUTUS AVENUE
HUNTINGTON PARK, CA. 90255
(323) 583-8176


DEAR BOARD BOARD OF PRISON TERMS     CHAIRMAN

I, MARIA CASTILLO, SISTER OF RAUL MOYERS AND HAVE KNOWN HIM FOR MORE THAN
55 YEARS, I HAVE FULL CONFIDENCE AND BELIEVE TAHT MY BROTHER RAUL IS A
USEFUL AND LAW ABIDING CITIZEN IN OUR COMMUNITY.
I KNOW HE HAS MADE MISTAKES LIKE MOST OF US, BUT AFTER ALL THAT I BELIEVE HE
IS A VERY GOOD PERSON.
I WILL LIKE TO TO LET YOU KNOW THAT I WILL OPEN MY HOME DOORS TO MY
BROTHER AND INVITE HIM TO LIVE IN MY HOME ANYTIME HE DESIRES, I WILL PAY FOR
ALL HIS PERSONAL EXPENSES.

I AM ALSO PLANNING ON FIND HIM A  DECENT JOB BASED ON ALL THE TRADES THAT
HE HAS LEARNED.
I WILL PROVIDE AT MY EXPENSE ALL MELAS TRANSPORATION AND CLOTHING IF
NECESSARY,AND ALL PERSONAL NEEDS. AND I WILL DO MY BEST TO GUIDE HIM IN
BEING A GOOD CITIZEN.



RESPECTFULLY:

*Maria a Castillo*
MARIA CASTILLO

*Juan M. Arenas*
JUAN M. ARENAS NOTARY PUBLIC
STATE OF CALIFORNIA
LOS ANGELES COUNTY

SEAL:



JUAN M. ARENAS
COMM. #1349065
NOTARY PUBLIC · CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Apr. 27, 2006



January 19, 1996

State of California
Board of Prison Terms "Chairman"
428 J. Street 6th Floor
Sacramento, California. 95814

RE: Raul Moyer

From :  Virginia Pesqueria
        943 W. Calle Antonia
        Tucson, AZ. 85706
        (520)741-8740

Dear: Board of Prison Terms "Chairman",

I Virginia Pesqueria am the sister of Raul Moya and have known him for 47 years, I believe that Raul will be a useful and law abiding citizen in the community. I know he has made mistakes but I do believe that he is a good person..

Raul has been studying computers and trying to better himself to start being able to enjoy himself, he is also studied accounting, painting and other beneficial trades. His behavior has been very good. I am opening my doors to my brother he will be able to live with me at 943 w. Calle Antonia in Tucson Arizona at phone (520)741-8740 I will provide all meals, transportation and clothing he will need I plan on helping him find a job with all the trades he has learned and be there for any moral support he might need I do believe he has what it takes to be a good and hard worker at what ever he might work as.

Respectfully,

Virginia Pesqueria

State of Arizona
County of Pima
This instrument was acknowledge before me this _19_ day of _January_ 1996.
By Virginia Pesqueria In witness whereof I herewith set my hand and official seal.

Notary Public

My Commission Expires May 30, 1998



FEBRUARY 16, 1996

STATE OF CALIFORNIA
BOARD OF PRISON TERMS "CHAIRMAN"
428 J STREET 6TH FLOOR
SACRAMENTO, CA. 95814



RE: RAUL MOYERS

FROM: MRS. RUFINA CARDENAS
      6702 CEDAR STREET
      HUNTINGTON PARK, CA.
                    90255

Dear ; Board of Prison Terms, "CHAIRMAN"

MY NAME IS RUFINA CARDENAS I LIVE IN 6702 CEDAR STREET IN
HUNTINGTON PARK, CA. 90255, I AM RAUL MOYERS SISTER AND I
HAVE KNOWN MY BROTHER FOR ABOUT 47 YEARS.
THE REASON I AM SENDING YOU OR WRITING THIS LETTER IS TO
INFORM YOU THAT MY BROTHER RAUL, IS A USEFUL AND LAW ABIDING
CITIZEN IN MY COMMUNITY.
I KNOW VERY WELL THAT HE IS A VERY GOOD PERSON HAS MADE A
FEW MISTAKES LIKE MANY OF US BUT I AM SURE HE HAS REALIZED
WHAT MISTAKES DO TO SOMEONE IN THE LIFE, I AM PRETTY SURE
HE WON'T MAKE THOSE MISTAKES AGAIN.
AS YOU CAN SEE RAUL WHILE IN PRISON HAS LEARN ALL ABOUT
COMPUTERS, AND IS TRYING TO BETTER HIMSELF , HE IS ALSO
LEARNING TO BECOME AN ACCOUNTANT. I WILL OPEN MY DOORS TO
MY BROTHER AND WELCOME HIM TO LIVE WITH ME AND MY ENTIRE FA_
FAMILY, AT THE ADREES IN THE CITY OF HUNTINGTON PARK, I WILL
PROVIDE WITH ALL THE FOOD,TRANSPORTATION AND CLOTHING NECESS
ARY AT MY OWN EXPENSE. I WILL ALSO CO-OPERATE IN HELPING
HIM FIND A JOB ADEQUATE TO HIS TRADES THAT HE HAS NOW LEARNED
AND BE ABAILABLE FOR ALL THE MORAL SUPPORT HE MIGHT NEED.

                                    SINCERELY

                                    Rufina Cardenas

                                    RUFINA CARDENAS

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
THIS INSTRUMENT WAS ACKNOWLEDGE BEFORE ME THIS 26TH DAY
OF February 1996 BY RUFINA CARDENAS IN WITNESS
WHEREOF I HEREWITH ST MY HAND AND OFFICIAL SEAL.

JUAN M. ARENAS    NOTARY PUBLIC

JUAN M. ARENAS
Comm. # 1024712
NOTARY PUBLIC - CALIFORNIA
Los Angeles County

916-02149

FEBRUARY 02,1996

STATE OF CALIFORNIA
BOARD OF PRISON TERMS (CHAIRMAN).
428 J. STREET 6TH FLOOR
SACRAMENTO, CA..95814

FEB 1 3 1996
BOARD OF PRISON TERMS

RE: MR. RAUL MOYERS                           E - 17403

FROM: MARIA CASTILLO
      7118 ARBUTUS AVE.
      HUNTINGTON PARK, CA. 90255
      (213) 583-8176

Dear : Board of Prison Terms , Chairman

I, Maria A. Castillo sister of Raul Moyers and have known him
for 47 years,Ihave full confidence and believe that my brother
Raul will be a useful and law abiding citizen in our community.
Iknow he has made few mistakes like all of us but I do believe
that he is a very good person.
Raul has  been learning about computers and trying to better
himself to start being able to enjoy himself, he also is studying
to become an accountant, also to become an Artist on Paintings, and
other beneficial trades.His behavior has been excellent. I am
letting you know that I will open my home doors to my brother and
inviting him to live with me at the adress mentioned above in the
City of Huntington Park , California. I will provide at my expense
all meals, transportation and clothing necessary. I am also planning
on helping him find a decent employment based on all the trades he
has learned and be 100% for any moral support he might need, Ido
believe he has what it takes to be a good and hard worker
at what ever he might work as.


RESPECTFULLY,


_Mария a. Castillo_
MARIA A. CASTILLO


STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
THIS INSTRUMENT WAS ACKNOWLEDGE BEFORE ME THIS 2ND DAY OF February
1006. BY Maria a. Castillo    IN WITNESS WHEREOF I HEREWITH
SET MY HAND AND OFFICIAL SEAL.

_Juan M. Arenas_    . NOTARY PUBLIC
JUAN M. ARENAS

JUAN M. ARENAS
Comm. # 1024712
NOTARY PUBLIC - CALIFORNIA
Los Angeles County
My Comm. Expires Apr. 27, 1998

# T & C CLEANERS

6015 S. Rosemead Blvd.
Pico Rivera, CA 90660
(562) 949-8227

June 3, 2005

To whom it may concern.

I, Manuel Moyers, am the owner of T&C Cleaners, located at 6015 S. Rosemead Blvd., Rico Rivera, CA 90660

I am offering Mr. Raul Moyers an employment opportunity at my business mentioned above.

The open position offered to Mr. Raul Moyers is a presser, earning $10.00 per hour working eight hours per day, Monday to Friday.

If you need further information, please feel free to contact me at the address stated at the top of this letter.

Very Truly Yours,

Sincerely

Manuel Moyers
Owner
T&C Cleaners

cc:file

VC PUMPING CONCRETE

1642 Glendale Blvd., Los Angeles, CA 90026

(213) 761-6338

To whom it may concern:

I, Victor Cruz, declare as follows:

I am the legal owner of VC Pumping Concrete, located at 1642 Glendale Blvd., Los Angeles, CA 90026

I am offering a job opportunity to Mr. Raul Moyers as construction worker.

The above-mentioned position has a rate of $12.00 per hour, Monday to Friday.

This position is available to Mr. Moyers immediately.

If you have any questions or concern, do not hesitate to contact me at the address and/or phone number stated at the top of this letter.

Sincerely yours,

Victor Cruz
Owner
VC Pumping Concrete

cc: file Moyers



**VC Construction**
**General Contractor**

SPECIALIZING IN ALL PHASES OF CONSTRUCTION

VICTOR CRUZ                              BBB
Lic. No. 584043          Fax: (213) 484-9346

**VC Pumping Concrete**

VICTOR CRUZ                  (877) 382-7867

# EXHIBIT "E"

# Any Reliance On AA or NA Participation During Parole Consideration Violates Establishment Clause

## by John E. Dannenberg

The United States District Court, E.D. Cal., ruled that requiring a California life prisoner to attend Narcotics Anonymous (NA) or Alcoholics Anonymous (AA) as a predicate for parole constituted a state establishment of religion prohibited by the First Amendment. Furthermore, the court enjoined the Board of Prison Terms (BPT) from ever imposing such a requirement in the future, and ordered all records of past references to the prisoner's failure to attend NA expunged from his prison records.

Charles Turner, serving a 15-life sentence for second degree murder since 1979, had been denied parole by the BPT eight times. Each time he was admonished to attend NA or AA prior to his next hearing. In 1997, BPT Commissioner Steven Baker (a former San Diego Police Detective, whose small son was murdered) drove his mandate home: "Let me explain it to you so it's real simple. Do you want to get out of prison?" When Turner replied, "Yes," Baker continued, "Go to NA; learn those Twelve Steps, work those Twelve Steps. And this Board will not accept any excuses. Can I make it any simpler than that. ... [I]f you don't go to NA; I would never let you out of prison, ever. ... I can't make it any plainer, I really can't; NA is mandatory for you."

Although Turner, a Christian, had attended NA sporadically since his first parole denial, he was uncomfortable with the religious aspects of NA that required assertion of belief in a "higher power" and saying the Lord's Prayer among a group consisting of others (including atheists) who falsely so swore to get BPT credit for attendance. He sued under 42 U.S.C. § 1983 claiming the Board's actions amounted to establishment of religion prohibited by the First Amendment.

The court relied upon *Lee v. Weisman*, 505 U.S. 577 (1992) for the proposition "that government may not coerce anyone ... to participate in religion or its exercise ...." Applying this coercion test, the court followed the three-part test of *Kerr v. Farrey*, 95 F.3d 472 (7th Cir. 1996). First, as to the quirement of state action, the court nd it clear that the BPT told Turner

he had to participate in NA to parole. Second, he was told if he didn't participate, he would never parole. Third, the coercion was religious, because the NA reference to "'God' necessarily implied a spiritual system of faith and worship." The Board's argument that 'God' could refer to, say, just a doorknob, fell flat under the facts of the case. Accordingly, the court followed the Second Circuit (*Warner v. Orange County Dep't Of Probation*, 115 F. 3 d 1068 (1997)) and the Seventh Circuit (*Kerr*, supra) to hold that "requiring participation in NA is an establishment of religion prohibited by the First Amendment."

The court rejected the Board's counter-argument that a recent establishment of secular alternatives to NA mooted Turner's complaint: "Mere voluntary cessation of illegal conduct does not moot a case; if it did, courts would be compelled to leave defendants free to return to their old ways." Moreover, the existence of secular alternatives would not "stop defendants from ... considering plaintiff's past failure to complete NA at future parole hearings."

Thereupon, the court ordered adoption of the Magistrate's Findings and Recommendations in full, specifying that "BPT Chair[person] Perez, their superiors, agents, co-employees and successors to state office be enjoined from considering plaintiff's refusal to participate in NA at any point in time as a basis for denying plaintiff parole." The court further enjoined Youth and Adult Correctional Agency Secretary Roderick Q. Hickman "and his successors, ... to expunge all references to plaintiff's failure to attend NA from any file maintained by the California Depart-

ment of Corrections (CDC)." Lastly, the court permitted plaintiff's counsel, Harry Arthur Oliver of Los Angeles, to apply for award of attorney fees and costs per 42 U.S.C. § 1988. See: *Turner v. Hickman*, 342 F.Supp.2d 887 (E.D. Cal. 2004).

Note: Any California lifer whose file contains unwanted references to BPT requirements to attend AA or NA should write the BPT and CDC to request expungement of their files prior to their next hearing. Of course, dealing with substance abuse remains a valid concern for parole, and those affected should seek secular treatment/counseling if they object to AA or NA. ∎



**Inmate Classified**

www.inmate.com
Pen Pal Ads Service Since 1996.
Still The Best!
Send for a brochure today!
Box 3311, Granada Hills, CA 91394



**PRISONER RIGHTS ATTORNEY**
**CHARLES CARBONE, ESQ.**

**REPRESENTING CALIFORNIA PRISONERS**
- **MEDICAL NEGLECT**
- **CRIMINAL APPEALS**
- **PAROLE ISSUES**
- **GUARD ABUSE**
- **CIVIL RIGHTS**
- **SHU**

Charles Carbone, Esq.
PMB 212 - 3128 16th St.
San Francisco, CA 94103

415-531-1980
(Please write for approval to call collect)
www.charlescarbone.com or www.prisonerattorney.com

Exhibit "E"

# EXHIBIT    "F"

(a)(1); its use is incompatible with the 60-year time limit.

In order to avoid a statutory absurdity, we hold that "a notice of default" under section 2924 that is recorded more than 10 years after "the last date fixed for payment of the debt or performance of the [underlying] obligation" does not constitute a part of the "record" for purposes of section 882.020, subdivision (a).

## IV. DISPOSITION

The trial court's grant of summary adjudication is reversed. The matter is remanded for further proceedings, consistent with this decision.

We concur: MARCHIANO, P.J., and STAGGER, J.

---

In re Richard SHAPUTIS on Habeas Corpus.

No. D046356.

Court of Appeal, Fourth District, Division 1.

Dec. 28, 2005.

**Background:** Petitioner, who had been denied parole by Board of Prison Terms (BPT), filed petition for writ of habeas corpus. The Superior Court, San Diego County, No. HC16007, Kerry Wells, J., denied petition, and petitioner sought writ of habeas corpus in the Court of Appeal.

**Holdings:** The Court of Appeal, McDonald, J., held that:

(1) "some evidence" did not support BPT's finding that petitioner committed his second degree murder in especially cruel or callous manner;

(2) some evidence did not support finding that murder was dispassionate or calculated;

(3) evidence did not support finding that petitioner posed unreasonable risk of danger to society; and

(4) proper disposition was remand to BPT for new hearing.

Petition granted.

Benke, Acting P.J., filed a dissenting opinion.

### 1. Pardon and Parole 53

Criteria in regulation for determining suitability for parole are "general guidelines" illustrative rather than exclusive and the "importance" attached to any circumstance or combination of the circumstances in a particular case is left to the judgment of the Board of Prison Terms (BPT). West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

### 2. Pardon and Parole 48.1

In determining an inmate's suitability for parole, the task of the Board of Prison Terms (BPT) is to try to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

... any other recorded document that discloses the final maturity date, regardless of its recordation date ...

---

### 3. Habeas Corpus 812

When the trial court denies habeas relief to an inmate who has been denied parole, the ensuing writ proceeding is an original proceeding that requires the Court of Appeal to independently review the record.

### 4. Pardon and Parole 62

The standard that a decision of the Board of Prison Terms (BPT) to deny parole be supported by "some evidence" is extremely deferential and requires only a modicum of evidence. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

### 5. Pardon and Parole 62

A court may not vitiate an administrative decision to deny parole, which is subject to "some evidence" standard of review, simply because it disagrees with the assessment by the Board of Prison Terms (BPT); the decision must be devoid of a factual basis to be overturned. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

### 6. Pardon and Parole 52

Because judicial review of a parole denial is to ensure that a decision of the Board of Prison Terms (BPT) is not arbitrary and capricious, thereby depriving the prisoner of due process of law, the court may inquire only whether some evidence in the record before the BPT supports the decision to deny parole, based upon the factors specified by statute and regulation. U.S.C.A. Const.Amend. 14; West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

### 7. Pardon and Parole 52

The discretion of the Board of Prison Terms (BPT) over parole suitability determinations, although broad, is not absolute. West's Ann.Cal.Penal Code § 3041.

### 8. Pardon and Parole 58

"Some evidence" did not support finding of Board of Prison Terms (BPT) that inmate seeking parole committed his second degree murder of his wife in especially "cruel or callous manner"; all murders involve some callousness, but inmate's single gunshot to wife's neck causing instantaneous death did not involve aggravated conduct such as torture, terror, or grievously increasing or prolonging her pain and suffering. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402(c)(1)(D).

### 9. Pardon and Parole 49

"Calculated" rather than the exception, and a conviction for second degree murder does not automatically render one "unsuitable for parole"; to deny parole on that ground there must be some evidence "beyond the minimum conduct necessary to convict" of second degree murder. West's Ann.Cal.Penal Code § 3041.

### 10. Pardon and Parole 58

Finding of Board of Prison Terms (BPT) that inmate seeking parole committed his second degree murder of his wife in dispassionate or calculated manner was not supported by "some evidence"; wife died from single gunshot, and inmate had been drinking that night, made no attempt to conceal crime or weapon, and voluntarily surrendered to police. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402(c)(1)(B).

### 11. Pardon and Parole 58

Evidence of inmate's alcohol-related dishistory with whether murdered and support finding by the Board of Prison Terms



(BPT) that inmate posed unreasonable risk of danger to society if released on parole based on his "unstable social relationships", inmate had been involved in stable relationships throughout his life, his alcoholism was in sustained remission, and his postincarceration conduct was exemplary. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402(c)(3).

**12. Pardon and Parole ⊕ 62**

Remand to Board of Prison Terms (BPT) for "new" suitability hearing was proper remedy for BPT's denial of parole based on "findings" of unsuitability that were not supported by some evidence. West's Ann.Cal.Penal Code § 3041.

**13. Pardon and Parole ⊕ 62**

A court reviewing a parole decision by the Board of Prison Terms (BPT) is precluded from independently resolving conflicts, weighing the evidence, or deciding the manner in which the specified factors relevant to parole suitability are to be considered and balanced; these are matters exclusively within the discretion of the BPT. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

Law Offices of Marc Elliot Grossman and Marc Elliot Grossman, Upland, for Petitioner.

Bill Lockyer, Attorney General, James M. Humes, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Michelle Des Jardins and Heather Bushman, Deputy Attorneys General, for Respondent.

1. Although this court reversed the original conviction and remanded the matter for retrial in the first second appeal proceeding again convicted him of "second" degree murder.

---

McDONALD, J.

Petitioner Richard Shaputis was sentenced to 15 years to life following his conviction for second degree murder. Shaputis, now 69 years old, has remained in prison for the past 18 years and his blemished record of rehabilitation progress. Nevertheless, the Board of Prison Terms (the BPT) found him unsuitable for parole at hearings conducted in 1997, in 2002, and finally in 2004. The most recent denial, challenged by the petition for writ of habeas corpus, was based on the BPT's conclusion that Shaputis posed an unreasonable risk of danger to public safety were he to be released from prison, even though the third party evaluations have consistently concluded he posed a "low" risk of danger to the public were he paroled.

Shaputis asserts the BPT's conclusion has no evidentiary support, and therefore violates his due process right to parole. He argues the BPT's conclusion was improperly based on the circumstances of his offense and his interpersonal skills prior to 1987, and there is no evidence he poses a risk of danger in his current condition.

**FACTS**

**A. The Offense.**

In 1987 a jury convicted Shaputis of the second degree murder of his wife, Irma, and found true that he used a firearm in the commission of the offense. He was sentenced to 15 years to life with the

1. *People v. Shaputis* (May 21, 1991, D012507) [nonpub. opn. at pp. 1, 4.]
2. Now known as the Board of Parole Hearings.

---

possibility of parole, plus a determinate two-year sentence for the firearm use.

Shaputis and Irma had been married for 18 years and their relationship was marked by domestic violence. Two years earlier, Irma complained that Shaputis had beaten her and cracked her ribs, and approximately 18 months earlier Shaputis had shot at his wife when they had been drinking and arguing. Shaputis apparently beat Irma at least two or three times a year and had threatened her with a knife. However, none of these alleged events resulted in criminal charges.

On the night of the murder, Shaputis called 9-1-1, around 10:00 p.m. and stated he had fought with his wife and killed her, but claimed it was an accident. When police arrived at Shaputis's home, he emerged, and surrendered without incident. When police entered the house, they found Irma's body in the living room with a handgun lying nearby. The autopsy report concluded Irma was killed some time between 8:30 p.m. and 10:00 a.m. and her death was caused by a single gunshot wound to the neck. The shot had been fired from close range, possibly as close as two feet, and had entered the neck between the lower left jaw and law. Shaputis was apparently intoxicated. Shaputis was a heavy "drinker" who became violent when intoxicated, and he had been drinking on the night of the murder.

**B. Shaputis's Background.**

Shaputis's mother deserted the family when he was nine years old, and he raised his siblings with the assistance of his grandparents. His father physically abused him. Shaputis moved out of the home when he was 18 years old and began working.

Shaputis, who was married twice, had a substantial alcohol problem. His first marriage lasted nine years and produced four daughters, of whom he was awarded custody after the divorce. Shaputis subsequently married Irma and, although the marriage lasted 23 years, it was marked by domestic violence, additionally, in 1988 Shaputis pleaded no contest to a misdemeanor soliciting or engaging in a lewd act with one of his daughters. Except for a 1976 "nonsupport" offense, the 1978 lewd act offense with one of his daughters was the extent of his criminal record.

**C. Shaputis's Performance in Prison.**

Shaputis's record during his 17 years of incarceration was impeccable. He has been discipline-free for his entire term and his work record is unblemished. He fully participated in all available AA and NA programs since 1991, and completed all applicable therapy programs. He has the lowest "classification" score possible for a life-term inmate, and has numerous commendations for his work, conduct and reform efforts from prison staff.

3. The BPT concluded the gun could not have been fired accidentally because the hammer must be pulled back manually to a "cocked" position before pulling the trigger, and there was a "transfer bar" to prevent accidental discharge. The source of this information is recited in the "Life Prisoner Evaluation Report"

---

The factual basis for the conclusions in the LPER does not appear in the probation report filed in connection with the 1987 conviction, and the source of this information is unclear.

HISTORY OF PROCEEDINGS

A. *The 1997 and 2002 BPT Proceedings*

Shaputis's minimum eligible parole date was in September 1998. At his first parole hearing in 1997, the LPEB prepared by his prison counselor for submission at the 1997 BPT hearing stated his "progress" in state prison could best be described as exemplary, and concluded Shaputis "would probably pose a low degree of threat to the public at this time, if released from prison." The BPT denied parole, apparently based on an unsuitability determination, and recommended he remain discipline free and participate in self-help and therapy groups. At Shaputis's second parole hearing conducted in 2002, the LPEB again noted he had "fully adhered" to the BPT's prior recommendations. The report again commended Shaputis's prior commitment offense, his prior criminal record, and his adjustment in prison. Shaputis would "probably pose a low degree of threat to the public at this time if released from prison."

*This Determination*

The BPT considered the materials presented, including the forensic evaluations, and concluded Shaputis was not suitable for parole because he posed "an unreasonable risk of danger to society or a threat to the public safety if released from prison." The BPT cited two findings for this conclusion. First, the BPT found the commitment offense was "carried out in an especially cruel and/or callous manner" and was "carried out in a dispassionate and/or calculated manner" because the murder was committed at close range with a single shot. Second, the BPT found Shaputis had a "history of unstable and tremulous [sic] relationships with others" and had assaulted his wife.

B. *The Habeas Proceedings*

Shaputis petitioned the San Diego County Superior Court for a writ of habeas corpus alleging the BPT violated his due process rights because his unsuitability determination was not supported by the evidence and was therefore arbitrary and capricious. The court denied the writ, concluding the BPT's decision was supported by some evidence.

Shaputis then petitioned this court for a writ of habeas corpus. We issued an order to show cause, the BPT filed a return, and Shaputis filed a traverse. Shaputis's petition asserts the BPT's decision to deny parole because of its conclusion he posed an unreasonable risk of danger violated due process because it was (1) contrary to the only reliable evidence of his current dangerousness and (2) relied on findings unsupported by any evidence.

6. All further references to section 2402 are to title 15 of the California Code of Regulations, section 2402.

7. Factors that support the finding the crime was committed "in an especially heinous, atrocious or cruel manner" (§ 2402, subd. (c)(1)) include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense

able risk of danger to society or a threat to the public safety if released from prison.

II. LEGAL FRAMEWORK

A. *Parole Suitability*

Penal Code section 3041 provides the framework for parole decisions for indeterminate life inmates. Subdivision (a) requires that, one year prior to the inmate's minimum release date, the BPT meet with the inmate and "normally set a parole release date" according to specified criteria. However, subdivision (b) provides that if the BPT determines the inmate is not suitable for parole because "consideration of the public safety requires a more lengthy period of incarceration," it need not set a release date.

Rule 2402 of title 15, California Code of Regulations (2005) § 2402 (rule 2402) implements section 3041 and sets forth the criteria for determining whether an inmate is suitable for parole. In making that determination, the BPT is charged with considering all relevant, reliable information. (Cal.Code Regs., tit. 15, § 2402, subd. (b).) Including the nature of the commitment offense and behavior before, during, and after the crime, the prisoner's social history, mental state, criminal record, attitude towards the crime, and parole plans. (§ 2402, subd. (b).) The circumstances tending to show unsuitability for parole include that the inmate: (1) committed the offense in a particularly heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) has previously sexually assaulted another individual in a sadistic manner; (5) was carried out in a dispassionate and calculated manner, such as an execution-style murder; (D) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense.

Dr. Mura, a forensic psychologist, evaluated Shaputis's psychological condition and submitted his report to the BPT in connection with Shaputis's 2004 parole hearing. Dr. Mura's report stated Shaputis had feasible and appropriate plans for his life if granted parole, and appeared very committed to maintaining his sobriety through continued involvement with AA. When assessing Shaputis's risk for violence if paroled, Dr. Mura concluded he presented a low risk for violence absent a relapse into alcoholism.

The LPEB, prepared by Shaputis's prison counselor for the 2004 BPT hearing, again noted his exemplary prison record and that he had "fully adhered" to the BPT's prior recommendations. The report again commended Shaputis's prior commitment offense, his prior criminal record, and his adjustment in prison. Shaputis would "probably pose a low degree of threat to the public at this time if released from prison."

Mura's risk of violence assessment evaluated three elements: Shaputis's history and background, his clinical presentation, and "management of future risk." Because Shaputis's history of violence appeared intertwined with his alcoholism, Mura concluded the risk based on this history was low absent a relapse into alcoholism. Shaputis's clinical presentation showed some growth in insight and Mura believed this factor evidenced a low risk for violence as long as he remained sober and involved in activities that halt his intertwined drinking. Finally, Shaputis's ability to handle future stress in a manner that was also largely dependent on his ability to remain sober; Mura believed Shaputis's prison

record (e.g. his commitment to his AA program and his demonstrated ability to comply with rules) and his current physical condition (a senior citizen with chronic health problems that would limit concerns over acting out in inappropriate ways) made Shaputis's low risk for future violence.

5. The Life Prisoner Evaluation Reports, prepared by Shaputis's prison counselors for parole hearings, in 1997 and 2002 parole hearings, expressed the same opinion that Shaputis posed a low degree of threat to the public if released from prison.

(6) has a lengthy history of severe mental problems related to the offense; and (8) has engaged in serious misconduct while in prison. (§ 2402, subd. (c).) A factor that alone, might not, establish, unsuitability for parole, may, contribute to a finding of unsuitability. (§ 2402, subd. (b).)

Circumstances tending to show *suitability* for parole include that the inmate: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress had built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use on release; and (9) has engaged in institutional activities that suggest an enhanced ability to function within the law on release. (§ 2402, subd. (d).)

[1, 2] These criteria are "general guidelines," illustrative rather than exhaustive, and the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the BPT." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 679, 128 Cal.Rptr.2d 104, 59 P.3d 174 (*Rosenkrantz*).) § 2402, subds. (c), (d).) The BPT's task is to try "to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*Rosenkrantz*, at p. 655, 128 Cal. Rptr.2d 104, 59 P.3d 174.)

## B.    Standard of Review

[3] "[T]he court below denied relief, and therefore this writ proceeding is an original proceeding that requires we independently review the record. (*In re Scott*

(2004) 119 Cal.App.4th 871, 884, 15 Cal. Rptr.3d 32 (*Scott*).)

"In *Rosenkrantz*, the California Supreme Court addressed the standard the courts apply when reviewing parole decisions by the executive branch. The court first held that, "the judicial branch is authorized to review the factual basis of a decision of the [BPT] denying parole in order to ensure that the decision comports with the requirements of due process of law, but in conducting such a review, the court may inquire only whether some evidence in the record before the [BPT] supports the decision to deny parole, based upon the factors specified by statute and regulation. (*Id.* at pp. 667-668, 128 Cal.Rptr.2d 104, 59 P.3d 174.)." [*Id.*]

[4-6] These "some evidence" standard is "extremely deferential" and requires only "a modicum of evidence." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 664-665, 128 Cal.Rptr.2d 104, 59 P.3d 174.) A court may not review an administrative decision subject to the "some evidence" review simply because it disagrees with the BPT's assessment. (*Id.* at p. 679, 128 Cal. Rptr.2d 104, 59 P.3d 174.) The decision must be "devoid of a factual basis" to be overturned. (*Id.* at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.) Because judicial review of a parole denial is to ensure that a decision of the BPT is not arbitrary and capricious, thereby depriving the prisoner of due process of law, "the court may

---

inquire only whether some evidence in the record before the [BPT] supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Id.* at pp. 667-668, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

[7] The BPT's discretion over parole suitability determinations, although broad, is not absolute. (*Scott, supra,* 119 Cal. App.4th at p. 884, 15 Cal.Rptr.3d 32.) *Rosenkrantz* explained that if "the [BPT's] decision's consideration of the specified factors is not supported by some evidence in the record, and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the [BPT] to vacate its decision denying parole and thereafter to proceed in accordance with the process of law." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

## IV.

## ANALYSIS

The BPT does not dispute the only evidence on all relevant parole *suitability* factors, as well as the only evidence on all but two of the parole *unsuitability* factors, militated in favor of finding Shaputis suitable for parole. Notwithstanding this evidentiary milieu, the BPT found he was unsuitable for parole because it concluded two of the unsuitability factors—the commitment crime itself and Shaputis's prior incarceration history of relationships with others—made him a "danger to society if released on parole. We are charged with the obligation to ensure the BPT's decision

---

comports with the requirements of due process of law, and we can discharge that obligation only if we are satisfied there is some evidence in the record before the BPT to support the factual basis for its findings. (*Rosenkrantz, supra,* 29 Cal.4th at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174; *In re Dannenberg, supra,* 34 Cal.4th at pp. 1095-1096 and fn. 16, 23 Cal.Rptr.3d 417, 104 P.3d 783.)

### A.    The Commitment Offense

The BPT concluded Shaputis posed an "unreasonable risk" of danger if released on parole because he committed the offense in "an especially cruel and/or callous manner (apparently under section 2402, subdivision (c)(1)(D)) and "an especially dispassionate and/or calculated manner" (apparently invoking section 2402, subdivision (c)(1)(B)).[8]

*Evidence the Murder Was Especially Cruel and/or Callous*

[8] Section 2402, subdivision (c)(1)(D), describing one of the factors that supports a finding the crime was committed "in an especially heinous, atrocious or cruel manner," provides the offense was "carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." Shaputis contends there is "no evidence" to support this finding. The BPT's only reference to the *evidence* supporting this finding—the victim died from a single gunshot wound fired at close range that perforated her larynx, spinal cord, column, and spinal cord—shows the crime was not committed in an exceptionally callous manner, disregarding the victim's suffering, because the forensic evidence appears to confirm the gunshot

8.    Section 2402, subdivision (c)(1) also lists as factors that support the finding the crime was committed in an especially heinous manner the fact that: (A) multiple victims were attacked in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner (§ 2402, subd. (c)(1)); that multiple victims were involved; the victim was abused, defiled, or mutilated during

## 37 CALIFORNIA REPORTER, 3d SERIES

reduced instantaneous death rather than a painful or lingering death.

[9] We agree with the observation made by several courts, recently recognized in *Scott, supra,* 119 Cal.App.4th at p. 891, 15 Cal.Rptr.3d 32, that "[A]ll second degree murders by definition involve some callousness—i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others." (Citation.) As noted, however, parole is the rule, rather than the exception, and a conviction for second degree murder does not, automatically, render one unsuitable. (Quoting *In re Smith* (2003), 114 Cal. App.4th 343, 366, 7 Cal.Rptr.3d 655, accordingly, the BPT cannot rely on the bare conviction for second degree murder, to deny parole under the exceptionally callous or cruel factor. As *Rosenkrantz* cautioned, "to deny parole on that ground there must be some evidence Shaputis engaged in conduct, apart from and beyond the minimum conduct necessary to convict him of second degree murder (*In re Dannenberg, supra,* 34 Cal.4th, at p. 1088, 23 Cal.Rptr.3d 417, 104 P.3d 783); that cruelly

[Footnote 9] *Rosenkrantz,* explaining why the nature of the offense must "involve particularly egregious acts beyond the minimum necessary to sustain a conviction for second degree murder," stated that, "[i]n some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a violation of the ... constitutional guarantee against ... the imposition of ... cruel and/or unusual punishment." *(Rosenkrantz, supra,* 29 Cal.4th at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.)

[Footnote 10] Under the BPT's matrices used to set the base term for a life prisoner, the circumstances of this offense would facially qualify Shaputis for one of the lowest base terms applicable to a person who directly caused "the death of the victim, because 'death was almost immediate and was not the result of severe trauma (such as beating, clubbing, stabbing, strangulation, suffocation, burning or multiple wounds) or following a period of torture." (Cal.Code Regs., tit. 15, § 2282, subds. (b), (d).)

or callously exacerbated the victim's suffering.

The record is devoid of any evidence of aggravated conduct, reflecting an exceptionally callous disregard for human suffering.[10] As in *In re Smith, supra,* 114 Cal.App.4th 343, 7 Cal.Rptr.3d 655, there is no evidence Shaputis "tormented, terrorized, or injured [his victim] before deciding to shoot [her]; or that he gratuitously increased or unnecessarily prolonged her pain and suffering." Was the crime callous? Yes. However, are the facts of the crime some evidence that [Shaputis] acted with exceptionally callous disregard for [the victim's] suffering, or do the facts distinguish this crime from other second degree murders as exceptionally callous? No. (Citation.) (*Id.* at p. 367, 7 Cal.Rptr.3d 655.)

Because the relevant evidence shows no conduct (beyond the minimum required for conviction of second degree murder) showing a callous disregard for human suffering, the BPT's use of this factor was arbitrary and capricious. (*Scott, supra,* 119

granted. Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date. (Quoting *In re Ramirez* (2001) 94 Cal.App.4th 549, 570, 114 Cal.Rptr.2d 381.)" (*Rosenkrantz, supra,* 29 Cal.4th at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.)

[Footnote 11] "BPT's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be

---

Cal.App.4th at pp. 891–892, 15 Cal.Rptr.3d 32.) In addition to being inconsistent with the jury's verdict acquitting him of first degree murder (cf. *Scott, supra,* 119 Cal. App.4th at pp. 889–890, 15 Cal.Rptr.3d 32), the BPT's finding is unsupported by (and indeed may be irreconcilable with) the evidence on which BPT purported to rely.[12] Accordingly, the BPT's reliance on this factor was arbitrary and capricious. (*Scott, supra,* 119 Cal.Rptr.3d 32.)

### Evidence the Murder Was Dispassionate, or Calculated

[10] "Section 2402, subdivision (c)(1)(B), describing a factor that can support a finding the crime was committed 'in an especially heinous, atrocious or cruel manner,' provides that the offense was one 'carried out in a dispassionate and calculated manner.' Shaputis contends there is no evidence to support this finding. The BPT's only reference to the *evidence* supporting this finding was again to note the manner of the death (e.g., the victim died from a single gunshot wound fired at close range that perforated her larynx, spinal cord column and spinal cord). The same report from which this manner of death was drawn also noted Shaputis was an alcoholic who became 'violent' when 'drunk' and he had been drinking the night of the shooting."[11] Moreover, he made no attempt to conceal the crime or the weapon, but instead called police and surrendered within 90 minutes of the shooting.

The BPT's finding that Shaputis acted in a dispassionate and calculated manner, in

the forensic psychological evaluation stated Shaputis did not fully understand his actions immediately before the shooting. The evidence at Shaputis's trial showed the victim had a blood alcohol level of .22 and Shaputis, when tested some six hours after the shooting, still had a blood alcohol level of .14. (*People v. Shaputis, supra,* D012507, at p. 3.)

[Footnote 12] BPT asserts there was other evidence supporting this finding. For example, BPT notes it was undisputed Shaputis was an alcoholic who, notwithstanding an awareness (standing alone) does not support a finding that history of unstable relationships; and instead Shaputis's alcoholism is only germane insofar as it was a contributing cause of his unstable.

### R. Unstable Social Relationships

[11] The "only other" finding cited by the BPT to support this "proritization" that Shaputis posed an unreasonable risk of danger to society if released on parole was that he had a "history of unstable and [tumultuous] relationships with others." However, the evidence showed that apart from his alcohol-related marital problems with and his misbehavior with some of his daughters, apparently also while he was intoxicated, Shaputis had no history of unstable, tumultuous relationships.[13] To the contrary, the evidence showed that he persevered (despite his mother's desertion of the family), by surrogate-parenting his siblings until he left home to begin his adult life. He thereafter maintained relative stability in his occupational endeavors, and continued to be in contact with his workmates even after he was imprisoned.

relationships. (Cf. *In re DeLuna* (2005) 126 Cal.App.4th 585, 594–595, 24 Cal.Rptr.3d 643.) BPT also asserts Shaputis's estrangement from his siblings (after he left home to begin his adult life) and the absence of any contact with his daughters (since his imprisonment) is evidence he has "trouble maintaining relationships." However, the complete breakdown of any relationship between Shaputis and his daughters only reflects that relationship. From being estranged from their children and their familial relationships were unstable. Similarly the fact Shaputis's daughters shunned him after he was imprisoned (after the mistreatment he visited on them) is not necessarily inconsistent with a finding that such relationships were either minimal or unstable.

His first marriage lasted nine years (slightly longer than the national average) and he was a sufficiently stable father that he was awarded custody of the children that union, although he did plead no contest to misdemeanor soliciting or engaging in a lewd act with one of his daughters. His second marriage, ended by the commitment offense, lasted 23 years. Finally, his postincarceration conduct was exemplary (evidencing no inability to maintain stable interpersonal relationships) and he has a durable and appropriate postrelease plans for housing, employment, and familial and community support networks.

Shaputis concedes there was "some evidence" (Rosenkrantz, supra, 29 Cal.4th at p. 667, 128 Cal.Rptr.2d 104, 59 P.3d 174) that had a tumultuous relationship with Irma. However, the evidence was uncontradicted that Shaputis's abusive behavior toward Irma (including the commitment offense) was intertwined with his alcoholism, and the only evidence was that he posed a low risk for future violence so long as he did not relapse into alcoholism. Because the only evidence was that Shaputis had actively participated in AA and NA since 1991 and his alcoholism was "sustained remission" and the BPT neither found nor cited any evidence regarding Shaputis's commitment to his sobriety was feigned or tenuous, there is no evidence to support the conclusion that Shaputis posed an unreasonable risk to public safety if paroled.

In In re Smith, supra, 114 Cal.App.4th 343, 7 Cal.Rptr.3d 655, the court evaluated an analogous determination denying parole to an inmate convicted of the second degree murder of his wife. In Smith, the

Because the language of the relevant subdivision permits the BPT to consider whether Shaputis had "a history of unstable or tumultuous relationships with others" (§ 2402, subd. (c)3), italics added), the language appears to contemplate that a prisoner can be

Governor cited the inmate's history of social instability, substance abuse and violence against his wife to conclude there was a "danger" the inmate might become violent if released into the community. (Id. at p. 366, 7 Cal.Rptr.3d 655.) Smith concluded the implied rationale for the finding of dangerousness—the inmate's deeply entrenched substance abuse problem raised a danger he would relapse into drug use and become violent—was unsupported by any evidence. First, all of the evidence on the issue was, to the contrary, the inmate had remained clean and sober for many years; he had fully participated in therapy and treatment programs; and had remained discipline-free in prison; and the opinions of both the prison staff and a psychologist was that his drug problem was in full remission and he posed a low degree of threat to the public. (Id. at pp. 371–372, 7 Cal.Rptr.3d 655.) Against this evidentiary showing, Smith concluded the Governor's contrary finding was "arbitrary and capricious, reasoning:

"[I]n sum, the sole factor cited by the Governor—Smith's entrenched desire for drugs due to long-term abuse—does not constitute some evidence that Smith might start using drugs and become violent again, and therefore that he currently poses an unreasonable risk of danger without further treatment. Indeed, if Smith's past use of drugs did invariably 'establish' his unsuitability, then the Governor could deny parole for the rest of Smith's life, based on this immutable factor, without regard to or consideration of subsequent circumstances and evidence indicating that he deemed unsuitable if he was chronically unable to form stable relationships. We therefore 'question' whether this 'criterion can be satisfied by evidence of a 'single' tumultuous relationship."

This no 'current desire for drugs and that there is little current likelihood of drug relapse, let alone a returningto violent conduct as a result of it.' Moreover, the Governor's conclusion that Smith currently would pose an unreasonable risk of violent criminal conduct if released without further drug treatment appears to be arbitrary and capricious because, as noted, his decision omits any consideration of, or even reference to, the disputed evidence noted above. [¶] In Rosenkrantz, the court stated that to ensure due process, the Governor's decision must "reflect the consideration of the specified factors as applied to the individual prisoner, as reflected in reliable legal standards." (Rosenkrantz, supra, 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

Here, however, the Governor's decision omits any consideration of relevant evidence and the numerous factors . . . that tend to show suitability, including that Smith committed the crime while under stress, he has shown great remorse for the crime, his age makes him less of a potential threat, he has developed marketable skills, he has wide support and realistic plans for the future, and during his lengthy incarceration, he has long participated in drug treatment and psychotherapy and has devoted himself to self-improvement and volunteer work with other troubled prisoners. (Smith, at p. 372, 7 Cal.Rptr.3d 655.)

We are similarly convinced the BPT's reliance on Shaputis's former alcoholism-related violence toward his marital partner, the sole evidence conceivably supporting the finding he had "unstable or tumultuous relationships" with other persons, cannot justify a finding Shaputis currently poses an unreasonable threat to others if released on parole absent some evidence there is a current likelihood Shaputis will

be unable to maintain his sobriety on parole. (In re Smith, supra, 114 Cal.App.4th at p. 372, 7 Cal.Rptr.3d 655; cf. Burgess v. Turham (9th Cir.2009) 334 F.3d 910, 916 [although reliance on conduct prior to imprisonment to justify denial of parole "can be initially justified as fulfilling the requirements set forth by statute law, where inmate over time continues to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his prior conduct would raise serious questions involving his liberty interest in parole"].)

Shaputis received no violent conduct toward anyone other than his wife and this is constrained with his suicidal problem. The only evidence before the BPT was that Shaputis had more than a decade of nonviolent conduct, free of violence in his nearly two decades of incarceration. Accordingly, this conclusion Shaputis remained a danger to society to the extent it was premised on a former lifestyle, than all of the evidence showed was a historical reality, is lacking in any medical, psychological or behavioral evidentiary support that it is arbitrary and capricious, within the deferential standards articulated by Rosenkrantz, supra, 29 Cal.4th 616, 128 Cal.Rptr.2d 104, 59 P.3d 174.

[12] We recognize the BPT's task is difficult because it seeks to predict which inmates may safely be released to society. Although Rosenkrantz cautions that a reviewing court must not engage in second-

guessing what necessarily are subjective decisions, we are at the same time bound to insure that the inmate is accorded the basic requirements of due process, and where there is no evidence to support the BPT's decision that an inmate is unsuitable for parole and would pose an unreasonable risk of danger to society if released, those minimum requirements have not been met.

In the present case, we conclude the record contains no evidence to support the BPT's articulated reasons for denying parole, and there is nothing in the record to suggest the BPT would have determined Shaputis posed an unreasonable risk of danger to society without the reasons we have found are unsupported by the record. It follows that, we cannot conclude, Shaputis received the basic requirements of due process and the BPT's decision must be therefore be reversed. Accordingly, we reverse the BPT's decision and the matter is remanded to the BPT with directions to conduct a new parole suitability hearing consistent with this opinion, and to issue a new decision within 45 days of the date of this order becoming final.

[13] Although we conclude the record before us contains no evidence to support the BPT's decision finding Shaputis unsuitable for parole, we recognize we cannot predict in advance what evidence will be available when the BPT conducts the new parole suitability hearing, particularly because more than 18 months have elapsed since the hearing challenged in this proceeding. Because "a reviewing court is precluded from independently resolving conflicts in the evidence, determining the weight to be given the evidence, or deciding the manner in which the specified factors relevant to parole suitability are to be considered and balanced because these matters exclusively within the discretion of the [BPT]" (Scott, supra, 119 Cal. App.4th at p. 899, 15 Cal.Rptr.3d 32), we

are precluded from directing the BPT's consideration of new evidence that has yet to be presented. We therefore conclude, although the BPT may not find Shaputis unsuitable for parole based on the same evidence and findings articulated at the 2004 hearing, if new evidence is presented different from the evidence presented at the 2004 hearing, the BPT may consider Shaputis's suitability considering that new evidence, if any.

VII.

DISPOSITION

Shaputis's petition for writ of habeas corpus is granted. The BPT is ordered to vacate the denial of parole and to conduct a new parole suitability hearing for Shaputis, and to issue a new decision within 45 days.

I CONCUR: McINTYRE, J.

BENKE, J., dissent.

Respectfully, there is no legal basis for granting relief in this case.

In In re DeLuna (2005) 126 Cal.App.4th 585, 591, 24 Cal.Rptr.3d 643, the court held: "When a decision by the Board denying parole is challenged, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (Citation.) (See In re Rosenkrantz (2002) 29 Cal.4th at pp. 658, 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.) The Rosenkrantz court stated: "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to

sustain a conviction for that offense." (Id. at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

In re Dannenberg (2005) 34 Cal.4th 1061, 123 Cal.Rptr.3d 417, 104 P.3d 783 (Dannenberg), further clarified the applicable standard under which the Board of Prison Terms fixes parole release dates for those imprisoned for indeterminate terms. It holds: "[T]he Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually. While the Board must, point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." (Id. at p. 1071, 28 Cal.Rptr.3d 417, 104 P.3d 783, italics omitted.) The court rejected the argument that once an indeterminate life prisoner reaches the minimum parole eligibility date, the board must fix a date for parole release unless it finds the prisoner's crime particularly egregious in comparison with other offenses of the same class. Instead, the court held the board may decline to set a parole date in an individual case "if it concludes, on relevant grounds with support in the evidence, that the grant of a parole date is premature for reasons of public safety." (Ibid.)

Clearly, if an inmate is not suitable for parole because considerations of public safety demand a more lengthy period of incarceration, the Board of Prison Terms is not required to set a release date. Our review of the board's decisions is highly deferential and only a modicum of evidence is needed to support the board's decision. (In re Rosenkrantz, supra, 29 Cal.4th at p. 667, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

This deference is based on two important considerations: first, we are reviewing the discretionary actions of a separate branch of government; and second, the board has far greater expertise and experience in dealing with determining public safety than do the courts.

With these considerations in mind, there is certainly a modicum of evidence to support the denial of parole in this case.

The Board reviewed the reasons for concluding petitioner is an unreasonable risk of danger to society, or a threat to public safety, if released from prison. First was the cruel and callous manner of the murder of his wife committed in the presence of his daughter. Second were petitioner's history of alcoholism and "terminable" relationships with others.

What clearly concerned the board, the district attorney, and the BPT psychologist who evaluated petitioner, was his long history of alcoholism and the physically abusive behavior in which he engaged when drunk. The crime here, which my colleagues emphasize involved a major, cold-calculated murder, Dannenberg (p. 338), consisted of petitioner shooting his wife in the neck at close range, killing her instantly. Her death followed long periods of abuse. Over a period of years, consisting in part of routine beatings, cracked ribs, and a previous incident where petitioner shot at her and missed. The underlying facts of the murder and previous violence was petitioner's entirely...

As one might expect, and as my colleagues emphasize, when petitioner is away from alcohol, he is a model inmate. His prison disciplinary history, at the time of the hearing was spotless. He had done well. The crucial discretionary task, however, was to make a prediction of his behavior, outside, the highly structured and restrictive setting of prison. The psychologist who evaluated petitioner qualified his conclusion that if released, petitioner

**338**     37 CALIFORNIA REPORTER, 3d SERIES

NEW YORK TIMES CO. v. SUPERIOR COURT    **339**
Cite as 37 Cal.Rptr.3d 338 (Cal.App.2 Dist. 2005)

---

would be a low risk to the community by stating repeatedly this was true *only* if petitioner avoided the use of alcohol. As is expressly noted in the psychologist's report. "The above information to hold a new hearing, at which time more information or evidence must be introduced than was introduced at the hearing from which this petition arose. Assuming there is no different evidence, it appears it appears my colleagues favor the setting of a release date for petitioner. It is apparently their conclusion that despite the psychologist's report, petitioner does not remain at risk to public safety, will not get drunk and will not release into dangerous conduct. With all due respect, such conclusions are not the prerogative of this court, as long as the record supports the board's action by a modicum of evidence. Respectfully, what is ultimately lacking is not a modicum of evidence but a modicum of judicial restraint.

"I would deny the petition for writ of habeas corpus."

The NEW YORK TIMES COMPANY, Petitioner,

v.

The SUPERIOR COURT of Los Angeles County, Respondent;

"Wall Street Network, Ltd., Real Party in Interest.

No. B183768.

Court of Appeal, Second District, Division 4.

Dec. 28, 2005.

**Background:** Newspaper filed cross-complaint against advertising company for breach of contract to generate subscriptions of its Web sites of marketing alliance partners. The Superior Court of Los Angeles County, No. BC304506, James R. Dunn, J., granted cross-defendant's motion for reconsideration of order granting newspaper summary judgment. Newspaper petitioned for writ of mandate.

**Holding:** The Court of Appeal, Epstein, P.J., held that no new evidence justified grant of reconsideration.

Petition granted.

**1. Motions** ⚖ 59

A party seeking reconsideration of an order based upon new or different facts, circumstances, or law must provide a satisfactory explanation for the failure to produce the evidence at an earlier time. West's Ann.Cal.C.C.P. § 1008(a).

**2. Appeal and Error** ⚖ 977(1)

A trial court's ruling on a motion for reconsideration of an order is reviewed under the abuse of discretion standard. West's Ann.Cal.C.C.P. § 1008(a).

**3. Judgments** ⚖ 186(1)

Trial court erred in granting motion for reconsideration of summary judgment order in favor of newspaper on cross-complaint against advertising company for breach of contract to generate subscriptions on Web sites of marketing alliance partners, where motion was based on evidence known to it, or available to it, before the summary judgment hearing; the evidence was from depositions of alliance partners obtained by newspaper two days before hearing, and, although the evidence was new to the trial court, it was available to advertising company through the discovery process and was easily obtainable, as demonstrated by the depositions, and there was no satisfactory explanation for the failure to present it to court. West's Ann.Cal.C.C.P. § 1008(a).

**4. Judgment** ⚖ 186.

A continuance of a summary judgment hearing is mandated upon a good faith showing by affidavit that a continuance is needed to obtain facts essential to justify opposition to the motion. West's Ann.Cal. C.C.P. § 437c.

**5. Motions** ⚖ 39

Trial court has the authority to reconsider a previous interim order on its own motion; if it gives notice to the parties that it may do so, and provides a reasonable opportunity to litigate the question. West's Ann.Cal.C.C.P. § 1008(a).

Law Offices of Arnold C. Regardie, Arnold C. Regardie; The Rayman Law Offices of Scott E. Shapiro and Scott E. Shapiro, for Real Party in Interest.

No appearance for Respondent.

EPSTEIN, P.J.

We hold that the trial court, order granting a motion for reconsideration violated Code of Civil Procedure section 1008, authoritatively construed in *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 29 Cal.Rptr.3d 249, 112 P.3d 636 (*Le Francois*), a case decided after the trial court ruling.

1. All statutory references are to the Code of Civil Procedure.

# EXHIBIT "G"

COPY

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT, DIVISION FIVE

In re

**MIKAEL SCHIOLD,**

                          Petitioner-Appellee,

**On Habeas Corpus.**

A103107

San Francisco County Superior Court No. 4523
The Honorable Ksenia Tsenin, Judge

## SETTLEMENT AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

FRANCES T. GRUNDER
Senior Assistant Attorney General

JULIE L. GARLAND
Supervising Deputy Attorney General

ANYA M. BINSACCA
Supervising Deputy Attorney General
State Bar No. 189613

455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5713
Fax: (415) 703-5843

Attorneys for Respondents/Appellants

COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT, DIVISION FIVE

In re

**MIKAEL SCHIOLD,**

Petitioner-Appellee,

**On Habeas Corpus.**

A103107

### SETTLEMENT AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS

"Releasor":   MIKAEL SCHIOLD

"Releasees":  GRAY DAVIS, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF CALIFORNIA; THE
BOARD OF PRISON TERMS; MICHAEL E. KNOWLES,
IN HIS OFFICIAL CAPACITY AS THE WARDEN OF
MULE CREEK STATE PRISON; AND CAROL A. DALY,
IN HER OFFICIAL CAPACITY AS THE CHAIRPERSON
OF THE BOARD OF PRISON TERMS

1.   Releasor, petitioner-appellee Mikael Schiold, is currently in the
custody of the California Department of Corrections pursuant to his
conviction by guilty plea to second-degree murder while using a deadly
weapon. Schiold's sentence is fifteen years to life plus one year. Schiold is
identified by the Department of Corrections as inmate number D-31112.

2.   The Board of Prison Terms found Schiold suitable for parole on
April 11, 2002. On September 6, 2002, the Governor reversed that decision
and found Schiold unsuitable for parole.

3.   Schiold filed a petition for writ of habeas corpus in San Francisco

1

COPY

Superior Court, Case No. 4523, challenging the Governor's determination that he was unsuitable for parole. The Superior Court granted that petition, and respondents-appellants appealed to the First District Court of Appeal, Case No. A103107.

4.    Releasor and releasees desire to enter into this settlement agreement in order to provide for a recommendation that Schiold be transferred to the custody of Sweden under the Convention on the Transfer of Sentenced Persons in full settlement of all claims which are or might have been the subject of the petition in this case, upon the terms and conditions set forth below.

5.    This release is executed in consideration of the Board of Prison Terms submitting, with its approval, the application of Schiold for custodial transfer to Sweden under Government Code section 12012.1 and the Convention on the Transfer of Sentenced Persons.

6.    Releasor Schiold agrees that upon approval of the transfer by the United States Department of Justice, Sweden, and any other necessary entities, and upon transfer to Sweden, he will stipulate to vacate the San Francisco Superior Court's order granting the petition in Case No. 4523. Releasor Schiold further agrees that pursuant to the satisfaction of the conditions of this paragraph, he will then dismiss the petition in San Francisco Superior Court Case No. 4523.

7.    Releasor and releasees agree to stay Court of Appeal Case No. A103107 pending resolution of this settlement. The stay shall immediately terminate on October 29, 2003 if before that date releasees have not fully complied with their obligations set forth in paragraph 5. Moreover, the stay shall immediately terminate on December 25, 2003 if releasor Schiold is not in Sweden prior to that date. However, with respect to the immediately preceding sentence only, releasees may file a motion to continue the stay

2

COPY

past December 25, 2003 based upon a showing that the transfer process is proceeding expeditiously. If the stay terminates pursuant to the terms of this paragraph, releasor and releasees agree that the filing and service of the opening brief in Court of Appeal Case No. A103107 will be due two weeks after the stay terminates. Releasees agree to voluntarily dismiss that appeal upon releasor's dismissal of the petition described in paragraph 6.

8.    Releasor agrees that he will be held in custody by the government of Sweden until January 1, 2007.

9.    Releasees agree that so long as Schiold and the government of Sweden comply with this agreement, they will take no further action against releasor arising from his conviction in San Francisco County Superior Court Case No. 119276.

10.    Upon full satisfaction of the conditions set forth in paragraph 6, Schiold thereafter fully and forever releases and discharges: the respondents-appellants in the above-captioned case and in San Francisco Superior Court Case No. 4523; the State of California; the California Department of Corrections; the Chairperson of the Board of Prison Terms; and each of their employees, agents, servants, and other representatives, past and present, from all claims, demands, actions, and causes of action, including claims for attorneys' fees, court costs, and other costs of suit, that are or could have been the subject of the petition for writ of habeas corpus in San Francisco Superior Court Case No. 4523. This release expressly does not apply to the obligations set forth in this settlement agreement.

11.    In making this release, Schiold understands and agrees that he relies wholly upon his own judgment, belief and knowledge as to the nature, extent, effect, and duration of liability. The making of this release is without reliance upon any statement or representation of any of the releasees or their agents.

3

COPY

12.    It is expressly understood by Schiold that the approval and submitting of the application for transfer under the Convention on the Transfer of Sentenced Persons referenced in paragraph 5 of this release constitutes a compromise of a disputed claim, and that the releasees expressly deny any and all liability in the above-captioned case.

13.    This agreement shall constitute the entire agreement between releasor and releasees, including attorney's fees, arising from the actions described in paragraph 3, and it is expressly understood and agreed that this agreement has been freely and voluntarily entered into by all parties, and each of them. It may not be altered, amended, modified, or otherwise changed in any respect except by writing duly executed by the parties to this agreement.

14.    This agreement shall be governed by and construed in accordance with the laws of the State of California.

15.    This release is freely and voluntarily made. Schiold has not been influenced to any extent in making this release by any representations or statements made by any of the releasees or their agents except as set out herein.

///

///

4

P.02

COPY

16.    Facsimile signatures shall bind the parties to this agreement.

Date:  10/22/03

ETHAN A. BALOGH
KEKER & VAN NEST
Attorneys for Petitioner-Appellee Mikael Schiold

Date:  10/22/03

ANYA BINSACCA
Supervising Deputy Attorney General
Attorney for Releasees Gray Davis, in his official capacity as Governor of
the State of California; the Board of Prison Terms; Michael E. Knowles, in
his official capacity as the Warden of Mule Creek State Prison; and Carol A.
Daly, in her official capacity as the Chairperson of the Board of Prison
Terms

400094425.wpd

5

# EXHIBIT "H"

1
2
3
4
5
6
7

LAW OFFICES OF
PICONE & DEFILIPPIS
625 North First Street
San Jose, CA 95112

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 26 2006

John A. Clarke, Executive Officer/Clerk
By _____ Deputy

8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                         **FOR THE COUNTY OF LOS ANGELES**

10

11   In re,                              )    Case No.:  BH003529
                                         )    ORDER RE: WRIT OF HABEAS CORPUS
12   ROBERT ROSENKRANTZ,                 )
                                         )
13              Petitioner,              )
                                         )
14          On Habeas Corpus             )
                                         )
15                                       )
                                         )
16       The court has read and considered petitioner's Writ of Habeas Corpus filed on August 17,

17   2005, as well as the return and denial filed in response to the court's order to show cause.

18   Having independently reviewed the record, giving deference to the broad discretion of the Board

19   of Prison Hearings ("Board") in parole matters, the court concludes that the Board's decision

20   denying petitioner parole is not supported by "some evidence."

21       Petitioner is currently serving a sentence of 15 years to life with a two-year firearm

22   enhancement following his 1986 conviction of second degree murder. Petitioner's minimum

23   eligible parole date was January 23, 1996. Petitioner asserts constitutional claims, including the

24   argument that the Board violated its regulations and petitioner's right to due process by its

25   refusal to set a parole date despite its inability to find him unsuitable for parole or to deem him

26   an unreasonable risk to public safety if paroled.

27       On April 25, 2005, the Board denied petitioner parole for one year. In denying petitioner

28   parole, the Board relied upon the circumstances of the commitment offense. When determining

ep                                        1

unsuitability based on commitment offense, the Board may consider as a factor whether the victim was abused, defiled or mutilated during or after the offense. (See Cal. Code Regs., tit. 15, § 2402(c)(1)(C).) Here, the Board found that the victim was "abused" due to "the number of times he was shot and the manner in which he was shot." In addition, the Board concluded that the case "rises to the highest level of second-degree murder." The Board further stated in its decision that the Deputy District Attorney and the Los Angeles Sheriff's Department opposed parole. While the Board is required to consider such opposition (see Penal Code section 3042), that opposition is not a factor on which the Board may rely to deny parole as enumerated in title 15, section 2281 of the California Code of Regulations.

Towards the conclusion of the hearing, the Board summarily mentioned its concern that petitioner is a danger to his brother, Joey. The court finds that this assertion is not only unsupported by the record, but belied by the record, which contains documented evidence that contradicts any fear that the petitioner is a threat to his brother's safety. Furthermore, the court rejects the Board's inference that the absence of yearly supportive letters from petitioner's brother shows that petitioner is a danger to his brother. In fact, the petitioner's denial and traverse draws attention to a recent psychological evaluation addressing and dismissing the Board's concern for the safety of petitioner's brother. However, because this psychological evaluation was not evidence before the Board at the time of petitioner's hearing, the court may not properly rely upon it in reviewing the Board's decision. Regardless, the court finds that there is no evidence in the record that supports the conclusion that petitioner remains a danger to his brother.

The Board's sole reliance on the gravity of the offense to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916.) However, over time, should petitioner continue to demonstrate exemplary behavior and evidence of rehabilitation, denying a parole date simply because of the nature of the commitment offense raises serious questions involving his liberty interest in parole. (*Id.* at p. 917.) Here, petitioner's record is replete with reports of petitioner's exemplary conduct as well as his vocational and educational achievements over a period of many years. Indeed,

1  petitioner is a model prisoner in every respect. A parole decision supported by some evidence

2  may nonetheless abrogate due process if it did not consider and weigh all favorable evidence.

3  (*In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

4      The court finds that petitioner's continual parole denials have been based mainly on the

5  gravity of the commitment offense, the circumstances of which can never change. Therefore, the

6  Board's continued sole reliance on the commitment offense will essentially convert petitioner's

7  original sentence of life with the possibility of parole into a sentence of life without the

8  possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his

9  crime was not serious enough to warrant a denial of parole. (*Irons v. Warden* (E.D. Cal. 2005)

10  358 F.Supp.2d 936, 947.)

11      Prior Board panels have found petitioner suitable for parole. Petitioner was found

12  suitable for parole on June 18, 1996, but a review unit later disapproved the parole grant. At

13  subsequent hearings in 1996, 1997 and 1998, petitioner was found unsuitable for parole based on

14  the gravity of his offense. On September 9, 1999, petitioner was found unsuitable for parole but

15  the panel set his prison term. On November 18, 1999, Governor Davis reversed petitioner's

16  parole grant. On June 30, 2000, a new panel found petitioner suitable for parole, but Governor

17  Davis reversed its decision on October 28, 2000. Petitioner has now served in excess of the

18  maximum term for both second degree and first degree murder. Therefore, the commitment

19  offense should no longer function as a factor for unsuitability and in that case, it should no longer

20  operate as "some evidence" to support the Board's parole denial. Petitioner has reached the

21  point in which the denial of parole can no longer be justified by reliance on his commitment

22  offense. The Board's continued reliance on the circumstances of the offense runs contrary to the

23  rehabilitative goals espoused by the prison system and has violated petitioner's due process.

24  //

25  //

26  //

27  //

28  //

ep                                      3

1      Therefore, this court orders that the petition for writ of habeas corpus be, and hereby is,

2  granted.

3

4  June 26, 2006

5

6                                DAVID S. WESLEY

7                                  Judge of the Superior Court

8  Clerk to give notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ep                            4

# EXHIBIT    "I"

(b) Matrix of Base Terms for First Degree on or after November 8, 1978.

**CIRCUMSTANCES**

| FIRST DEGREE MURDER<br>Penal Code § 189 (in years and does not include post conviction credit as provided in § 2290) | A. Indirect<br>Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force, e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution<br>Death was almost immediate or resulted at least partially from contributing factors from the victim, e.g., victim initiated struggle or had goaded the prisoner. This does not include victims acting in defense of self or property. | C. Severe Trauma<br>Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. | D. Torture<br>Victim was subjected to the prolonged infliction of physical pain through the use of continually brutal prior to act resulting in death. |
|---|---|---|---|---|
| I. Participating Victim<br>Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 25–26–27 | 26–27–28 | 27–28–29 | 28–29–30 |
| II. Prior Relationship<br>Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 26–27–28 | 27–28–29 | 28–29–30 | 29–30–31 |
| III. No Prior Relationship<br>Victim had little or no personal relationship with prisoner; or motivation for act resulting in was related to the accomplishment of another crime, e.g., death of victim during robbery, rape, or other felony. | 27–28–29 | 28–29–30 | 29–30–31 | 30–31–32 |
| IV. Threat to Public Order or Murder for Hire<br>The act relating to the victim's death constituted a threat to the public order include the murder of a police officer, prison guard, public official, fellow patient or prisoner, any killing within an institution, or any killing where the prisoner hired and/or paid another person to commit the offense. | 28–29–30 | 29–30–31 | 30–31–32 | 31–32–33 |

**SUGGESTED BASE TERM**

(c) Matrix of Base Terms for Second Degree Murder on or after November 8, 1978.

**CIRCUMSTANCES**

| SECOND DEGREE MURDER<br>Penal Code § 189 (in years and does not include post conviction credit as provided in § 2290) | A. Indirect<br>Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force, e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution<br>Death was almost immediate or resulted at least partially from contributing factors from the victim, e.g., victim initiated struggle or had goaded the prisoner. This does not include victims acting in defense of self or property. | C. Severe Trauma<br>Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. |
|---|---|---|---|
| I. Participating Victim<br>Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 15–16–17 | 16–17–18 | 17–18–19 |
| II. Prior Relationship<br>Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 16–17–18 | 17–18–19 | 18–19–20 |
| III. No Prior Relationship<br>Victim had little or no personal relationship with prisoner; or motivation for act resulting in death was related to the accomplishment of another crime, e.g., death of victim during robbery, rape, or other felony. | 17–18–19 | 18–19–20 | 19–20–21 |

**SUGGESTED BASE TERM**

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

HISTORY

1. Editorial correction filed 10–8–81; effective thirtieth day thereafter (Register 81, No. 41).

2. Amendment of subsection (a) filed 1–20–88; operative 2–19–88 (Register 88, No. 5).

§ 2404.  Circumstances in Aggravation of the Base Term.

(a) General. The panel may impose the upper base term or another term longer than the middle base term upon a finding of aggravating circumstances. Circumstances in aggravation of the base term include:

(1) The crime involved some factors described in the appropriate matrix in a category higher on either axis than the categories chosen as most closely related to the crime;

(2) The victim was particularly vulnerable;

(3) The prisoner had a special relationship of confidence and trust with the victim, such as that of employee–employer;

(4) The murder was committed to preclude testimony of potential or actual witnesses during a trial or criminal investigation;

(5) The victim was intentionally killed because of his race, color, religion, nationality or country or origin;

(6) During the commission of the crime the prisoner had a clear opportunity to cease but instead continued;

EXHIBIT

PROOF OF SERVICE BY MAIL

I, Raul Moyers, declare that;

I am over 18 years of age and that I am the pro per Petitioner to the attached cause of action. My complete mailing address is: Raul Moyers, E-17403, Box 689 F-252L, California State Prison at Soledad, CA 93960-0689.

That I served a true and correct copy (original to the court) of the attached:

PETITION FOR WRIT OF HABEAS CORPUS

to the following party(ies), with postage fully prepaid and deposited said documents in the prison (U.S. Mail) bod addressed to:

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCOSCO, CA 94102

I declare under penalty of perjury that the foregoing is true and correct, executed this _25_ day of _March_ , 2008 at Soledad, California.

Raul Moyers

RAUL MOYERS E-17403
P.O. Box 689  F-252L
Soledad, CA 93960-0689

OFFICE OF THE CLERK
UNITED STATES DISTRICT CO
NORTHERN DISTRICT OF CALIFO
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA  9410?